**In the Matter of HOLLY'S, INC., d/b/a Holly's Landing, Holly's Bistro, Holly's By Golly!, Grazin' in the Brass, Holiday Inn Expressway, Holiday Inn West, Holiday Inn–Grand Rapids South, Holiday Inn–Grand Rapids North, Holly's Holiday Lanes, Holiday Inn–Grand Rapids East, Econolodge–Grand Rapids, Econolodge–Muskegon, Meadowwood Country Club, Nob Hill Bakery, Division Laundry, Holly's Back Door Bar & Grill, Escapades, and formerly**

d/b/a Holly's Hotel, J.C. Grundy, Shade Tree, Cafe Amolfi, Holly's Commissary, Holly's Steak & 4, Marriott Hotel, Holly's At The Inn, Holly's Suburban, Ristorante Holly's, Rodeway Inn–Grand Rapids, Debtors.

The SUMITOMO TRUST & BANKING CO., LTD., LOS ANGELES AGENCY, Movant,

v.

HOLLY'S, INC., Debtor-in-Possession, Respondent.

In the Matter of GRAND RAPIDS HOTEL LIMITED PARTNERSHIP, d/b/a Holiday Inn Crowne Plaza, Debtor.

The SUMITOMO TRUST & BANKING CO., LTD., LOS ANGELES AGENCY, Movant,

v.

GRAND RAPIDS HOTEL LIMITED PARTNERSHIP, d/b/a Holiday Inn Crowne Plaza, Debtor-in-Possession, Respondent.

Bankruptcy Nos. GG91–84931, GG91–85811. Motion No. 91–861 R.

United States Bankruptcy Court, W.D. Michigan.

April 28, 1992.

648

Jeffrey R. Hughes, Grand Rapids, Mich., for Holly's, Inc.

Harold E. Nelson, Grand Rapids, Mich., for Grand Rapids Hotel Ltd. Partnership, d/b/a Holiday Inn Crowne Plaza.

Patrick E. Mears, Grand Rapids, Mich., Jeffrey R. Hudson, Los Angeles, Cal., Bruce Ortwine, New York City, and Robert Nelson, for Sumitomo Trust & Banking Co., Ltd., Los Angeles Agency.

Perry Pastula, Wyoming, Mich., for the creditors' committee of Holly's, Inc.

## OPINION

JAMES D. GREGG, Bankruptcy Judge.

### I. ISSUES

The two chapter 11 debtors entered into a prepetition hotel management agreement which has not yet been assumed or rejected. The management agreement provides that all management fees earned by the debtor which manages the hotel shall be subordinated to a bank in the event the debtor which owns the hotel is in default on its obligations to the bank. Is the management agreement, and the asserted subordination clauses therein, enforceable postpetition in connection with the debtors' chapter 11 cases? Should the debtors be compelled to assume or reject the management agreement prior to possible confirmation of their respective plans? Does cause exist to modify the automatic stay to permit the bank to take action to collect the postpetition management fees and apply those fees toward partial satisfaction of its prepetition indebtedness?

Does cause exist to modify the automatic stay in favor of the bank because of the debtors' alleged prepetition or postpetition mismanagement and fraud? Does cause exist to modify the automatic stay in favor of the bank, as an undersecured creditor, because the debtors' failure to pay, or hold in escrow sufficient funds to pay, postpetition real and personal property taxes respecting the bank's collateral?

Given that there exists no equity in the property which serves as the bank's collateral, should the automatic stay be modified because the property is not necessary to the debtors' effective reorganization? What standards should the court apply to determine whether an effective reorganization is in prospect?

### II. JURISDICTION

This court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding in accord-

ance with 28 U.S.C. § 157(b)(2)(A), (G), and (O). However, to the extent that this court must interpret state law and the matter may be a noncore, related proceeding, the parties have impliedly consented to this court entering a final order. *DuVoisin v. Foster (In re Southern Indus. Banking Corp.)*, 809 F.2d 329, 331 (6th Cir.1987) (absence of a timely objection constitutes implied consent to the bankruptcy court entering a final order); *Cain Partnership, Ltd. v. Pioneer Inv. Servs. Co. (In re Pioneer Inv. Servs. Co.)*, 946 F.2d 445, 449–50 (6th Cir.1991) (failure to object regarding lease issues raised under Tennessee law constituted implied, if not express, consent to final order in noncore but related proceeding). This court therefore determines it has the authority to enter a final order in this contested matter. 28 U.S.C. § 157(c)(2). The following constitutes the court's findings of fact and conclusions of law. FED.R.BANKR.P. 7052.

### III. PROCEDURAL BACKGROUND

Holly's, Inc. ("Holly's") filed a petition for relief under chapter 11 of the Bankruptcy Code on September 13, 1991. Six days later, on September 19, 1991, the Sumitomo Trust & Banking Co., Ltd., Los Angeles Agency ("Sumitomo" or "Bank") filed its Motion for Relief From Automatic Stay and for Other Related Relief against Holly's. Sumitomo has requested the following relief: (1) modifying the automatic stay to permit commencement of a state court action for appointment of a receiver for certain hotel collateral known as the Holiday Inn Crowne Plaza ("Crowne Plaza", "hotel property" or "hotel facility") to the extent Holly's has an interest in the collateral; (2) modifying the automatic stay to permit commencement of a state court action to foreclose upon the Crowne Plaza real and personal property; (3) compelling Holly's to reject a certain management agreement for the Crowne Plaza immediately or, in the alternative, directing Holly's to assume or reject the agreement before a date certain; and (4) granting such

other relief as may be just and proper. A preliminary hearing was held on October 8, 1991 and a final hearing was scheduled for November 8, 1991.

Grand Rapids Hotel Limited Partnership, d/b/a Holiday Inn Crowne Plaza ("the Partnership")[1] filed its petition for relief under chapter 11 of the Bankruptcy Code on October 29, 1991. Seven days later, on November 5, 1991, Sumitomo filed a Motion for Relief From Automatic Stay and for Other Related Relief against the Partnership. Sumitomo requested the following relief: (1) modifying the automatic stay to allow Sumitomo to commence a state court action for appointment of a receiver for the Crowne Plaza, enforcement of an assignment of rents and other hotel revenues, and foreclosure upon the Crowne Plaza; (2) compelling the Partnership to reject its management agreement with Holly's immediately or, in the alternative, to direct the Partnership to assume or reject the agreement before a date certain; (3) obtaining a declaratory judgment that the Partnership is prohibited and permanently enjoined from paying management fees to Holly's; and (4) granting such further relief that is just and proper.

On November 7, 1991, Sumitomo, Holly's, the Partnership, and the Creditors' Committee in Holly's chapter 11 case, filed a Stipulation for Consolidating Contested Matters and Regulating Other Procedures in Related Contested Matters. The parties requested the court to consolidate Sumitomo's motion against Holly's and its motion against the Partnership. An order authorizing the consolidation of the contested matters was entered on November 18, 1991.

On November 13, 1991, Sumitomo filed an Amended Motion for Relief From Automatic Stay and for Other Related Relief against the Partnership. The only difference between the original motion and the amended motion is that Sumitomo has asserted the Partnership lacks equity in the

---

**1.** In this opinion, to the extent necessary, Holly's and the Partnership are sometimes collectively referred to as the "Debtors".

Crowne Plaza and it is not necessary for an effective reorganization.

On November 21, 1991, Sumitomo filed an Amended Motion for Relief From Automatic Stay and for Other Related Relief against Holly's. In this amended motion, Sumitomo has separated its claims against Holly's into three counts regarding relief from the automatic stay, rejection of the management agreement, and declaratory and injunctive relief. Sumitomo asserts that cause exists to lift the automatic stay. Sumitomo also requests a declaratory order that Holly's is prohibited and enjoined from accepting any payment of management fees from the Partnership.

The final hearing began on November 25, 1991. On January 7, 1992, after seven days of trial, proofs were closed.[2] During the trial, the court heard the testimony of eight witnesses. The court admitted seventy-six exhibits into evidence (fifty-four by Sumitomo, eighteen by Holly's, and four by Crowne Plaza).

At the conclusion of the evidence, final oral arguments were scheduled for February 12, 1992. The parties were required to file proposed findings of fact and proposed conclusions of law. In addition, the Debtors were required to file written offers of adequate protection; Sumitomo was given an opportunity to respond. The parties were permitted, but not required, to file supplemental post-hearing memoranda of law.[3] Holly's and the Partnership filed a Joint Offer of Adequate Protection on January 17, 1992. Sumitomo filed a Response to Joint Adequate Protection Offer on January 22, 1992. On January 24, 1992, Holly's and the Partnership filed Joint Proposed Findings of Fact. On the same date, Sumitomo filed its Proposed Findings of Fact.

## IV. WITNESSES AND CREDIBILITY

During the hearing of the consolidated contested matters, the court heard testimony from eight witnesses. To better comprehend this opinion, it is helpful to identify the witnesses and assess the credibility of their testimony.

First, it is necessary to identify a person who was *not* a witness at the hearing but who was figuratively present throughout the proceedings. Frank Krok ("Krok") was the prior Chief Executive Officer and major (or sole) shareholder of Holly's. He was also the controlling insider of the Partnership which acquired the hotel property. Krok committed suicide, by gunshot, on June 10, 1991, apparently during the early morning hours. Nearly all witnesses, to a greater or lesser degree, testified about Krok's actions and business involvement with the Debtors.

Based upon the testimony of the witnesses, described herein later, the court believes Krok was an unstable and mercurial individual. In accordance with all testimony, the court also finds Krok mismanaged Holly's and the Partnership prior to his death. The court believes, in accordance with testimony based upon preponderance of evidence, that Krok wrongfully represented the involvement of other persons on certain Partnership documents which were submitted to Sumitomo. To a great degree, until his death, Krok kept other executives employed by Holly's and the Partnership in the dark regarding the Debtors' serious financial problems. Although other persons may have had an inkling of the Debtors' financial difficulties, it was not until after Krok's death that the true nature and extent of the Debtors' precarious financial situation was realized.

Michael D. Elliston ("Elliston") is the Vice President of Finance and the Secre-

---

**2.** Due to the court's schedule, it was unable to give the parties seven consecutive days of trial. The actual trial days were: November 25, 1991; November 26, 1991; November 27, 1991; December 20, 1991; December 23, 1991; January 6, 1992; and January 7, 1992.

**3.** The fervor of the litigation between these parties is partially shown by the fact a total of 12

briefs have been submitted on the issues before the court. Sumitomo has submitted six briefs. Holly's and the Partnership have each submitted three briefs. The court commends the attorneys involved in this contested matter. They have all performed excellently and civilly in light of the complexity of the issues.

tary of Holly's. He holds a B.A. degree in business administration and is a certified public accountant. He was previously employed, commencing in 1983, with Ernst & Whinney, an accounting firm. Elliston was first employed by Holly's shortly after Krok's death in June, 1991; he inherited a substandard and nightmarish accounting system which he is now in the process of revamping. Elliston testified regarding the Debtors' finances, including income and liabilities, and the past and anticipated future record-keeping procedures of the Debtors. The court finds Elliston to be a credible witness.

George Alexander Azar ("Mr. Azar") is an Executive Vice President of Azar's, Inc. Food and Lodging Services ("Azar's"). Azar's operated the hotel property prior to termination of its management contract in November, 1990. Mr. Azar generally testified regarding the prepetition management of the Partnership's hotel until Holly's took responsibility for the entire management of the business operations. For reasons not fully known, Mr. Azar's testimony appeared somewhat guarded upon occasion [4]; however, his testimony regarding Krok's management style was candid. The court finds Mr. Azar to be a credible witness.

Christopher Cooper ("Cooper") was previously an employee of Azar's. He has an undergraduate degree from a college in Auckland, New Zealand. After locating in the United States and being employed in the hotel industry since 1976, he obtained further certification in hotel management from Michigan State University in 1990. Cooper was the on-site general manager of the Partnership's hotel property from November, 1989, to November, 1990. He testified regarding the business operations of the hotel property during his tenure as the general manager for Azar's. His testimony regarding the hotel's daily business operations and Krok's management style was direct and objective. The court finds Cooper to be a credible witness.

Pieter Lion ("Lion") is the Vice President of Operations for Holly's. He has been employed by Holly's since April 4, 1991. Lion has extensive business experience in hotel management since 1974, including serving as a general manager for a hotel and acting in a supervisory capacity for Holiday Inn, Inc. He testified, among other things, about Holly's various hotel businesses and the sales marketing efforts regarding the Partnership's hotel property. Testimony was also given respecting the status of the on-going conversion of the hotel property from a Marriott franchise to a Holiday Inn Crowne Plaza franchise.

On direct examination, Lion volunteered information and answered the question posed, as well as all other possibly related questions, in a run-on style. Normally, this type of answers might create concern regarding a witness' credibility. However, on cross-examination Lion answered questions in a similar fashion, albeit sometimes argumentatively. The court believes that Lion was generally attempting to be helpful rather than being self-serving. The court finds Lion to be a credible witness.

Jay Ahrens ("Ahrens") became the President and Chief Executive Officer of Holly's in July, 1991. After obtaining a physics degree from Muhlenberg College, receiving a M.B.A. degree from Wharton College, and serving in the Air Force for five years, he worked for Salomon Brothers from 1974 to 1988. He was first employed by Holly's in March, 1988, as an executive vice president to investigate, review, and obtain financing for acquisitions. Ahrens was actively involved in negotiating the purchase of the Partnership's hotel property and in obtaining financing from Sumitomo to complete the acquisition in July, 1989. Ahrens testified regarding the purchase of the hotel property, Holly's relationship with Sumitomo, the Debtors' prepetition operational business problems and deficiencies, and the general goals of the Debtors in their efforts to reorganize under chapter 11 of the Bankruptcy Code.

---

**4.** Mr. Azar testified that his company now asserts claims against Holly's and Holly's has asserted claims against Azar's; also, in passing, Mr. Azar mentioned his company might have an interest in acquiring the hotel property.

Ahrens appears to be an intelligent, savvy, and somewhat salesmanlike person with business acumen. His management style is "big picture" and he willingly delegates authority to others. Although he has no extensive experience in day-to-day hotel management, he readily acknowledged that he consults with and sometimes defers to hotel specialists, including Lion, regarding hotel operations business decisions.

Before Krok's death, Ahrens transmitted the Partnership's financial information to Sumitomo as was requested from time to time. He did not prepare the Partnership's financial information and he did not warrant its accuracy to Sumitomo's loan officer, although he believed the financial information was accurate. Almost immediately after Krok's death, upon review of Holly's and the Partnership's financial circumstances, Ahrens informed Sumitomo of the Debtors' major economic difficulties, including cash flow problems and tax arrearages. The court finds Ahrens to be a credible witness.

Ninoos Benjamin ("Benjamin") is a Vice President for Business Operations at Sumitomo; in effect he is the loan officer charged with monitoring the Partnership's obligations. He attended college at London University in London, England. He holds a M.A. degree in economics from Westminster College in Salt Lake City, Utah. Benjamin was previously employed by Coopers & Lybrand, an accounting firm, and he appears knowledgeable in accounting practices and methodology. He was first employed by Sumitomo in January, 1986. Benjamin negotiated with Krok and Ahrens regarding Sumitomo's financing of the purchase of the hotel property by Holly's. He requested the creation of a separate entity, the Partnership, for purposes of the transaction.

Benjamin testified about Sumitomo's financing relationship with the Partnership and various post-lending business communications with representatives of Holly's

and the Partnership. Benjamin is Sumitomo's key witness to support its assertions that cause exists to modify the automatic stays in the chapter 11 cases.

During his testimony, Benjamin occasionally appeared very nervous. On direct examination, he appeared businesslike, articulate and sane. However, on cross-examination, he was alternately defensive, wishy-washy, aggressive, argumentative (hot-headed on at least one instance), and, regarding his version of the facts, partially inconsistent.

Notwithstanding his demeanor, the court, with reservations, believes Benjamin to be a credible witness in many respects. However, some of his testimony is given lesser weight than the testimony of other witnesses. The court finds it curious and strange that Benjamin prepared and maintained almost no written substantially contemporaneous notes or memoranda regarding his version of asserted facts relating to Sumitomo's lending relationship and business conversations with the Debtors. This failure is somewhat inexplicable given Benjamin's own testimony that it was his practice to prepare a written "contact report" whenever he received "material information" for Sumitomo's management "to know". Notwithstanding this asserted practice, no contact reports were prepared by Benjamin prior to Krok's death in June, 1991.[5] (*See* Trial Transcript January 7, 1992, at 49–50.) The court may have accorded Benjamin's testimony greater weight regarding his factual assertions for the time period prior to Krok's death if Benjamin had some written corroboration regarding his testimony. *Cf. In re Sabec*, 137 B.R. 659, 670 (Bankr.W.D.Mich.1992), citing *In re Taylored Prods.*, 5 U.C.C.Rep. Serv. (Callaghan) 286, 293 (Bankr. W.D.Mich.1968) (recognizing that a "scrap of paper" is often entitled to much greater weight than a witness' faded memory of events years' passed). With regard to those contested facts which occurred prior

---

**5.** The court finds that during the period of January to June, 1990, Benjamin was advised in writing of the Partnership's cash flow problems, hotel franchise agreement defaults, and unpaid suppliers. After receiving this information, which the court believes to be material, no contact report or other file writing was prepared by Benjamin.

to Krok's death, the court considers other witnesses' testimony, who have corroborated each other, more compelling.

Steven Jorns ("Jorns") is the President of American General Hospitality Inc., a hotel management company. He has an extensive educational and practical background in the hotel industry. His company now manages approximately thirty to forty hotels in approximately twenty states and earns roughly $125 million in annual revenues. Jorns was found qualified to give expert opinion testimony. FED.R.EVID. 702. His testimony generally covered proper hotel management procedures, management fees within the industry, marketing strategies, the past and future anticipated business climate in the hotel industry, the Debtors' operations and business projections, and an operator's sensitivity to possible conflicts of interest in managing competing hotels within the same geographical market.

This judge was impressed with Jorns' testimony. He answered all questions in a businesslike, even-handed fashion. Although he admitted that his company might be retained by Sumitomo to operate the hotel property if relief from stay is granted, his testimony was unbiased. The court finds Jorns to be a credible witness whose expert opinions were helpful.

Wanda L. Spencer ("Spencer") is the principal and owner of the Spencer Group. She serves as an independent consultant who is involved in hotel market studies, appraisals, and budgeting operations in the Michigan geographical area. She was previously employed by BDO Seidman in its hospitality consulting division. In 1988, while employed by that firm, Spencer provided services to Holly's in connection with its acquisition of the Partnership's hotel property. Spencer was found qualified to give expert opinion testimony. FED.R.EVID. 702.

Her testimony generally covered competition within the Grand Rapids, Michigan, hotel market, the impact of converting the hotel property from a Marriott franchise to a Holiday Inn Crowne Plaza franchise, and the Debtors' operations and business projections. The court finds Spencer to be a credible witness whose expert opinions were helpful in part.

## V. FACTS

Holly's is a Michigan corporation which owns and operates hotels and other businesses in west Michigan.[6] The hotels owned and operated by Holly's in the Grand Rapids area include the Holiday Inn—South; the Holiday Inn—North; the Holiday Inn—East and; the Econolodge. (*See* Schedule A of Holly's Voluntary Petition.) Holly's also operates the Crowne Plaza in Grand Rapids pursuant to a management agreement with the Partnership.

From 1986 to June 10, 1991, the President and controlling shareholder of Holly's was Krok. The testimony of several witnesses indicates that Krok could be a difficult person to deal with on a professional level. Krok was referred to as a "bully", a "raving lunatic", and "not a professional manager"; yet he was also described as "charming" and "intelligent". (*See* Trial Transcripts November 25, 1991, at 167–68; November 27, 1991, at 33.) Holly's executives characterized Krok as a chief executive officer operating a complex business as a sole proprietor would.[7] He was very

---

**6.** Holly's current and past business assumed names are listed on the caption of its case.

**7.** This characterization is corroborated by the testimony of two witnesses called by Sumitomo. Mr. Azar testified that on one occasion he had scheduled a meeting with Krok to introduce a new Azar's vice president to him. On the day of the meeting, a terrible snow storm had hit Grand Rapids. Krok entered the hotel for the meeting and became extremely irritated because the Marriott signs had not been cleaned off even though the snow was still steadily falling. A heated argument pursued which almost resulted in a fist fight between Mr. Azar and Krok. (Trial Transcript November 25, 1991, at 168.)

Cooper, a former Azar's employee and manager of the Marriott, also testified that "little things tended to upset Mr. Krok." (Trial Transcript November 26, 1991, at 31.) For example, he witnessed Krok throw a ladder into a hotel lobby full of people because some employees were changing light bulbs there at a busy time of the day. Additionally, Cooper testified that he occasionally received phone calls after mid-

"entrepreneurial" and unable to delegate authority well. (*See* Trial Transcript November 27, 1991, at 72–74.) He hired executives and subsequently hindered their ability to make decisions and perform the functions they were employed to do.[8] Krok committed suicide on June 10, 1991.

Ahrens began employment with Holly's in March, 1988, as Executive Vice President and Vice Chairman.[9] (*See* Trial Transcript November 27, 1991, at 66.) Ahrens was originally hired to evaluate and assist Holly's in acquiring additional hotel properties and other businesses. (*See* Trial Transcript November 27, 1991, at 67–68.) Ahrens was able to perform these functions for Holly's and still maintain his residence in New Jersey. In September of 1990, Ahrens moved to Grand Rapids because "[t]he capital markets had shut down effec-

tively and ... the ability to do acquisitions had come to a stop." (*See* Trial Transcript November 27, 1991, at 68.)

Ahrens' role with Holly's from the time he moved to Grand Rapids until Krok's death was somewhat uncertain and ambiguous. He testified that his duties became more "general" after moving to Grand Rapids. He took a much more "macro" view of the company. Krok wanted Ahrens to help restructure and operate the company. (*See* Trial Transcript November 27, 1991, at 69.) Ahrens testified that Holly's had major problems with its corporate structure. He believed that Krok's style of operating Holly's and his inability to delegate authority was not efficient.[10] Ahrens also assisted the corporate sales group, had contact with lenders "from time to time"[11], and negotiated with numerous

---

night from an intoxicated Krok, Krok frequently threatened him with his job, and that the employees were generally scared of Krok. (Trial Transcript November 25, 1991, at 30–31.)

8. Witnesses testified to particular examples of Krok's management style and personality. For example, Lion and Krok disagreed on the performance of the general manager of the Holiday Inn—East. Lion felt that the general manager was doing an excellent job and wanted to keep him involved in the property. Additionally, Lion felt it was his corporate duty to make decisions regarding hotel personnel. Krok did not like the general manager as an individual and wanted to dismiss him. Krok refused to listen to Lion yet did not terminate the general manager. Instead he bet Lion $50 he could force the general manager to resign by making his job miserable and intolerable. The general manager refused to quit and Krok eventually terminated him. (*See* Trial Transcript November 27, 1991, at 34–35.)

9. Prior to employment with Holly's, Ahrens was employed as an investment banker with Salomon Brothers in Philadelphia and New York City for 14 years. While with Salomon Brothers, Ahrens worked in several capacities including managing a corporate coverage department, managing a commodities group, and managing a subsidiary of the corporate finance group involving capital markets. Krok and Ahrens met in 1986 when Salomon Brothers assisted Krok in the acquisition of Holly's. (*See* Trial Transcript November 27, 1991, at 63–66.)

10. Ahrens testified that:

[Krok] recognized the weakness of how he was running [Holly's] but he just never would

seem to let go. He ... always wanted to get involved ... in all parts at too level a detail. We used to go out on sales calls which for a chief executive officer to go out and start talking to people about ... booking room nights doesn't seem like a very efficient way for a chief executive officer to use his time. (Trial Transcript November 27, 1991, at 74.)

11. The parties disagree on how much contact Ahrens had with Sumitomo after moving to Grand Rapids. Sumitomo asserts that Ahrens was Sumitomo's primary contact. The Debtors maintain that Ahrens was not designated as Sumitomo's contact for the Crowne Plaza.

Prior to moving to Grand Rapids, Ahrens was admittedly involved in the negotiations with Sumitomo to obtain the financing for the hotel. (*See* Sumitomo Exhibit 18; Trial Transcript November 27, 1991, at 70–71.) After moving to Grand Rapids in September, 1990, Ahrens testified that he had no specific responsibilities related to the Crowne Plaza. During the conversion from a Marriott to a Crowne Plaza, he occasionally went to the hotel to check on the progress of the project. Ahrens testified that Sumitomo would contact him requesting financial information, he would notify Krok of the request, and then apparently he or Krok would send the information to Sumitomo. (*See* Trial Transcript November 27, 1991, at 88–89.)

Benjamin testified that he would contact Ahrens for financial information because he did not feel comfortable with Krok's knowledge of financial matters. He maintains that from the time Holly's acquired financing from Sumitomo, Ahrens has always been Sumitomo's primary contact with the Debtors. (Trial Transcript December 20, 1991, at 70.) The Mortgage Agreement states that notices are to be sent to

unpaid creditors. (*See* Trial Transcript November 27, 1991, at 69–74.) Ahrens testified that his ability to make independent management decisions was severely hindered by Krok's management style. He "would not make any decision without consulting Frank [Krok]". (*See* Trial Transcript November 27, 1991, at 73.) According to Ahrens, his primary role with Holly's was as an "advisor" to Krok. The court finds that, until his death, Krok exclusively controlled all the Debtors' major business operations. Ahrens had no substantial independent control over the Debtors' operations.

Holly's acquired the Grand Rapids Marriott ("the Marriott") in March, 1989 from Centennial Park Hotel Corporation ("Centennial").[12] Azar's was the manager of the property at that time. Upon acquiring the Marriott, Holly's, Azar's and Centennial executed an Assignment and Assumption of Management Agreement which authorized Azar's to continue managing the property.[13] (*See* Sumitomo Exhibit 35–4 & 35–6.) An appraisal of the Marriott was completed in February, 1989 on behalf of Holly's by BDO Seidman. (*See* Sumitomo Exhibit 55.) According to the BDO Seidman appraisal, as of December, 1988, the going concern value of the Marriott was $24,600,000. (*See* Sumitomo Exhibit 55, at 2.)

After the purchase of the Marriott, Holly's contacted Boettcher & Company ("Boettcher"), an investment banking firm located in Denver, Colorado, to procure refinancing of the property. Boettcher approached Sumitomo regarding the refinancing effort. (*See* Trial Transcript December 20, 1991, at 39.) Sumitomo became interested in refinancing the property and subsequently sent Holly's a commitment letter dated July 12, 1989. (Sumitomo Exhibit 18.) The negotiations for the financing were conducted on behalf of Sumitomo by Benjamin. Sumitomo relied on the appraisal by BDO Seidman to determine the value of the property.

In order to obtain refinancing from Sumitomo, among other prerequisites, Holly's was required to establish a wholly owned subsidiary as the actual borrower of the monies from Sumitomo. To satisfy this requirement, Holly's established the Partnership. The Partnership is a Michigan limited partnership and owner of the Crowne Plaza. GRM Hotel, Inc., a subsidiary of Holly's, is the Partnership's general partner.[14] (*See* Partnership's Amended Statement of Financial Affairs.) There is conflicting testimony and evidence regarding the Partnership's other limited partners. The Partnership's Statement of Financial Affairs lists Holly's as the sole limited partner. (*See* Partnership's Statement of Financial Affairs.) Yet, the Partnership's Agreement of Limited Partnership dated July 31, 1989, and the Certificate of Limited Partnership filed with the Michigan Department of Commerce on July 27, 1989 lists Jay Ahrens and JAM Management Company as limited partners.[15] (*See*

the Partnership's Vice President of Finance and that financial information is to be certified by the Partnership's Chief Financial Representative. (Sumitomo Exhibit 35–1, at 25, 57.) Ahrens did *not* hold either of these titles.

12. At the time Holly's acquired the Marriott, Ahrens was employed by Holly's and living in New Jersey. He assisted Krok in the acquisition of the Marriott which eventually was converted to the Crowne Plaza. (*See* Trial Transcript November 27, 1991, at 70.)

13. Azar's had managed the Marriott since 1980. (*See* Sumitomo Exhibit 47, at 6.)

14. GRM Hotel, Inc. filed its Articles of Incorporation with the Michigan Department of Commerce on July 25, 1989. (Sumitomo Exhibit 35–19.)

15. Neither the Agreement of Limited Partnership nor the Certificate of Limited Partnership was actually signed by Ahrens. Krok signed both documents as President of GRM Hotel, Inc. and "attorney in fact" for the limited partners. (*See* Sumitomo Exhibits 15 & 35–22.) Ahrens testified that he is not a limited partner of the Partnership, he never made any form of investment in the Partnership, and never signed any agreement to be a limited partner in the Partnership. (*See* Trial Transcript November 27, 1991, at 92.) Additionally, Ahrens testified that JAM Management Company is not and never was a limited partner of the Partnership. (*See* Trial Transcript November 27, 1991, at 92.)

On October 29, 1991, a Certificate of Amendment was filed with the Michigan Department of Commerce amending the Certificate of Limited Partnership to list Holly's as the only limited

Sumitomo's Exhibits 15 & 35–22.) Based upon the preponderance of evidence and Ahrens testimony, the court finds that Ahrens was not a limited partner of the Partnership.[16]

As an additional condition of obtaining the refinancing, Azar's was required to subordinate its management fee to Sumitomo. (Sumitomo Exhibits 18 & 47.) Because Azar's refused to subordinate its management fee, Holly's and Sumitomo agreed that Holly's would deposit $300,000 in a management fee reserve account to secure payment of the management fee. (Sumitomo Exhibit 19.) The management fee reserve account was established to ensure payment of future management fees and to avoid any form of possible senior security interest by Azar's ahead of Sumitomo. (Sumitomo Exhibit 48.) If funds were used from the management fee reserve account to pay Azar's, the account would have to be replenished by the Partnership.

The Loan Documents[17] were executed on July 27, 1989. (*See* Sumitomo Exhibit 35.) Sumitomo advanced the Partnership $14,-800,000 to be repaid by interest payments over five years with a balloon payment being due on August 1, 1994. (Sumitomo Exhibit 35–3.) As collateral for the loan, the Partnership granted Sumitomo a mortgage lien in the real estate, buildings, improvements and fixtures owned by the Partnership and an assignment of all accounts, fees, rents, royalties, profits and income derived from the property. (Sumitomo Exhibit 35–1.) The Partnership also granted Sumitomo security interests in all personal property and fixtures. (Sumitomo Exhibits 35–11 to 35–13.)

In early 1990, the relationship between the Partnership and Azar's became strained. The Partnership and Holly's accused Azar's of mismanaging the Marriott. (*See* Sumitomo Exhibit 9; Holly's Exhibit 12.) Azar's, on the other hand, claimed that, although the Marriott was generating sufficient revenues to pay its obligations, many creditors were not being paid and were insisting upon C.O.D. payments.[18] (*See* Sumitomo Exhibit 9; Holly's Exhibit 12; Trial Transcript November 25, 1991, at 135, 150.) Although Holly's was responsible for managing the cash requirements of the Marriott, a segregated account was not opened for the Partnership.[19] Sumitomo was aware of the escalating problems between Azar's and Holly's.[20]

In late July, 1990, Krok contacted Benjamin requesting Sumitomo's consent to (1)

partner of the Partnership. (*See* Sumitomo Exhibit 32.)

**16.** The evidence is that Krok signed both the Certificate of Limited Partnership and the Agreement of Limited Partnership on behalf of Ahrens pursuant to a power of attorney contained in the Agreement of Limited Partnership. (*See* Sumitomo Exhibit 15, at 26.) No cogent evidence exists that Ahrens consented to Krok having power of attorney or authorized Krok to sign the Certificate of Limited Partnership and Agreement of Limited Partnership on his behalf.

**17.** The documents necessary to effectuate the loan between Sumitomo and the Partnership are contained in a metropolitan telephone book-sized binder containing 31 separate documents. (*See* Sumitomo Exhibit 35.) The court will refer to these documents collectively as the "Loan Documents". In the course of this opinion, the court will also refer to individual documents contained in the Loan Documents by their individual titles.

**18.** Pursuant to the Assignment and Assumption of Management Agreement, Azar's relinquished all cash management of the Marriott. Holly's and Azar's agreed that Azar's duties with respect to accounting would be very limited. Azar's was responsible to account for and bill accounts receivables, compile payroll records, and code invoices for transmission to Holly's for payment. Holly's was responsible for all cash and payments. (*See* Holly's Exhibit 1 & 3; Trial Transcript November 25, 1991, at 134–35, 146.)

**19.** The Loan Documents do not explicitly require the Debtors to establish a segregated account for the Partnership or Crowne Plaza. (*See* Sumitomo Exhibit 35.) The first indication that a separate account was required is in the Management Agreement executed between Holly's and the Partnership in October, 1990. (Sumitomo Exhibit 40, at 9.)

**20.** Both Azar's and Krok corresponded with Sumitomo regarding the problems between Azar's and Holly's. (*See* Holly's Exhibits 2, 3 & 6; Sumitomo Exhibit 50; Trial Transcript November 25, 1991, at 151–56.) Ultimately, in May, 1990, Benjamin travelled to Grand Rapids and met with representatives from Azar's and Holly's concerning the disputes. Benjamin concurred with Holly's that "evidences of neglect

terminate the management agreement with Azar's and substitute Holly's as the hotel manager, and (2) convert the Marriott franchise to a Holiday Inn Crowne Plaza franchise. (Sumitomo Exhibit 50.) Based upon certain conditions, Sumitomo consented to termination of the management agreement, substitution of Holly's as manager, and conversion of the property to a Crowne Plaza. (Sumitomo Exhibit 48.) A Commitment Agreement to Issue a Holiday Inn Crowne Plaza License Agreement ("Commitment Agreement") was executed by the Partnership and Holiday Inns Franchising, Inc. on September 6, 1990. (Sumitomo Exhibit 16.) A management agreement was executed between the Partnership and Holly's apparently in October, 1990 ("Management Agreement").[21] (Sumitomo Exhibit 40.) In order to effectuate the conversion, the Partnership requested that the $300,000 in the management fee reserve account be released for the purpose of renovating the hotel.[22] In exchange, Holly's was required to subordinate its management fee. (*See* Sumitomo Exhibit 40, art. VII(D).) As of the hearing dates, a licensing agreement had not yet been issued by Holiday Inns to the Partnership.

The Management Agreement provides *inter alia* that (1) Holly's is designated the exclusive manager of the Crowne Plaza; (2) Holly's management fee shall be calculated by three percent (3%) of gross revenues; (3) Holly's agreed, subject to certain conditions, to subordinate its management fee to Sumitomo and other parties; and (4) Holly's agreed to establish a special bank account in the name of the Partnership for all monies collected from operating the Crowne Plaza.[23] (*See* Sumitomo Exhibit 40.)

After Holly's assumed management, the Crowne Plaza continued to perform below projections. Much of the blame for the poor performance was reasonably justified by the Debtors because of the recession, an oversupply of hotel rooms in the local economy, the short term effects from converting the Marriott to a Crowne Plaza, and the Persian Gulf War.[24] (Holly's Exhibit 14 & 16.) As early as May, 1991, the Partnership had become delinquent for personal property taxes for 1989 and 1990 and was making arrangements with the taxing authorities for payment. (Sumitomo Exhibit

and lack of sufficient concern by Azar's [were] quite evident...." (Sumitomo Exhibit 48, at 2.)

**21.** Similar to many facts in this case, the Management Agreement also has mysterious aura about it. The Management Agreement was executed on behalf of both Holly's and the Partnership by Krok only. Also, the exact date of execution of the agreement is unclear because the date was never filled in. (*See* Sumitomo Exhibit 40.) To make matters worse, current management claims that it did not even know the express terms of the Management Agreement until after discovering a copy in late July or early August, 1991, after Krok's death. (*See* Trial Transcript December 20, 1991, at 72–73.) Sumitomo claims Krok negotiated the terms of the Management Agreement with it. Sumitomo agreed to the terms and approved the Management Agreement. (*See* Trial Transcript December 20, 1991, at 72–73.) Benjamin claims that he was informed of the execution of the Management Agreement by Ahrens in a telephone call in late October, 1990. (Sumitomo Exhibits 32 & 36.)

**22.** As a requisite to converting the Marriott to a Crowne Plaza and obtaining a Holiday Inn Crowne Plaza Licensing Agreement, the Partnership was required to complete a Product Improvement Plan ("PIP") developed by Holiday

Inns. (*See* Sumitomo Exhibit 16.) The release of the $300,000 from the management fee reserve account was for the purpose of partially funding the PIP. (*See* Sumitomo Exhibit 50.) As of the trial, the PIP had not been completed. There was testimony that completion could occur in February or March of 1992. (Trial Transcript November 27, 1991, at 31.)

**23.** A separate account for the Partnership was not established until August 26, 1991. (Sumitomo Exhibit 28.) Also, even though the Management Agreement mandated a three percent (3%) management fee, the Partnership did not pay Holly's a prepetition management fee. The first management fee was paid by the Partnership to Holly's for September 1991. (*See* Trial Transcript December 20, 1991, at 77.) The management fee was paid after Holly's bankruptcy filing and before the Partnership's filing. (*See* Trial Transcript November 27, 1991, at 25–26.) Sumitomo then objected and subsequent management fees have been placed in an escrow account.

**24.** Jorns, Sumitomo's expert witness, partially concurred with the Debtors. He testified that the recession and Persian Gulf War had a negative impact on the entire hotel industry and converting hotel franchises may have short term

20.) At approximately the same time, Holly's had become delinquent on franchise fees to Holiday Inns for all its Holiday Inn hotels including the Crowne Plaza. (Sumitomo Exhibit 22.) Krok, Ahrens, and other Holly's executives were attempting to work out payment plans for the delinquencies.[25] (*See* Sumitomo Exhibits 20–24.) At this time, Sumitomo was not informed of these delinquencies. During this period, the Partnership was current with its payments to Sumitomo.

After Krok committed suicide on June 10, 1991, Ahrens immediately assumed control of Holly's. (Trial Transcript November 27, 1991, at 74.) Until the Board of Directors took official action, Ahrens controlled Holly's pursuant to a "handwritten note" by Krok's widow. (Trial Transcript November 27, 1991, at 76.) New officers were appointed, pursuant to consent of Holly's Board of Directors, on July 12, 1991. Ahrens was appointed President and Chief Executive Officer. Lion was appointed Vice President of Operations and Secretary. Elliston was appointed Vice President of Finance and Treasurer.[26] (*See* Sumitomo Exhibit 11.)

After assuming these positions, Ahrens and Lion received enormous pay increases.

Ahrens' salary skyrocketed from $100,000 to $250,000; Lion's salary leap-frogged from $80,000 to $175,000. Elliston's salary was more justifiably increased from $50,-000 to $80,000.[27] (Sumitomo Exhibit 12.)

Holly's first explicitly informed Sumitomo of the seriousness of the Partnership's financial difficulties on July 9, 1991 when Ahrens told Benjamin that the Partnership was unable to make its July 1, 1991 interest payment.[28] (*See* Sumitomo Exhibit 26.) On July 26, 1991, Sumitomo was first explicitly advised of the Partnership's substantial arrearage for: (1) outstanding franchise fees owed to Holiday Inns; (2) unpaid PIP payments; (3) delinquent real and personal property taxes; and (4) other unpaid obligations including federal and state withholding taxes, unemployment and single business taxes, and state sales and use taxes. (Sumitomo Exhibit 52.)

Due to continued cash flow problems, the Partnership again failed to make its August 1, 1991 interest payment to Sumitomo.[29] On August 13, 1991, Benjamin and Sumitomo's counsel met in Grand Rapids with Ahrens and Holly's counsel to discuss the financial difficulties occurring at the Crowne Plaza. In addition to the financial

---

negative implications. (*See* Trial Transcript January 6, 1992, at 67–69, 83, 89.)

**25.** Lion testified that in April, 1991, he inadvertently discovered that Holly's was in arrears for franchise fees to Holiday Inns. Because he was formerly employed by Holiday Inns, Lion knew that a default of the franchise agreement could result in Holly's being disconnected from the Holiday Inn reservation system. Generally, if a franchise is disconnected from the reservation system, the immediate effect is a drastic decrease in occupancy. He informed Krok of the consequences of not keeping the franchise fees current and Krok subsequently sent a check to Holiday Inns.

In May, 1991, Lion discovered that Holly's was late again. Lion talked to Krok who then sent another check to Holiday Inns. This check bounced. After learning that the check bounced, Lion contacted his former boss at Holiday Inns for advice. He was informed to have Krok contact the president of the franchise division of Holiday Inn Worldwide to set up some type of payment plan. When Lion confronted Krok and asked him to contact Holiday Inns, Krok became so violently upset with Lion that he threw a book at him. Krok informed

Lion that the franchise fees were not any of his business. (Trial Transcript November 26, at 72–73.)

**26.** Ahrens and Lion were also appointed Directors of Holly's substantially contemporaneous to July 12, 1991. (*See* Sumitomo Exhibit 11; Trial Transcript December 20, 1991, at 14–15.).

**27.** At the time of their salary increase, both Lion and Elliston were fairly new employees of Holly's. Lion started on April 4, 1991; while Elliston began on June 17, 1991. (*See* Trial Transcripts November 25, 1991, at 22; November 26, 1991, at 59.)

**28.** At that time, the Partnership consented to allow Sumitomo to use a portion of funds held in an account pursuant to the Security and Pledge Agreement dated July 27, 1989 ("Pledged Funds") to make the payment. The Security and Pledge Agreement required the Partnership to replenish the funds. (Sumitomo Exhibits 26 & 35–8.)

**29.** Once again, the Partnership consented to Sumitomo paying the August 1, 1991 interest

problems previously disclosed, Sumitomo was informed that Holly's did not maintain a separate account for the Crowne Plaza as required by the Management Agreement.[30] Therefore, because of a failure to keep a separate account and records, intercompany claims in an undetermined amount existed between the Partnership and Holly's. (Sumitomo Exhibit 41.)

By letter dated August 22, 1991, Sumitomo advised the Debtors that a number of defaults existed under the Loan Documents including failure to replenish the Pledged Funds, failure to pay real and personal property taxes, failure to maintain adequate books and records, failure to maintain a separate account for the Crowne Plaza, and commingling funds from the Crowne Plaza to allegedly pay the obligations of other Holly's properties. Sumitomo also expressed concerns regarding mismanagement by Holly's, alleged conflicts of interest resulting from Holly's management of the Crowne Plaza[31], and asserted noncompliance with the Management Agreement. (*See* Sumitomo Exhibit 41.)

On September 11, 1991, Sumitomo notified the Partnership by letter that the continuing defaults existing under the Loan Documents now included failure to make the September 1, 1991 interest payment and failure to fully replenish the Pledged Funds. (*See* Sumitomo Exhibit 43.) On September 20, 1991, Sumitomo notified both the Partnership and Holly's by letter that due to the continuing defaults under the Loan Documents, it was accelerating the loan and requesting relief from the

payment from the Pledged Funds. (Sumitomo Exhibit 27.)

**30.** Shortly thereafter, a separate account was established for the Crowne Plaza on August 26, 1991. (Sumitomo Exhibit 28.)

**31.** Lion testified extensively to the "portfolio management approach" used by Holly's. The portfolio management approach segments consumers into different groups according to their needs and desires. The segments are divided into three categories—lower end, medium, and higher end. Holly's "portfolio" of hotels can service all segments of consumers. The Econolodge services the lower end. The Holiday Inn—North, Holiday Inn—South, and Holiday

stay in Holly's bankruptcy to seek appointment of a state court receiver and other relief pursuant to the loan documents. (Sumitomo Exhibits 44 & 45.) Despite the fact that the Partnership was in default of the Loan Documents, and the Management Agreement required a subordination to Sumitomo and other Partnership creditors, the Partnership paid, and Holly's accepted, a management fee for September, 1991 after Holly's filed for bankruptcy but before the Partnership filed. (*See* Trial Transcript November 27, 1991, at 25–26.)

## VI. DISCUSSION

### A. *The Management Agreement Issues.*

1. Provisions of Agreement.

In October, 1990, Krok executed the Management Agreement on behalf of both the Partnership and Holly's. (*See* Sumitomo Exhibit 40.) Although Sumitomo was not a signatory or party to the agreement, it was involved in approving the final form of the Management Agreement. As a prerequisite to Holly's assuming management of the Crowne Plaza, Sumitomo required that the Management Agreement contain certain provisions including subordination of the management fee. (Trial Transcripts December 20, 1991, at 72–73; January 7, 1992, at 107.) Because Holly's agreed to subordinate its management fee, Sumitomo granted the Debtors' request to release the $300,000 pledged in the management fee reserve account pursuant to the original Loan Documents. (*See* Sumitomo Exhibit

Inn—East service the middle. The Crowne Plaza services the upper end. (*See* Trial Transcript November 26, 1991, at 89–96.)

Sumitomo claims that conflicts of interest exist regarding Holly's portfolio management approach. Sumitomo asserts that by placing the Crowne Plaza in the upper segment, Holly's has restricted its ability to compete for business in the middle segment because Holly's marketing and sales plan reserves the middle market for other hotels in the system. Consequently, because the Crowne Plaza could compete against other hotel properties owned and operated by Holly's, the portfolio management approach results in a conflict of interest between Holly's and the Partnership. (*See* Sumitomo's Proposed Finding of Fact ¶ 76.)

48; Trial Transcript December 20, 1991, at 76–77.)

Under the Management Agreement, Holly's is designated as the exclusive manager of the Crowne Plaza and it agreed to operate the hotel as a "First Class Hotel". (Sumitomo Exhibit 40, art. I.) As compensation for managing the hotel, Holly's is entitled to receive a fee of three percent (3%) of gross revenues of the hotel facility. (Sumitomo Exhibit 40, art. VII, para. A.)

■ Article VII of the Management Agreement states:

> Notwithstanding anything to the contrary, [Holly's] hereby subordinates its right to collect all amounts under this Agreement including but not limited to the management fee set forth in this Article VII to all *amounts due* The Sumitomo Trust & Banking Company, Ltd., Los Angeles Agency or any prior lienholder including all payments of principal and interest and other costs of *Lender*.[32]

(Sumitomo Exhibit 40, art. VII, para. D.) (emphasis added.) Because, pursuant to this clause, Holly's agrees, upon certain conditions, to subordinate its management fees to Sumitomo and prior lienholders[33], the court shall sometimes refer to this clause as "Holly's affirmative promise".

Article XIX of the Management Agreement states in pertinent part:

*Distribution of Gross Revenues.* [The Partnership] shall distribute the Gross Revenues of the Facility, to the extent funds are available in the Operating Accounts, for the payment of the following in accordance with the following priorities:

A. All costs of sales and operating expenses (excluding Management Fees including debt service) deducted from Gross Revenue to determine Total Income Before Fixed Charges.

B. Rent, property taxes, and fire and extended coverage insurance.

C. Actual expenditures made for Capital Improvements and for acquisition and replacement of furniture, fixtures and equipment.

D. The Management Fee due [Holly's] under this Agreement.

E. The Balance to [the Partnership].

(Sumitomo Exhibit 40, art. XIX.) Because, pursuant to this clause, the Partnership agrees, upon certain conditions, not to pay Holly's management fees but rather to first pay Sumitomo's and other parties' obligations in a stated priority, the court shall sometimes refer to this clause as the "Partnership's negative promise".[34]

2. Arguments of the Parties.

Sumitomo argues that because the Partnership failed to make its July, August, and September, 1991 interest payments,

---

**32.** Amounts "due" may be defined as "owed or owing as a debt" or "having reached the date at which payment is required". WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 699 (1986). "Lender" is not defined by the Management Agreement. In their briefs, the parties have implicitly agreed that the Lender is Sumitomo. (*See* Sumitomo's Supplemental Brief in Support of Motions for Relief From the Automatic Stay and for Other Related Relief at 4; Holly's Supplemental Brief Regarding Subordination Clause Contained in Management Agreement at 2.)

**33.** The only prior lienholders appear to be the real and personal property taxing authorities which have prepetition liens for unpaid taxes. Under Michigan law, tax liens have priority over mortgagees and secured creditors, such as Sumitomo. MICH.COMP.LAWS ANN. § 211.40; *Chrysler Corp. v. Long & Long, Inc.*, 171 F.Supp. 541, 544 (E.D.Mich.1958); *Manistee County v. Reef Petroleum Corp. (In re Reef Petroleum Corp.)*, 92 B.R. 741, 745–46 (Bankr.W.D.Mich.

1988); *Cambron Tool Co. v. Manufacturers Bank of Detroit (In re Cambron Tool Co.)*, 27 B.R. 723, 725 (Bankr.E.D.Mich.1983); *In re Rite–Way Tool & Mfg. Co.*, 333 Mich. 551, 556, 53 N.W.2d 373, 376 (1952); *In re Ever Krisp Food Prods. Co.*, 307 Mich. 182, 196, 11 N.W.2d 852, 856 (1943).

**34.** The Management Agreement as a whole does not appear to be a typical boilerplate contract. In addition to not including a specific date of execution, the Management Agreement does not provide a conflicts of law provision, or a severability clause. As only one example of the agreement's ambiguity, Article XXI, paragraph F, provides:

> [The Partnership] and [Holly's] agree that no party shall be deemed to the drafter of the Agreement and further that in the event that this Agreement is ever construed by a court of law, such court shall deem *either* party to the drafter of this Agreement.

(Sumitomo Exhibit 40, art. XXI, para. F (emphasis added).)

and paid Holly's September management fee, the Debtors disregarded the subordination provisions of the Management Agreement. (*See* Sumitomo's Brief in Support of Motions for Relief From the Automatic Stay at 11.) Sumitomo asserts that the court must construe Holly's affirmative promise and the Partnership's negative promise as two intertwined subordinations for its benefit; the effect of the two clauses is that, after the Partnership defaulted in its obligations to Sumitomo, Holly's earned management fees must be directly paid to Sumitomo to be applied to its total indebtedness, i.e., "double dividends" must be paid to Sumitomo.

Sumitomo asserts that, regardless of the fact that both Holly's and the Partnership are chapter 11 debtors, subordination agreements are, without exception, entitled to full validity and enforcement under the Bankruptcy Code and the Uniform Commercial Code. *See* 11 U.S.C. § 510(a) & U.C.C. § 9–316 [35]. An injunction is sought to prohibit the Partnership from making any further payments to Holly's and to prohibit Holly's from receiving any management fees.

Further, Sumitomo argues that because the Management Agreement can be of absolutely no benefit to Holly's: (1) Sumitomo should be granted modification of the automatic stay against both Debtors to enforce its bundle of rights in state court; (2) Holly's or the Partnership must now reject the Management Agreement and Holly's must forthwith cease from managing the Partnership's hotel property; and (3) alternatively, the court should compel the Partnership and Holly's each to seek to assume the management contract in its entirety, including the subordination clauses, within a shortened specified time.

The Debtors assert that, under these facts, the subordination clauses are not valid or enforceable in bankruptcy. The gist of the Debtors' argument is that: (1) the Partnership's negative promise does not constitute a subordination agreement but rather is akin to a negative covenant which is not enforceable in bankruptcy; (2) Holly's affirmative promise to subordinate its fees to Sumitomo is, or is tantamount to, an unenforceable security interest in Holly's postpetition property; (3) alternatively, if Holly's affirmative promise is enforceable at all, it is only enforceable if both the Partnership and Holly's assume the Management Agreement; and (4) Holly's affirmative promise is a legally separate agreement which is severable from the management contract and is therefore separately rejectable by Holly's.

### 3. Subordination Agreements in General.

Surprisingly to this court, there is no settled black letter law regarding subordination agreements. There exists a relative lack of reported bankruptcy cases which discuss subordination agreement issues in depth.[36] Even more surprisingly, there appears to be no universally recognized or accepted definition of a subordination agreement.

A broad definition of debt subordination is:

**35.** The Uniform Commercial Code has been adopted in Michigan. MICH.COMP.LAWS ANN. §§ 440.1101 to 440.11102. This statute shall be referred to as the "U.C.C.".

**36.** Because of the paucity of case law, a careful reading of various commentators' articles is helpful to understand some of the issues presented. *See* Calliger, *Subordination Agreements,* 70 YALE L.J. 376 (1961) [hereinafter Calliger]; Coogan, Kripke & Weiss, *The Outer Fringes of Article 9: Subordination Agreements, Security Interests in Money and Deposits, Negative Pledge Clauses and Participation Agreements,* 79 HARV.L.REV. 229 (1965), *reprinted in* 1C P. COOGAN ET AL., SECURED TRANSACTIONS UNDER THE UNIFORM COMMERCIAL CODE §§ 23.01–.11 (Matthew Bender 1991) [hereinafter Coogan, Kripke & Weiss]; Zinman, *Under the Spreading U.C.C.— Subordinations and Article 9,* 7 B.C. INDUS. & COM.L.REV. 1 (1965) [hereinafter Zinman]; Henson, *Subordinations and Bankruptcy: Some Current Problems,* 21 BUS.LAW. 763 (1966) [hereinafter Henson]; Osborne, Note, 49 TEX.L.REV. 822 (1971) [hereinafter Note]; Heileson & Hirsch, *Private Subordination Agreements and the U.C.C.: Is Section 1–209 an Un-Wyse Solution?,* 38 BUS.LAW. 555 (1983) [hereinafter Heileson & Hirsch]; Carlson, *A Theory of Contractual Debt Subordination and Lien Priority,* 38 VAND.L.REV. 975 (1985) [hereinafter Carlson].

[A] subordination agreement is simply a contract in which a creditor (the "subordinated" or "junior" creditor) agrees that the claims of specified senior crditors must be paid in full before any payment on the subordinated debt may be made to, and retained by, the subordinated creditor. The contracting parties may include the senior creditor or ... the contract may be between the debtor and the subordinated creditor for the benefit of the senior creditor. Unless the specific terms of the contract provide otherwise, the contract's effect runs between the subordinated creditor and the senior creditor, i.e., the subordination of the junior creditor's right to payment until after the senior creditor has been paid.

*New York Stock Exch. v. Pickard & Co., Inc.*, 296 A.2d 143, 146–47 (Del.Ch.1972) (citing Calligar, *supra*, at 376). A rather succinct definition of lien subordination is that "a subordination agreement is nothing more than a contractual modification of lien priorities and must be construed according to the expressed intention of the parties and its terms." *ITT Diversified Credit Corp. v. First City Capital Corp.*, 737 S.W.2d 803, 804 (Tex.1987).

As is clear from the debt subordination definition stated above, there are often three parties to a subordination agreement. First, a "common debtor" exists who owes debts to two creditors or two groups of creditors. Second, there is a "junior creditor" (sometimes referred to as the "subordinator") who agrees to subordinate its debt to a holder of senior debt.[37] Third, a "senior creditor" exists who obtains the benefit of the subordination and acquires priority over the junior creditor. Coogan, Kripke & Weiss, *supra*, § 23.02[1], at 2350–51. "The subordinated debt of the junior creditor may be all present and future debt, or all debt of a certain class, or only specified debt; likewise the senior debt may be all present or future debt, or only specified existing or future debt." *Id.*

■■■ Courts and commentators have identified four theories of validity and enforceability of subordination agreements. The four theories are: equitable lien, equitable assignment, constructive trust, and contract. *See First Nat'l Bank of Hollywood v. American Foam Rubber Corp.*, 530 F.2d 450, 454 (2d Cir.), *cert. denied*, 429 U.S. 858, 97 S.Ct. 157, 50 L.Ed.2d 135 (1976); Calligar, *supra*, at 384; Zinman, *supra*, at 25; Heileson & Hirsch, *supra*, at 561–63.[38] It appears the weight of authori-

---

**37.** One of two reasons may exist for a junior creditor to subordinate its debt. "First, a creditor may wish to subordinate its priority to induce another creditor to advance new funds. Second, a junior creditor may wish to advance credit, but the resulting increased leverage of the debtor would violate a covenant in a loan agreement between the debtor and some other creditor." Carlson, *supra*, at 976–77.

**38.** The "equitable lien" theory interprets subordination agreements as interests in property of the debtor that courts of equity identify as securing an obligation owed to the senior creditor. Therefore, the junior creditor's claims against the debtor are subordinated to the senior creditor's "equitable lien" priority. *See In re George P. Schinzel & Son, Inc.*, 16 F.2d 289 (S.D.N.Y.1926); Calligar, *supra*, at 384–85; Heilson & Hirsch, *supra*, at 561–62.

The "equitable assignment" theory interprets subordination agreements as a contingent assignment of the junior creditor's claim against the debtor to senior creditor. The junior creditor assigns its claim against the debtor to the senior creditor subject to the condition that if the senior creditor's claim is satisfied by the debtor, the claim will revert back to the junior creditor. *See Allen v. Handy–Andy Community Stores, Inc. (In re Handy–Andy Community Stores, Inc.)*, 2 F.Supp. 97 (W.D.La.1932); Calligar, *supra*, at 385–86; Heileson & Hirsch, *supra*, at 562.

The "constructive trust" theory enforces subordination agreements on the basis that the junior creditor holds the right to payment from the debtor subject to an equitable duty to convey the right to the senior creditor if a condition subsequently occurs. Therefore, the junior creditor is a constructive trustee who holds the right to payment in constructive trust for the senior creditor. *See In re Dodge–Freedman Poultry Co.*, 148 F.Supp. 647 (D.N.H.1956), *aff'd sub nom. Dodge–Freedman Poultry Co. v. Delaware Mills, Inc.*, 244 F.2d 314 (1st Cir.1957); Calligar, *supra*, at 386–88; Heilson & Hirsch, *supra*, at 562.

The "contract theory" enforces subordination agreements based on the principle that it is consistent with public policy for creditors to adjust rights based on their own contracts. Courts and commentators have recognized the contract theory as the "most logically·supportable and sensible of all the theories." Calligar, *supra*, at 388. *See Bank of America Nat'l Trust*

ty favors a *contract* validity and enforceability theory. This court believes that the better view is to generally analyze subordination agreements under a contract theory after reviewing the governing language of a given agreement in each instance, but recognizing that in some debt subordination instances an assignment analysis may be warranted if intended by the parties.

 Commentators have also attempted to categorize types of subordination. Although the commentators have given different titles to the categories, there appear to be two broad classes of subordination agreements that are recognized. "Complete" subordinations occur when the parties agree that the subordination promise is immediately effective subject to no contingencies. *See* Calliger, *supra,* at 378; Coogan, Kripke & Weiss, *supra,* § 23.02[2]; Carlson, *supra,* at 983.[39] "Subsequent" or "contingent" subordinations occur when the parties agree that the subordination promise is contingent on a future event of default, such as insolvency or bankruptcy. *See* Zinman, *supra,* at 3–6; Henson, *supra,* at 763; Heileson & Hirsch, *supra,* at 555–56; Carlson, *supra,* at 983.[40] These types of subordinations can take a variety of different forms. In addition to these two categories, subordination agreements may also be classified into debt subordination, i.e. unsecured parties agree to subordinate, and lien subordination, i.e., secured parties

agree to subordinate. Carlson, *supra,* at 976–79.

All commentators acknowledge, either explicitly or implicitly, that it is difficult in some instances to readily classify a given subordination agreement. This court believes the only relative easy method of classification is based upon the dichotomy between unsecured debt subordination and secured lien subordination. However, even this type of identification scheme may be complicated when an unsecured debt subordinates to a secured lien claim or, although less likely, vice versa.

4. General Enforceability of Subordinations in Bankruptcy.

11 U.S.C. § 510(a)[41] states:

A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law.

The legislative history regarding this subsection is relatively sparse and only states that subordination agreements are generally enforceable in bankruptcy. H.R.REP. No. 595, 95th Cong., 1st Sess. 359 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6315. Section 510(a) codifies pre-Code case law in which the courts enforced such agreements. 3 L. KING, COLLIER ON BANKRUPTCY ¶ 510.03 (15th ed. 1992).

& Sav. Ass'n v. Erickson, 117 F.2d 796, 798 (9th Cir.1941) ("The court may administer the estate and order its distribution conformably to the rights of creditors as fixed by there own contracts, if these are lawful."); *American Foam Rubber Corp.,* 530 F.2d at 454 (four theories of subordination agreements acknowledged; court favors the contract theory); *Pickard,* 296 A.2d at 147 (of the four theories, the better is the contract theory); Coogan, Kripke & Weiss, *supra,* § 23.02[3], at 2351 n. 21 (acknowledging that the majority of decisions are based on the contract theory); Heileson & Hirsch, *supra,* at 562–63 (same). *See also* U.C.C. § 1–209 official cmt. 2 (subordinations enforceable as contracts regardless of characterization).

Another commentator has argued that debt subordinations should be treated as assignments and lien subordinations should be considered as a demotion or waiver of a lienholder's right to repossess and sell collateral. Carlson, *supra,* at 996–1022.

**39.** Other commentators have titled these types of subordinations as *ab initio* subordinations. *See* Zinman, *supra,* at 6; Henson, *supra,* at 763; Heilson & Hirsch, *supra,* at 655. *Ab initio* means "from the beginning; from the first act; from the inception." BLACK'S LAW DICTIONARY 6 (6th ed. 1990).

**40.** Other commentators have titled these subordinations as "inchoate" subordinations and "insolvency" subordinations. *See* Calligar, *supra,* at 377, 379–81; Coogan, Kripke, Weiss, *supra,* § 23.02[2]. "Inchoate" means "partial; unfinished; begun but not completed." BLACK'S LAW DICTIONARY 761 (6th ed. 1990).

**41.** Unless otherwise noted, all future statutory references are to Title 11 of the United States Code, sometimes referred to as the "Bankruptcy Code" or "Code".

A review of reported cases indicates that subordination agreements are regularly enforced in bankruptcy cases. In lien priority subordinations, the courts have enforced such subordinations under the current Bankruptcy Code.[42] *See, e.g., Gulfstream Bank v. McCracken (In re Cormarc, Inc.),* 29 B.R. 569, 571 (Bankr.S.D.Fla.1983) (subordination by landlord for benefit of secured creditor enforceable under § 510(a) of Bankruptcy Code); *Citibank, N.A. v. Smith Jones, Inc.,* 17 B.R. 128, 131 (Bankr. D.Minn.1982) (two secured creditors agreed to priority based upon subordination; the contract was binding on the common debtor's postpetition as well as prepetition liabilities); *cf. Levitz v. Capitol Sav. & Loan Co.,* 267 Mich. 92, 96–97, 255 N.W. 166, 168 (1934) (subordination agreement binding upon mortgagees who signed letter and recorded same thereby subordinating priority to other mortgagee; consideration for agreement need not be direct as between the mortgagees).[43]

Likewise, in debt subordination instances, the courts have enforced such agreements whether under the old Act or the Bankruptcy Code. *See, e.g., American Foam Rubber Corp.,* 530 F.2d at 456 (in old Act case, with regard to the "loan transaction", senior creditor entitled to enforce subordination against junior debenture creditor to recover amount of payment made contrary to subordination clause); *Gould v. Levin (Matter of Credit Indus. Corp.),* 366 F.2d 402, 408–09 (2d Cir.1966) (in old Act case, subordinated notes consensually accepted remain junior to senior institutional creditors with no requirement of reliance by senior creditors; subordination

agreements enforced according to terms in bankruptcy cases); *Austin v. National Discount Corp.,* 322 F.2d 928, 931 (4th Cir.1963) (in old Act case, court notes that subordinated debentures "almost universally enforced by bankruptcy courts, in absence of circumstances making such enforcement inequitable"); *In re Aktiebolaget Kreuger & Toll,* 96 F.2d 768, 770 (2d Cir.1938) (in old Act case, court held parties not prohibited from making subordination agreement provided subordination does not infringe on statutory priorities); *Fleet Nat'l Bank v. Trans World Airlines, Inc.,* 767 F.Supp. 510, 517–19 (S.D.N.Y.1991) (senior creditors held third party beneficiary rights under subordinated debentures which common debtor could not unilaterally modify; injunction granted prohibiting common debtor from purchasing subordinated debentures with corporate funds).

Focusing on § 510(a) of the Bankruptcy Code and the cases cited above, Sumitomo's argument regarding the inviolability of all subordination agreements has some facile appeal. However, although the authorities cited above are informative regarding the general enforceability of subordination agreements under bankruptcy law, they do not directly address the issue before the court—whether a subordination agreement is enforceable in a dual bankruptcy situation where both the junior creditor and the common debtor are bankruptcy debtors. In an old Act case, which has been discussed by many of the commentators, the Sixth Circuit Court of Appeals has held that a subordination agreement was unenforceable in a so-called dual bankruptcy setting. *Pioneer–Cafeteria Feeds, Ltd. v.*

**42.** Outside of bankruptcy, when competing secured creditors exist who agree to subordinate their lien priorities, § 9–316 of the Uniform Commercial Code permits these creditors to subordinate their liens by agreement. *See* U.C.C. § 9–316.

**43.** This court has also recently enforced a lien subordination agreement and resolved a circular priority dispute among three competing secured creditors. *See Matter of Cliff's Ridge Skiing Corp.,* 123 B.R. 753 (Bankr.W.D.Mich.1991). In *Cliff's Ridge,* none of the competing secured creditors was a debtor under the Bankruptcy Code. Rather, the court was required to deter-

mine their respective priorities with regard to their liens which attached to court approved sale proceeds. In resolving the dispute, this court utilized a formula whereby the second priority secured nonsubordinating creditor was not benefited or burdened by the first priority secured creditor's subordination to the third priority secured creditor; in effect, the first and third priority lien creditors "traded places". *Id.* at 767. Therefore, this court used what might be considered as an assignment analysis. Under a demotion or waiver of right concept, the result may have been different. *See* Carlson, *supra,* at 1019–24.

*Mack (Matter of Wyse)*, 340 F.2d 719, 723–25 (6th Cir.1965).

In *Wyse*, the junior creditor, who was the principal shareholder of the common debtor, guaranteed the common debtor's payment of debts owed to the senior creditor. As part of the guaranty agreement, the junior creditor subordinated its right to payment on all past and future debt owed to it by the common debtor to debt owed to the senior creditor by the common debtor. *Id.* at 721. The junior creditor later filed a voluntary petition in bankruptcy in Ohio. Approximately one month later, the common debtor also filed bankruptcy in Canada. *Id.* The Canadian bankruptcy court enforced the subordination in the common debtor's bankruptcy proceeding by giving the senior creditor the dividend which would otherwise have been paid to the junior creditor. Because the senior creditor's claim was not fully satisfied in the common debtor's Canadian bankruptcy proceeding, it attempted to claim an additional dividend (i.e. a "double dividend") in the junior creditor's bankruptcy proceeding in Ohio. *Id.* at 722.

The Sixth Circuit stated "that the enforcement of subordination agreements between creditors of the same bankrupt, affects only their rights and does not interfere with or change the rights of other creditors". *Id.* at 723. Notwithstanding this observation, the Sixth Circuit upheld a distribution of assets of the junior creditor which deprived the senior creditor of the subordinated dividend it received in the Canadian bankruptcy. In effect, the Sixth Circuit held the subordination was unenforceable and the senior creditor was not entitled to double dividends. *Id.* at 724. The Sixth Circuit's reasoning is not fully articulated but the *Wyse* decision seems to be based on two grounds: first, given the equality of distribution principle, the bank-

ruptcy court possessed equitable power to deny the senior and junior creditor the order of priority which they would otherwise be entitled; and second, that the guaranty agreement was an unrecorded and abhorred "secret lien" of which the junior creditor's creditors lacked notice. *Id.* at 723–24.

The *Wyse* decision sent shockwaves throughout the commercial finance world because it could be interpreted as standing for the proposition that subordination agreements constitute security interests. Therefore, under Article 9 of the U.C.C., in order to be enforceable against third parties, the subordination agreement would have to be perfected to give adequate and requisite notice.[44] *See* Coogan, Kripke & Weiss, *supra,* § 23.01[1], at 2348; Note, *supra,* at 822–23; Heileson & Hirsch, *supra,* at 558–59. The *Wyse* decision was one of the primary reasons for the promulgation of U.C.C. § 1–209, an optional section to Article 1 of the Uniform Commercial Code, in 1966.[45]

The current import, if any, of *Wyse* is unclear. One commentator states the holding in Wyse is not valid under the Bankruptcy Code. "The Bankruptcy Code ... has changed subordination law considerably. Section 510(a) now provides that subordination agreements are enforceable in bankruptcy to the same extent they are enforceable under applicable nonbankruptcy law. To the extent [*Wyse*] represented a federal bankruptcy rule, section 510(a) has repealed it." Carlson, *supra,* at 1009. However, another post-Bankruptcy Code enactment article opines that, under *Wyse,* the "enforceability of subordination agreements becomes uncertain when a junior creditor goes into bankruptcy along with the common debtor". Heileson & Hirsch, *supra,* at 557. Further, this article raises

---

**44.** *Wyse* was decided under pre-U.C.C. law but at the time the decision was released the 1962 version of the U.C.C. had been adopted in many states.

**45.** Section 1–209 states:

An obligation may be issued as subordinated to payment of another obligation of the person obligated, or a creditor may subor-

dinate his right to payment of an obligation by agreement with either the person obligated or another creditor of the person obligated. Such a subordination does not create a security interest as against either the common debtor or a subordinated creditor....

Section 1–209 was adopted in Michigan in 1978. *See* Mich.Comp.Laws Ann. § 440.1209.

the specter of continued possible attacks upon the enforceability of subordination agreements.[46]

Nevertheless, under the facts of this case, the unlikely dual bankruptcy situation, which was present in *Wyse*, has turned its Gorgon-like head toward this court. Although *Wyse* is distinguishable, a careful reader will realize that this case has many factual commonalities with *Wyse*. The principal difference is that in *Wyse* the senior creditor sought to obtain double dividends from the junior creditor's prepetition property rights, albeit postponed to after the junior's bankruptcy filing. In this case, Sumitomo is seeking not only some of Holly's prepetition management fees but also Holly's *postpetition earnings,* to which it may be entitled, derived from the executory (but thus far unassumed) Management Agreement. This court must consider some of the issues that the *Wyse* court addressed approximately twenty-seven years ago. Because the authorities post-*Wyse* are scarce and contrasting, and reported cases nonexistent, this court must delve into these "hellish questions"[47] which previously "raised numerous eyebrows and much blood pressure".[48]

5. Characterization of the Subordination Clauses in the Management Agreement.

As an initial matter, this court must carefully review the language of the Partnership's negative promise and Holly's affirmative promise to identify and characterize the specific language in question. *Chase Manhattan Bank v. First Marion Bank,* 437 F.2d 1040, 1047 (5th Cir.1971) (the fact finder must characterize the subordination agreement); *Peoples Bank & Trust v. Reiff,* 256 N.W.2d 336, 346 (N.D.1977) (Vogel, J., dissenting) (same); ANDERSON, ANDERSON ON THE UNIFORM COMMERCIAL CODE § 1–209:3 (3d ed. 1981) (same). Only after the language in the Management Agreement is structured into a legal context can the court fully consider the specific rights and obligations of the parties and then determine the respective clause's validity and enforceability under the Bankruptcy Code.

■ The Management Agreement was executed by the Partnership and Holly's thereby establishing a contractual relationship between the two Debtors. Because performance remains on both sides, the Management Agreement is an executory contract within the meaning of the Bankruptcy Code. *Terrell v. Albaugh (In re Terrell),* 892 F.2d 469, 471 (6th Cir.1989) (an executory contract is defined as a contract "on which performance remains due to some extent on both sides"). Because the Management Agreement has not yet been assumed or rejected under § 365, the rights, duties and obligations of the Debtors are in a limbo-like state. *See generally* Buschman, *Benefits and Burdens: Post–Petition Performance of Unassumed Executory Contracts,* 5 BKRTCY.DEV.J. 341 (1988) [hereinafter Buschman].

---

**46.** Ultimately, the article concludes that the best method of assuring the validity of a subordination agreement when a common debtor and junior creditor are both in bankruptcy is to "cast the subordination agreement in the form of an agreement creating a security interest and perfect it accordingly under Article 9 of the U.C.C.". Heileson & Hirsch, *supra,* at 566–67. The problem with such a solution for the senior creditor is that "hindsight is 20/20". For such a solution to work, the senior creditor, or the senior creditor's counsel, must be "a real prophet of gloom and assume the possibility of a double bankruptcy of the common debtor and junior creditor." Coogan, Kripke & Weiss, *supra,* § 23.02[4], at 2357. The commentators have differing views on the likelihood of such a dual bankruptcy situation. *See* Coogan, Kripke & Weiss, *supra,* § 23.02[4], at 2356 (likelihood that a dual bankruptcy will occur is greater in an insider subordination situation); Note, *supra,* at 824 (dual bankruptcy of common debtor and junior creditor is "rare"). *But see* Heilson & Hirsch, *supra,* at 556 (In private subordination agreement situations, the junior creditor is usually an insider of the debtor resulting in their financial conditions often being "intertwined", therefore both the junior creditor and common debtor "could easily become bankrupt from a common cause".).

**47.** Heileson & Hirsch, *supra,* at 557 (citing Counrtyman, *Scope of the Concept of Security Interest, in* PERFECTION AND ENFORCEMENT OF SECUIRTY DEVICES 19, 39 (1980)).

**48.** Zinman, *supra,* at 29.

■ Sumitomo is not a signatory to the Management Agreement. Because the court is analyzing the Management Agreement under the contract theory, any rights Sumitomo had before filing, has during the bankruptcy cases, or may have after assumption or rejection, will be based upon a third party beneficiary status. To determine Sumitomo's property rights, Michigan law applies.[49] *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) ("Property interests are created by and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."). *See also Schewe v. Fairview Estates (Matter of Schewe),* 94 B.R. 938, 949–50 (Bankr. W.D.Mich.1989) (bankruptcy court should not create additional property rights for a party in interest where such rights do not exist outside of bankruptcy *except* when the rights are recognized under the Bankruptcy Code).

■ "In the United States, there are various persons who are recognized as having enforceable rights created in them by a contract to which they are not parties and for which they give no consideration. They are called ... 'third party beneficiaries'." 4 A. CORBIN, CORBIN ON CONTRACTS § 774 (1951).[50] Michigan has codified the third party beneficiary doctrine at MICH.COMP. LAW ANN. § 600.1405 which states in pertinent part:

Any person whose benefit a promise is made by way of contract, as hereinafter defined, has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promisee.

(1) Contracts included. A promise shall be construed to have been made for the benefit of a person whenever the promisor of said promise has undertaken to give or to do or refrain from doing something directly to or for said person.

This court determines that Sumitomo's rights, under the clauses in the Management Agreement, against the Partnership pursuant to the negative promise, and against Holly's pursuant to the affirmative promise, are that of a third party beneficiary creditor.[51]

■ With regard to the Partnership's negative promise, it must pay certain creditors or classes of creditors pursuant to an established priority set forth in the Management Agreement. (Sumitomo Exhibit 40, art. XIX.) Basically, because Holly's management fees are deemed to be a last priority, Sumitomo and all other benefited creditors, must first be paid before the Partnership may pay Holly's its fee. Under state law, Sumitomo's rights resulting from the Partnership's breach of its negative promise would include: (1) specific performance, (2) injunctive relief if irreparable harm is shown, or (3) recovery of damages resulting from the breach. The negative promise clause is ancillary and supplemental to Sumitomo's rights under the Loan Documents. In the event Sumitomo is not timely paid by the Partnership, the Loan Documents permit Sumitomo to

49. The Management Agreement does not contain any provision regarding governing law. However, the signatory Debtors are each Michigan legal entities and their cases are pending in a Michigan Bankruptcy Court. "Michigan's conflict of law rules require that construction of a contract be governed by the law of the state in which the last act necessary to make the contract a binding agreement occurs." *MCA Ins. Co. v. Peninsula Asphalt Corp. (In re Peninsula Asphalt Corp.),* No. 1:90–CV–81, 1990 U.S. Dist. LEXIS 11861, at *5 (W.D.Mich. Sept. 6, 1990) (quoting *Century Boat Co. v. Midland Ins. Co.,* 604 F.Supp. 472, 479 (W.D.Mich.1985)). *See also Keehn v. Charles J. Rogers, Inc.,* 311 Mich. 416, 425–26, 18 N.W.2d 877, 880 (1945) (contractual rights are governed by the law in which the contract is made); *State of Ohio v. Eubank,* 295 Mich. 230, 233, 294 N.W. 166, 167 (1940) (same).

50. The third party beneficiary doctrine is incorporated in RESTATEMENT (SECOND) OF CONTRACTS §§ 302–315. For a general discussion and application of the RESTATEMENT (SECOND) OF CONTRACTS §§ 302–315, see *Newton v. Johnson (In re Edward M. Johnson & Assocs., Inc.),* 845 F.2d 1395, 1398–1400 (6th Cir.1988).

51. Of course, Sumitomo also has direct contract and security rights against the Partnership and its property in accordance with the other Loan Documents.

accelerate its indebtedness, foreclose upon its collateral, and eventually sell the collateral to fully, or partially, satisfy the Partnership's debt to it.

Benjamin's testimony indicates that the purpose of the negative promise clause is to permit Sumitomo to exercise limited control over both Debtors and prohibit the Partnership from paying Holly's, under certain circumstances, its management fees. Benjamin testified that the subordination was a method by which Sumitomo could implement a system of "checks and balances" between the Debtors. Under the checks and balances system neither the owner (the Partnership) nor the operator (Holly's) would have excess control over Sumitomo's collateral. (*See* Trial Transcript December 20, 1991, at 57.) By requiring the Partnership to agree to the negative promise before consenting to Holly's becoming manager of the hotel property, Sumitomo was, in effect, able to acquire additional control over the operations of the hotel property and additional assurance of repayment on its loan.

With regard to Holly's affirmative promise, Holly's agrees to subordinate its rights to receive all future management fees, under certain circumstances, to Sumitomo and others. (*See* Sumitomo Exhibit 40, art. VII, para. D.) This clause creates a subordination: a common debtor—senior creditor—junior creditor relationship is established. The subordination is conditional. If the Partnership fails to pay Sumitomo, Holly's right to collect a management fee from the Partnership is then subordinated to Sumitomo. The subordination includes after-acquired property, i.e., future management fees that may be earned for future months based upon then contemporaneous services rendered by Holly's to the Partnership. It must be again noted that Holly's has not guaranteed the payment of the Partnership's indebtedness to Sumitomo in any other writing.

This affirmative promise clause may be characterized as a conditional assignment by Holly's of an after-acquired account receivable (or chose in action) which is tantamount to a nonrecourse limited guaranty. Sumitomo, the senior creditor, and Holly's, the junior creditor, did not each have existing debt rights against the Partnership, the common debtor, which rights were immediately subordinated between themselves on the date the Management Agreement was executed. Therefore the subordination *cannot* be classified as "complete" or "*ab initio*". If and when a condition subsequent occurs, e.g., the Partnership fails to make its monthly interest payment to Sumitomo, the subordination then springs into effect. The subordination may therefore be characterized as "subsequent", "contingent" or "inchoate". *See* Zinman, *supra* at 3–6; Henson, *supra* at 763; Heileson & Hirsch, *supra* at 555–56; Carlson, *supra* at 983. Further, this is not an instance when a debt was currently owed by the Partnership to Holly's and the payment is deferred to a later date, e.g., under an installment promissory note or debenture. *Cf. Segal v. Rochelle*, 382 U.S. 375, 379–81, 86 S.Ct. 511, 514–15, 15 L.Ed.2d 428 (1966) (case involving trustee's right to tax refund of debtor; "postponed enjoyment does not disqualify an interest as 'property'"); *Kokoszka v. Belford*, 417 U.S. 642, 648, 94 S.Ct. 2431, 2435, 41 L.Ed.2d 374 (1974) (under old Act, income tax refund "is sufficiently rooted in prebankruptcy past" to constitute property of the estate).

It must be reiterated that the practical effect is the affirmative promise clause is tantamount to a guaranty.[52] In the event that the Partnership fails to pay its debt to Sumitomo, Holly's must utilize its then earned, or subsequently earned, management fees to pay, or partially pay, the Partnership's obligation to Sumitomo. This guaranty is limited because it is in the nature of an *in rem* obligation which only

---

**52.** Under Michigan law, a guaranty is defined as "a promise by one person to answer for the payment of some debt, or the performance of some contract or duty, of another, *in case of the default of the other to pay* or perform." 11 CALLAGHAN'S MICHIGAN CIVIL JURISPRUDENCE *Guaranty* § 2 (1987) (emphasis added). *See also First Nat'l Bank of Ann Arbor & Trust v. Dolph*, 287 Mich. 219, 225, 283 N.W. 35, 37–38 (1938); *Moore v. Capital Nat'l Bank of Lansing*, 274 Mich. 56, 61, 264 N.W. 288, 291 (1936).

covers Holly's right to collect management fees; Holly's has no other liability to Sumitomo and Sumitomo cannot seek Holly's other property under the tacit guaranty.

6. Enforceability of the Management Agreement Clauses in These Debtors' Dual Bankruptcy Cases.

 Outside of bankruptcy, the two promises to Sumitomo, as a third party beneficiary, are enforceable. MICH.COMP. LAWS ANN. § 600.1405.[53] When the senior creditor and junior creditor are outside bankruptcy and the common debtor is in bankruptcy, the clauses are enforceable in absence of circumstances making the enforcement inequitable. *See, e.g,* 11 U.S.C. § 510; *Austin,* 322 F.2d at 931; *American Foam Rubber Corp.,* 530 F.2d at 455–56; *Trans World Airlines, Inc.,* 767 F.Supp. at 517–19.

 The Partnership's negative promise is *not* a subordination agreement. The promise not to pay Holly's until other contractually higher priority creditors are first paid does not meet the definition of a subordination agreement quoted above. *See Pickard & Co.,* 296 A.2d at 146–47. It does not create a common debtor—senior creditor—junior creditor relationship. This clause is nothing more than a negative covenant by the Partnership not to pay Holly's fee until other creditors are first paid.[54] *Cf. Hunt Energy Co., Inc. v. United States (In re Hunt Energy Co., Inc.),* 48 B.R. 472, 486 (Bankr.N.D.Ohio 1985) (negative covenants in bank loan documents do not constitute subordination agreement).

 If the negative promise was enforced it would conflict with the Bankruptcy Code's equality of distribution principle which has been recognized by the Supreme Court for over one hundred years. *See Boyd v. Dock's Corner Assocs. (Matter of*

*Great Northern Forest Prods., Inc.),* 135 B.R. 46, 66–67 (Bankr.W.D.Mich.1991) (collecting numerous Supreme Court and Sixth Circuit cases regarding the equality of distribution principle). If a court cannot judicially create priorities or subclasses of creditors within distribution classes mandated by Congress, *a fortiori,* the Partnership's negative promise in the Management Agreement cannot do so. The Bankruptcy Code governs Sumitomo's rights to distribution respecting its claim. The Partnership's negative covenant is not now enforceable in its bankruptcy case. The Partnership will pay its debts to Sumitomo and others as is required by federal bankruptcy law, whether under a confirmed chapter 11 plan or an eventual chapter 7 distribution.

Holly's affirmative promise creates a common debtor—senior creditor—junior creditor relationship and constitutes a subordination agreement. What about the enforceability of the subordination in this dual bankruptcy situation? Given the adoption in Michigan of § 1–209 of the Uniform Commercial Code and the adoption of § 510(a) of the Bankruptcy Code, is *Wyse* still good law in the Sixth Circuit? If not, does *Wyse* have any remaining legal vitality or applicability to the facts of this case? As urged by Sumitomo, should § 510(a) of the Bankruptcy Code be considered in a vacuum? Should only state law apply?

 In most instances respecting property rights, a bankruptcy court will examine and apply state law unless a *federal purpose requires to the contrary. Butner,* 440 U.S. at 55, 99 S.Ct. at 918. Additionally, statutory construction is a "holistic endeavor". *International Primate Protection League v. Administrators of Tulane Educ. Fund,* —— U.S. ——, 111 S.Ct. 1700, 1705, 114 L.Ed.2d 134 (1991);

---

**53.** Under certain conditions, the Michigan statute permitted the Partnership and Holly's to mutually agree to divest Sumitomo of its rights as a third party beneficiary. MICH.COMP.LAWS ANN. § 600.1405(2)(c). There is nothing in the record regarding any such prepetition divestment.

**54.** A "negative covenant" is defined as a promise "in which the covenantor obliges himself *not* to do or perform some act." BLACK'S LAW DICTIONARY 363 (6th ed. 1990) (emphasis in original).

The negative promise might also be characterized as an affirmative covenant to first pay Sumitomo and others prior to paying Holly's management fee. Regardless of the characterization, this court's rationale is not affected.

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988). However, statutory language must be read in pertinent context and interpreted to avoid unreasonable results whenever possible. *American Tobacco Co. v. Patterson*, 456 U.S. 63, 71, 102 S.Ct. 1534, 1538, 71 L.Ed.2d 748 (1982); *Vause v. Capital Poly Bag, Inc. (In re Vause)*, 886 F.2d 794, 800–01, 803 (6th Cir.1989). This court believes it must consider § 510(a) together with other sections of the Bankruptcy Code and the principles and policies of bankruptcy law to determine whether the prepetition and postpetition subordination of Holly's management fee is enforceable in this dual bankruptcy situation.

In addition to equality of distribution, the other well-established principle of bankruptcy is that bankruptcy debtors are entitled to a "fresh start". This fundamental policy is axiomatic under the Bankruptcy Code.

> One of the primary purposes of the Bankruptcy Act is to "relieve the honest debtor from the weight of oppressive indebtedness, and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes." *Williams v. U.S. Fidelity & Guaranty Co.*, 236 U.S. 549, 554, 555, 35 S.Ct. 289, 290, 59 L.Ed. 713. This purpose of the act has been again and again emphasized by the courts as being of public as well as private interest, in that it gives to the honest but unfortunate debtor who surrenders for distribution the property which he owns at the time of bankruptcy, a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt.

*Local Loan v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934). *Accord Grogan v. Garner,* — U.S. ——, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991); *Brown v. Felsen*, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979); *Kokoszka v.*

*Belford*, 417 U.S. at 645–46, 94 S.Ct. at 2433–34; *Lines v. Frederick*, 400 U.S. 18, 20, 91 S.Ct. 113, 114, 27 L.Ed.2d 124 (1970); *Segal v. Rochelle*, 382 U.S. at 379, 86 S.Ct. at 514; *Stellwagen v. Clum*, 245 U.S. 605, 617, 38 S.Ct. 215, 218, 62 L.Ed. 507 (1918); *In re Krohn*, 886 F.2d 123, 125 (6th Cir. 1989); *Ryan v. Ohio Edison Co.*, 611 F.2d 1170, 1175 (6th Cir.1979); *Cesner v. Schmelzer (In re Schmelzer)*, 480 F.2d 1074, 1077 (6th Cir.1973).

A corollary of the "fresh start" principle is that after the date of the bankruptcy filing, the "cleavage date", prepetition debts may not be paid from postpetition assets except as may be permitted by federal bankruptcy law. "A fundamental tenet of bankruptcy law is that a petition for bankruptcy operates as a 'cleavage' in time. Once a petition is filed, debts that arose before the petition may not be satisfied through post-petition transactions." *Ashland Petroleum Co. v. Appel (In re B & L Oil Co.)*, 782 F.2d 155, 158 (10th Cir. 1986) (authorizing recoupment). *Accord Paris v. Transamerica Ins. Group (In re Buckley & Assocs. Ins., Inc.)*, 78 B.R. 155, 158 (E.D.Tenn.1987) (postpetition assets may not be utilized to pay prepetition debt); *In re Orndoff*, 100 B.R. 516, 519 (Bankr. E.D.Cal.1989) (the filing date establishes a "line of demarcation" determining which assets are available to satisfy claims; prepetition assets are available for prepetition debts, postpetition earnings are unavailable to satisfy prepetition debts); *United States v. Thomas (In re Thomas)*, 91 B.R. 731, 734 (Bankr.N.D.Tex.1988) (filing date establishes a "dividing line" in which prepetition assets are used to pay prepetition debt while postpetition assets are used to pay postpetition debts); *Ohning v. Schneider Nat'l Transcontinental, Inc. (In re Ohning)*, 57 B.R. 714, 717–18 (Bankr.N.D.Ind. 1986) (A creditor "may not, consistent with the policy of the Bankruptcy Code, withhold that which is due a debtor for post-petition efforts to satisfy a pre-petition debt").[55]

---

**55.** Some courts have held that upon filing of a chapter 11 case, the debtor in possession constitutes a "new entity". *See, e.g., Local Unions v.*

*Brada Miller Freight Sys., Inc. (In re Brada Miller Freight Sys., Inc.)*, 702 F.2d 890, 894–95 (11th Cir.1983); *Shopmen's Local Union No. 455 v.*

Section 552 deals with the post-petition effect of security interests and is a prime example of the cleavage date corollary to the fresh start principle.[56] Section 552(a) states:

> Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

Section 552 generally invalidates after acquired property clauses. The purpose of the section is "to facilitate the debtor's 'fresh start' by allowing the debtor to acquire postpetition assets free of prepetition liabilities and thereby offer postpetition accounts receivable and inventory as collateral to new creditors." *Unsecured Creditors Comm. v. Marepcon Fin. Corp (In re Bumper Sales, Inc.)*, 907 F.2d 1430, 1436

(4th Cir.1990) (quoting *In re Photo Promotion Assocs., Inc.*, 53 B.R. 759, 763 (Bankr.S.D.N.Y.1985)).

By its language, § 552 is applicable to "any lien resulting from any security agreement entered into by the debtor before commencement of the case."[57] Under state law, a subordination agreement "does not create a security interest as against either the common debtor [the Partnership] or a subordinated creditor [Holly's]." U.C.C. § 1-209. However, the U.C.C. does not prevent the creation of a security interest pursuant to a subordination agreement when the parties to the subordination so intend. U.C.C. § 1-209 official cmt. 2; *Chase Manhattan Bank*, 437 F.2d at 1047 (under U.C.C. § 1-209 proof is required to establish that subordination agreement is a security interest); *Hubbard Milling Co. v. Citizens State Bank*, 385 N.W.2d 255, 257 n. 1 (Iowa 1986) (subordination agreement

---

*Kevin Steel Prods., Inc.*, 519 F.2d 698, 704 (2d Cir.1975); *Matter of Springfield Casket Co., Inc.*, 21 B.R. 223, 228 (Bankr.S.D.Ohio 1982); *Hill v. Farmers Home Admin. (In re Hill)*, 19 B.R. 375, 380 (Bankr.N.D.Tex.1982). This rationale is related to the cleavage date corollary to the fresh start principle. The "new entity" rationale has been called into question. See *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 528, 104 S.Ct. 1188, 1197, 79 L.Ed.2d 482 (1984) ("For our purposes, it is sensible to view the debtor-in-possession as the same 'entity' which existed before the filing of the bankruptcy petition, but empowered by virtue of the Bankruptcy Code to deal with its contracts and property in a manner it could not have employed absent the bankruptcy filing."). Notwithstanding this language, some courts have continued to utilize a "new entity" rationale. See, e.g., *United States v. Gore (In re Gore)*, 124 B.R. 75, 78 (Bankr.E.D.Ark. 1990); *Patton v. John Deere Co. (Matter of Durham)*, 87 B.R. 300, 302 (Bankr.D.Del.1988), aff'd, 100 B.R. 711 (D.Del.1989); *Merrill v. Abbott (In re Independent Clearing House Co.)*, 41 B.R. 985, 998–99 (Bankr.D.Utah 1984). Given this court's analysis, a new entity rationale is neither accepted nor rejected in this opinion, notwithstanding its appeal.

**56.** Many other sections of the Bankruptcy Code are premised, in whole or in part, upon the cleavage date corollary to the fresh start principle. By way of illustration, those sections include § 362 (automatic stay), § 541 (property of estate), § 522 (exemptions), § 553 (set off), and § 549 (postpetition transfers). The only *statutory* exception appears to be in connection with

the assumption of unexpired leases and executory contracts under § 365. When a lease or executory contract is assumed, a trustee or debtor in possession is *required* postpetition to cure and pay otherwise unsecured prepetition indebtedness. There are two major judge-made exceptions to the cleavage date corollary. First, postpetition repayment of prepetition unsecured debt may be allowed under a recoupment theory. See, e.g., *B & L Oil Co.*, 782 F.2d ·at 157–59 (allowing recoupment); *Matter of American Sunlake Ltd. Partnership*, 109 B.R. 727, 730–731 (Bankr.W.D.Mich.1989) (discussing and denying recoupment under facts of case); Buschman, *supra*, at 356–58, 360 (criticizing the inequity of recoupment and noting Congress' intent "to retain the bright line between pre-petition claims and post-petition obligations"). Second, postpetition payment of prepetition debt is sometimes allowed under the "necessity of payment" doctrine. See, e.g., *In re Gulf Air, Inc.*, 112 B.R. 152, 153–54 (Bankr.W.D.La.1989); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 176 (Bankr.S.D.N.Y. 1989); 3 NORTON BANKR.L. & PRAC. § 56A.05, at 8–14.

This court strongly believes that these recognized exceptions, whether statutory or judge-made, are very limited and should be construed as an extremely slight erosion of the cleavage date corollary to the fresh start principle.

**57.** Under the Bankruptcy Code, a "lien" is defined as a "charge against or interest in property to secure payment of a debt or performance of an obligation". 11 U.S.C. § 101(37). A "security agreement" is an "agreement that creates or provides for a security interest". *Id.* § 101(50).

**678**

determined to intend to create a security agreement).

In October, 1990, when the Management Agreement was prepared (and executed) subject to Sumitomo's counsel's input and review, Sumitomo released $300,000 in pledged funds, which were subject to its security interest, to the Partnership to be utilized in connection with the conversion of the hotel property from a Marriott franchise to a Crowne Plaza franchise. In substitution for the pledged funds, Sumitomo accepted the subordination language in the Management Agreement. Notwithstanding a lack of testimony regarding the intent of the parties, and Sumitomo's failure to sign the Management Agreement as a party, this action itself is a strong indication that the parties intended the Partnership's negative promise and Holly's affirmative promise be in the nature of additional security for the Partnership's repayment of Sumitomo's indebtedness.

During the proofs, it appeared no party focused on the issue of a possible intent to create a security interest by reason of the Management Agreement clauses. Ahrens did not address the issue. Krok, due to his death, could not give testimony regarding

the intent of the parties. Benjamin, in his testimony, made only indirect references to the possible intent of Sumitomo.[58] Lastly, although Benjamin consulted with Sumitomo's counsel regarding the language in the subordination prior to release of the pledged funds, there was no testimony from Sumitomo's counsel regarding conversations, if any, that it may have had with the Debtors' representatives.

■ Given the incomplete record, the court has determined at this time not to determine whether the parties intended the subordination clauses to create a security agreement. Further, to properly raise this issue and to determine whether the subordination agreement is an avoidable security interest under § 544, an adversary proceeding is required. FED.R.BANKR.P. 7001(2). Because no adversary proceeding has been filed and litigated, this remains an open question.[59]

■ Now that applicable law has been surveyed and discussed, it is time to proceed to the heart of the matter with emphasis. *This court holds that the subordination agreement is unenforceable with regard to Holly's postpetition earnings.*[60] Section 510(a) does not provide

A "security interest" is a "lien created by an agreement". *Id.* § 101(51).

**58.** Benjamin testified sparsely regarding Sumitomo's intent in including the subordination provisions in the Management Agreement.
Q: What did [Sumitomo] intend to accomplish with these subordination provisions? What was the purpose of them?
A: The purpose was to block, in case [Sumitomo's] interest was not paid, to block the owner, [the Partnership], from paying management fee to Holly's. This was one part of it. Also, you have the subordination agreement that Holly's would not take any management fees out of this operation should [Sumitomo's] interest not be paid. So subordination applies to both of them. This was to block payment.
(*See* Trial Transcript January 7, 1992, at 107–08.)

**59.** Holly's has also argued that the definition of a security agreement under the U.C.C., with its subordination exclusion in U.C.C. § 1–209, is not coextensive with the definition of security interest for bankruptcy purposes under federal law. The legislative history respecting the definitions of "security agreement" and "security interest" states:

Though these terms are similar to the same terms in the Uniform Commercial Code, Article IX, they are broader. For example, the UCC does not cover real property mortgages. Under this definition, such a mortgage is included, as are all other liens created by agreement, even though not covered by the UCC. H.R.REP. No. 595, 95th Cong., 1st Sess. 314 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6271.

Holly's argues that the subordination clauses constitute a security agreement under bankruptcy law notwithstanding state law. Given the express language in § 510(a), this argument now appears weak. However, similarly with the issue of whether the parties intended the subordination clauses to constitute a security interest, Holly's argument shall only be considered if and when an adversary proceeding is filed and after the court conducts a trial.

**60.** Whether Holly's is entitled to postpetition earnings, and the amount, if any, for managing the Partnership's hotel facility is a question left for another day. Holly's will be entitled to payment if the Management Agreement is assumed by both Debtors. Even if the agreement is rejected, Holly's asserts it is entitled to a chapter 11 administrative claim for its postpetition efforts. Sumitomo asserts that a hotel

carte blanche to a creditor under the guise of a subordination agreement to collect a debtor's postpetition earnings to be applied to a prepetition debt. After a bankruptcy case is filed, state law takes a backseat to bankruptcy law when a federal purpose is served. To hold to the contrary would allow an unsecured creditor to possess greater rights than a secured creditor under the Bankruptcy Code. *Cf.* 11 U.S.C. § 552(a). Such a bizarre and freakish result would be fundamentally at odds with the language and intent of the Bankruptcy Code and the equitable principles and policies of overall bankruptcy law.

This court has not explicitly relied upon *Wyse* to support its holding. However, *Wyse* appears to stand for the proposition that the bankruptcy laws are based, in great part, upon equity and the equitable considerations which, in that case, mandated the disallowance of the senior creditor's double dividends. This court is mindful that "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank of Worthington v. Ahlers,* 485 U.S. 197, 207, 108 S.Ct. 963, 969, 99 L.Ed.2d 169 (1988). *Accord Ray v. City Bank & Trust Co. (In re C–L Cartage Co., Inc.),* 899 F.2d 1490, 1494 (6th Cir.1990); *Wasserman v. Immormino (In re Granger Garage, Inc.),* 921 F.2d 74, 77 (6th Cir.1990); *Middleton Arms Ltd. Partnership,* 934 F.2d at 724; *Schewe,* 94 B.R. at 950. Based upon the discussion and rationale above, to the extent that this holding may be characterized as "equitable", this court believes the re-

sult is mandated by the Bankruptcy Code. Regardless of state law, the decision is based upon an overriding federal purpose.

■ However, to the extent that *Wyse* may stand for the proposition, as suggested by some commentators, that a subordination agreement is a security agreement, which must be perfected to be enforceable in the junior creditor's bankruptcy, this court rejects such a conclusion. Post–*Wyse* law, i.e., § 510(a) of the Bankruptcy Code and U.C.C. § 1–209, expressly permits enforceability of subordination agreements under applicable state law. Only two exceptions are now apparent: first, if the parties intended the subordination to be a security agreement under state law or, second, if a federal purpose requires a different result.

■ Therefore, *this court further holds that the affirmative promise subordination clause in the Management Agreement, in favor of senior creditors Sumitomo and prior lienholders, is enforceable against junior creditor Holly's in its bankruptcy case with respect to its prepetition earnings.* Based on the record now before it, there appears to now be no demonstrable federal purpose that would mandate a different result.[61] Therefore, the senior creditors, Sumitomo and any prior lienholders may be entitled to double dividends, i.e., their own dividends plus certain dividends to which the junior creditor, Holly's, may be entitled.

Regretfully, based upon the current record, the court is now unable to deter-

---

management company is a "professional person" that must be first appointed by the court before it may be allowed an administrative claim. 11 U.S.C. § 327. *See Childress v. Middleton Arms Ltd. Partnership (In re Middleton Arms Ltd. Partnership),* 934 F.2d 723 (6th Cir. 1991). Sumitomo alleges Holly's holds an adverse interest and is not disinterested and therefore cannot be appointed to manage the Partnership's hotel facility. A further possibility exists that Holly's may be entitled to compensation under a theory that the Debtors, after filing but before assumption or rejection, "conformed" their actions to the Management Agreement thereby giving rise to a quasi-contract or quantum meruit recovery. Buschman, *supra,* at 345, 359.

These types of issues were first raised in one of Sumitomo's posthearing memoranda of law. During final argument, all parties agreed that any decision respecting these issues should be deferred to a later hearing.

**61.** For example, federal questions may exist: (1) assuming the parties intended that the subordination is a security agreement, whether the subordination is avoidable under § 544; (2) whether any payments to be made under the subordination may be fully, or partially, avoided as a preferential transfer under § 547 or as a fraudulent conveyance under § 548; or (3) whether the postpetition transfer avoidance provision in § 549 has any applicability. *Cf.* Heileson & Hirsch, *supra,* at 564–66.

mine the economic rights of Sumitomo and obligations of Holly's under the affirmative promise subordination clause. Factual and interrelated legal issues remain. First, what total amount, if any, does the Partnership owe Holly's for prepetition management fees? Second, do prior lienholders have rights under the subordination and, if so, who are such prior lienholders and what is the amount of their respective claims? Third, on what date, or dates, did the condition giving rise to Sumitomo's and/or prior lienholders' subordination rights occur, i.e., the default date or dates? Fourth, do Sumitomo and prior lienholders have differing rights and, if so, does Sumitomo have any standing to assert the prior lienholders' rights? Fifth, what is the amount of Holly's management fees to which it may be entitled measured from the default date, or dates, until Holly's bankruptcy filing date, i.e., the fees subject to the subordination? Sixth, with regard to the fees subject to subordination, will Holly's be entitled to a distribution as a nonpriority unsecured creditor or may Holly's be entitled to a full dividend based upon cure by the Partnership of the Management Agreement if assumed by both Debtors? Seventh, assuming Sumitomo and prior lienholders each have subordination rights and are entitled to receive "double dividends", shall their competing rights to Holly's proper dividend be determined on a pro rata basis or based upon their lien priorities (or subordination priorities if any)? *Cf. United States v. Darnell (In re Darnell)*, 834 F.2d 1263, 1269 (6th Cir.1987) (under § 724(b), competing tax lien creditors' claims determined by priority under non-bankruptcy law; lower court's determination of pro rata distribution was erroneous).

Summarizing, the subordination is *unenforceable* against Holly's *postpetition* management earnings. However, unless it is later determined in an adversary proceeding that a federal purpose requires a different result, the subordination is *enforceable* against Holly's *prepetition* management earnings.

### 7. Assumption or Rejection of Management Agreement.

We have now returned from the outer fringes. The Management Agreement signed by the Partnership and Holly's, as of the Debtors' bankruptcy filing date, contained reciprocal obligations and required performance by both Debtors. There is no question that the agreement is an executory contract. *Terrell*, 892 F.2d at 471; *JRT, Inc. v. TCBY Sys., Inc. (Matter of JRT, Inc.)*, 121 B.R. 314, 320 (Bankr. W.D.Mich.1990).

In this dual bankruptcy setting, the Management Agreement may be assumed if approved by court order in *both* Debtors' bankruptcy cases. 11 U.S.C. § 365(a). *See, e.g., Data–Link Sys., Inc. v. Whitcomb & Keller Mortgage Co. (In re Whitcomb & Keller Mortgage Co.)*, 715 F.2d 375, 380 (7th Cir.1983); *In re Providence Television Ltd. Partnership*, 113 B.R. 446, 452 (Bankr.N.D.Ill.1990). If the Management Agreement is burdensome to either estate based upon the respective Debtor's business judgment, *either* the Partnership or Holly's may reject the agreement after notice and hearing.[62] *Bildisco*, 465 U.S. at 528, 104 S.Ct. at 1197; *Leasing Serv. Corp. v. First Tennessee Bank Nat'l Ass'n*, 826 F.2d 434, 436 (6th Cir.1987); *JRT*, 121 B.R. at 320–21.

Generally, an executory contract must be assumed or rejected in its entirety;

---

**62.** The court notes that it may be argued, given the overlapping control of the two Debtors, that both Debtors will necessarily determine to each assume or each reject the executory contract. Such an argument ignores the involvement of Holly's creditors' committee and the interests it represents. This committee, to date, has been very involved in both bankruptcy cases. Although the Partnership does not now have a committee, it has very few unsecured creditors compared to Holly's and the largest unsecured claim may be Sumitomo's undersecured deficiency claim. When a chapter 11 debtor is insolvent, the unsecured creditors often have the most to gain or lose. T. JACKSON, THE LOGIC AND LIMITS OF BANKRUPTCY LAW 167–69 (1986). At any assumption or rejection hearing, or hearings, the court will carefully consider the views of creditors.

a trustee or debtor in possession may not pick and choose terms or clauses in a contract to assume or reject. *See, e.g., Bildisco,* 465 U.S. at 531–32, 104 S.Ct. at 1198–99 (chapter 11 debtor in possession must assume executory contract *cum onere*); *United States Lines, Inc. v. United States (In re McLean Indus., Inc.),* 132 B.R. 247, 265 (Bankr.S.D.N.Y.1991); *In re Cutters, Inc.,* 104 B.R. 886, 888 (Bankr.M.D.Tenn. 1989); *Matter of Executive Technology Data Sys.,* 79 B.R. 276, 282 (Bankr. E.D.Mich.1987). Sumitomo, as one of its alternative arguments, asserts that the Partnership's negative promise and Holly's affirmative promise must therefore be assumed or rejected with the entire Management Agreement. The Debtors assert the clauses are severable and separately rejectable even if the Management Agreement is assumed.

■ A single writing may contain more than one contract for § 365 assumption-rejection purposes. *Byrd v. Gardinier, Inc. (In re Gardinier, Inc.),* 831 F.2d 974, 975–76 (11th Cir.1987), *cert. denied,* 488 U.S. 853, 109 S.Ct. 140, 102 L.Ed.2d 112 (1988). In that case, the court determined that a brokerage agreement and a purchase and sale agreement, set forth in a single document, were two separate contracts. The three factors considered by the court were: (1) the differing nature and purpose of the agreements; (2) the separate and distinct consideration for the agreements; and (3) the non-interrelatedness of the obligations of the parties to the document.[63]

■ In this case, the nature and purpose of the overall Management Agreement respecting operating the hotel is to-

tally different from the third party beneficiary clauses therein regarding establishing a contractual debt payment priority and a subordination of Holly's management fees. The consideration is separate and distinct. The Partnership and Holly's have mutual obligations in the agreement; Sumitomo allowed a release of its pledged funds and permitted the Partnership to enter into the Management Agreement with Holly's in return for the inclusion of the clauses in the agreement. Finally, the obligations to Sumitomo by the Debtors are only marginally related to the great bulk of the agreement respecting rights, duties and obligations to operate the hotel facility. The clauses could have just as easily been placed in a separate document, whether signed by Sumitomo or not, with no effect upon the other terms in the Management Agreement. Therefore, this court finds that the Partnership's negative promise and Holly's affirmative promise are legally separate and severable provisions from the rest of the Management Agreement.

■ It has been argued that once severed, the clauses are separately rejectable. Under these facts, that argument is unsuitable. Under both the Partnership's negative promise and Holly's affirmative promise, Sumitomo has fully performed.[64] The only possible remaining obligation is for Holly's to pay its earned management fees to Sumitomo under the subordination. Therefore, the clauses are nonexecutory and are not assumable or rejectable by the Debtors. *Matter of Dunes Casino Hotel,* 63 B.R. 939, 948 (D.N.J.1986) (where the only obligation is for one party to pay money and the other party has no remaining obligation, there is no executory con-

**63.** Other courts have also found separate or severable obligations in an executory contract setting. *See, e.g., McLean Indus., Inc.,* 132 B.R. at 265 ("the *cum onere* principle does not provide that once assumed, every single provision of an agreement is enforceable by and against the debtor; indeed, the Code itself alters certain rights of the parties"; the court determined that assumed "Charters" were separate from an assignment upon which an avoidable preferential transfer recovery was based); *Cutters, Inc.,* 104 B.R. at 889 (the court determined that a single document contained separate agreements regarding sale of assets and future mutual obli-

gations to market certain inventory; the sale portion of the contract was substantially performed and nonexecutory while the marketing agreement was executory and rejectable).

**64.** Sumitomo is a third party beneficiary and therefore does not need to perform anything. To the extent Sumitomo may have been required to perform, it gave consideration at or near the time the Management Agreement was executed and that action has been fully accomplished.

tract); *Cutters, Inc.*, 104 B.R. at 889 (severable sale contract was so substantially performed to render it nonexecutory); *Executive Technology Data Sys.*, 79 B.R. at 280–81 n. 5 (discussing in *dicta* the approaches by which the executory or nonexecutory nature of a contract may be determined).

Under § 365(d)(2), unless the bankruptcy court specifies a shorter time period, a chapter 11 debtor in possession "has until a reorganization plan is confirmed to decide whether to accept or reject an executory contract". *Bildisco*, 465 U.S. at 529, 104 S.Ct. at 1198. The "Code's overall effort [is] to give a debtor-in-possession some flexibility and breathing space." *Id.* at 532, 104 S.Ct. at 1199.

■ Sumitomo has requested this court to shorten the maximum statutory period to a lesser specified time by which the Debtors will be required to assume or reject the Management Agreement. When such a request is made, a court must determine a reasonable period of time within its discretion based upon the facts and circumstances of the case. *Theatre Holding Corp. v. Mauro*, 681 F.2d 102, 105 (2d Cir.1982); *Dunes Casino Hotel*, 63 B.R. at 949; *Levy v. McLouth Steel Corp. (Matter of McLouth Steel Corp.)*, 20 B.R. 688, 692 (Bankr.E.D.Mich.1982).

■ The Debtors' cases are fairly large cases in this district. The cases are extremely legally complex for a number of reasons including the validity and enforceability of the subordination clauses addressed earlier in this opinion. It is understandable that the Debtors (and perhaps Sumitomo as well) first desired a determination regarding some of the legal issues before they could know *what* they might be seeking to assume or reject. Further, as set forth above, the court has identified

seven possible factual or legal issues pertaining to its ruling regarding Sumitomo's and prior lienholders' possible subordination rights against Holly's management fees. This court has balanced the Debtors' need to breathe freely in the reorganization process and to consider possible plans in light of the remaining open legal matters against Sumitomo's desire to obtain a prompt quantification (and perhaps payment if the Management Agreement is assumed) of its double dividends from Holly's. At present, the scalepan tips strongly in the Debtors' favor. Therefore, in the immediate future, this court will not exercise its discretion and require the Debtors to seek to assume or reject the Management Agreement before plan confirmation.[65]

8. Sumitomo's Requested Injunction Prohibiting Payment of Management Fees by the Partnership to Holly's.

■ In its amended motions filed against the Debtors, Sumitomo has requested the court to prohibit the Partnership from paying Holly's, and to prohibit Holly's from receiving, management fees.[66] The request was premised upon Sumitomo's assertion of entitlement to all of Holly's earnings under the Management Agreement. The court has rejected Sumitomo's argument regarding postpetition earnings.

"Four factors are particularly important in determining whether a preliminary injunction is proper: (1) the likelihood of [Sumitomo's] success on the merits; (2) whether the injunction will save [Sumitomo] from irreparable injury; (3) whether the injunction would harm others; and (4) whether the public interest would be served by the injunction." *Unsecured Creditors' Comm. v. DeLorean (In re DeLorean Motor Co.)*, 755 F.2d 1223, 1228

---

**65.** The court takes judicial notice that the Partnership has filed a proposed plan and disclosure statement. Fed.R.Evid. 201. The court determined to schedule the disclosure statement hearing on a date approximately three weeks after the release of this opinion. After the Debtors have had the opportunity to review and become fully cognizant of the import of various legal determinations herein, they should have

adequate incentive to seek to assume or reject the Management Agreement within a reasonable time.

**66.** To obtain an injunction an adversary proceeding is normally required. Fed.R.Bankr.P. 7001(7). All parties agreed that the consolidated motions could be treated as an adversary proceeding and the court did so.

(6th Cir.1985). After considering these factors with respect to its findings of fact, the court has determined Sumitomo has not adequately demonstrated that injunctive relief is warranted.

At this time, Holly's is not entitled to any postpetition payment from the Partnership. The Management Agreement has not been assumed, this court has not allowed any chapter 11 administrative expense claim to Holly's, and no determination has been made whether Holly's may be entitled to quasi-contract recovery under the suspended unassumed executory contract. Until these issues are decided, the Partnership's obligation, if any, to Holly's will accrue and Holly's payment, if any, will be delayed.[67]

**B.** *Relief From the Automatic Stay Issues.*

Sumitomo requests the automatic stay be lifted, pursuant to 11 U.S.C. § 362(d), to allow it to pursue a state court action to: (1) appoint a receiver for the Crowne Plaza; (2) enforce its assignment of rents and other hotel revenues; and (3) foreclose on its collateral. (*See* Sumitomo's Amended Motion Against the Partnership at 5, 7.) Sumitomo asserts that "cause" exists under § 362(d)(1) because the Partnership has mismanaged the Crowne Plaza both prepetition and postpetition; the Partnership has committed fraud upon Sumitomo; and the Partnership has failed to provide for the payment of postpetition taxes. Sumitomo also asserts the Partnership lacks equity in the Crowne Plaza and that it is not necessary to an effective reorganization which is in prospect pursuant to § 362(d)(2).

**1.** Is the Bank Entitled to Relief From Stay for "Cause"?

**a.** *Burden of Proof Under § 362(d)(1).*

■ In a relief from stay proceeding, the party opposing the motion has the burden of proof on all issues except for debtor's equity in the property. 11 U.S.C. § 362(g). However, § 362(g) does not con-

template allowing a creditor to blindly assert causes of action without bearing some burden of production. As stated by the Second Circuit Court of Appeals:

> The burden of proof on a motion to lift or modify the automatic stay is a shifting one. Section 362(d)(1) requires an initial showing of cause by the movant, while Section 362(g) places the burden of proof on the debtor for all issues other than "the debtor's equity in property"[.] If the movant fails to make an initial showing of cause, however, the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection.

*Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.),* 907 F.2d 1280, 1281 (2d Cir.1990). *Accord In re Kerns,* 111 B.R. 777, 786 (S.D.Ind. 1990) (burden of production on moving party because "debtor should not have to demonstrate the nonexistence of every conceivable cause or answer a naked assertion of the existence of a particular cause."); 2 L. KING, COLLIER ON BANKRUPTCY ¶ 362.10 (15th ed. 1992) (moving party required to make a showing of cause under § 362(d)(1), then burden of proof, i.e. risk of nonpersuasion, shifts to party opposing motion).

Sumitomo asserts that "cause" exists to grant relief from the stay because of the Debtors' alleged mismanagement, fraud, and failure to provide for payment of postpetition real property taxes. Sumitomo must initially make some showing of cause. If Sumitomo satisfies the initial showing, the burden of proof shifts to the Partnership which then bears the risk of nonpersuasion.

**b.** *Is "Cause" to Modify Stay Under § 362(d)(1) Identical to "Cause" to Appoint a Trustee Under § 1104(a)?*

■ Relying on a principle of statutory interpretation enunciated in *United Sav. Assoc. of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) [68], Sumitomo as-

---

67. The court strongly urges all parties to attempt to forthwith settle these types of issues including the seven factual and legal issues identified earlier in this opinion.

68. As is typically the practice, this decision will be referred to throughout this opinion as *"Timbers"*.

serts that a more precise definition of "cause" may be ascertained by relying on the language of § 1104(a) of the Bankruptcy Code. Sumitomo argues that because § 1104(a) defines the term "cause", the language in § 1104(a) is compelling when determining "cause" under § 362(d)(1). Sumitomo does not cite, nor has the court located, any reported decisions following this analysis.

Section 362(d)(1) provides that:

On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest....

Except for lack of adequate protection, "cause" is not defined by § 362(d)(1). The legislative history of § 362(d) does little to assist in defining "cause".

[C]auses [other than lack of adequate protection] might include the lack of any connection with or interference with the pending bankruptcy case. For example, a divorce or child custody proceeding involving the debtor may bear no relation to the bankruptcy case [and] should not be stayed. A probate proceeding in which the debtor is the executor or administrator of another's estate usually will not be related to the bankruptcy case, and should not be stayed. Generally, proceedings in which the debtor is a fiduciary, or involving postpetition activities of the debtor, need not be stayed because they bear no relationship to the purpose of the automatic stay, which is protection from his creditors. *The facts of each request will determine whether relief is appropriate under the circumstances.*

H.R.Rep. No. 595, 95th Cong., 1st Sess. 343–44 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6300 (emphasis added).

Section 1104(a) sets forth the standards for appointment of a trustee and provides, in pertinent part:

(a) ... the court shall order the appointment of a trustee—

(1) for *cause, including fraud, dishonesty, incompetence, or gross mismanagement* of the affairs of the debtor by *current management,* either before or after the commencement of the case....

11 U.S.C. § 1104(a) (emphasis added).

At first blush, Sumitomo's argument has some superficial appeal. In *Timbers,* the Supreme Court interpreted the term "interest in property" used in § 362(d)(1) by analyzing other sections of the Code which employ similar terminology. *See* 484 U.S. at 371–79, 108 S.Ct. at 630–34. The statutory interpretation principle utilized in *Timbers* is:

*A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—* because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law[.]

*Id.* at 371, 108 S.Ct. at 630 (citations omitted) (emphasis added).

▪ Sumitomo argues that because § 1104's definition of "cause" clarifies § 362(d)(1)'s ambiguous use of the same term, the court should adopt § 1104(a)'s definition. A closer examination of the principle of statutory interpretation exercised in *Timbers* indicates that a court should not confer identical words used in different sections of the same act with the same meaning in every situation.

"[T]here is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning." *Atlantic Cleaners & Dyers v. United States,* 286 U.S. 427, 433, 52 S.Ct. 607, 609, 76 L.Ed. 1204. But, since most words admit of different shades of meaning, susceptible of being expanded or abridged to conform to the sense in which they are used, *the presumption readily yields to the controlling force of the circumstance that the words, though in the same act, are*

*found in such dissimilar connections as to warrant the conclusion that they were employed in the different parts of the act with different intent.*

*Helvering v. Stockholms Enskilda Bank,* 293 U.S. 84, 87, 55 S.Ct. 50, 51, 79 L.Ed. 211 (1934) (emphasis added). *See also Sorenson v. Secretary of Treasury,* 475 U.S. 851, 860–61, 106 S.Ct. 1600, 1606–07, 89 L.Ed.2d 855 (1986) (acknowledging identical words may have different meanings in separate sections of the same act but presumption of same meaning strengthened when identical words appear in same subchapter) [69]; *District of Columbia v. Carter,* 409 U.S. 418, 420–21, 93 S.Ct. 602, 604, 34 L.Ed.2d 613 (1973) (refusing to give the term "State or Territory" the same meaning under 42 U.S.C. § 1983 as 42 U.S.C. § 1982); *Farmers Reservoir & Irrigation Co. v. McComb,* 337 U.S. 755, 764, 69 S.Ct. 1274, 1279, 93 L.Ed. 1672 (1949) (refusing to give the term "production" the same meaning in two different sections of the Fair Labor Standards Act).

■■■■■ In a chapter 11 case, the debtor in possession retains management of the business unless a party in interest demonstrates that appointment of a trustee is necessary. *See, e.g., In re Ionosphere Clubs, Inc.,* 113 B.R. 164, 167 (Bankr. S.D.N.Y.1990); *Matter of Parker Grande Dev., Inc.,* 64 B.R. 557, 560 (Bankr.S.D.Ind. 1986); *Dardarian v. La Sherene, Inc. (In re La Sherene, Inc.),* 3 B.R. 169, 174 (Bankr.N.D.Ga.1980). The debtor in possession generally has the same rights and duties as a trustee in a chapter 11 case. These duties include the protection and conservation of property of the estate for the benefit of all creditors. *Ionosphere Clubs,* 113 B.R. at 169; *Parker Grande Dev.,* 64 B.R. at 561. Additionally, the debtor in possession has a fiduciary obligation to the creditors of the estate to refrain "from acting in a manner which could damage the estate, or hinder a successful reorganization". *Parker Grande Dev.,* 64 B.R. at 561 (citing *In re Thurmond,* 41 B.R. 464, 465 (Bankr.D.Or.1983)). *See Ionosphere Clubs,* 113 B.R. at 169; *In re Microwave*

*Prods. of America,* 102 B.R. 666, 671 (Bankr.W.D.Tenn.1989); *In re Sharon Steel Corp.,* 86 B.R. 455, 457 (Bankr. W.D.Pa.1988), *aff'd,* 871 F.2d 1217 (3d Cir. 1989).

■■■■ The legislative history of § 1104 states that "[t]he twin goals of the standard for appointment of a trustee should be *protection of . . . the interests of creditors* . . . and facilitation of a reorganization that will benefit both the creditors and the debtors . . . ." H.R.REP. No. 595, 95th Cong., 1st Sess. 232–33 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6192. The legislative history and case law indicate an appointment of a trustee is appropriate when the debtor in possession fails to adequately perform the duties of a trustee. Specifically, appointment of a trustee is proper when the debtor in possession fails to protect and conserve property of the estate for the benefit of its creditors. The intent of § 1104(a) is to protect the *entire creditor body* from debtor activities which diminish the value of the estate as a whole.

The purpose of the automatic stay is twofold involving the protection of the debtor and all creditors of the estate.

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. . . .
>
> The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally. A race of diligence by creditors for debtor's assets prevents that.

H.R.REP. No. 595, 95th Cong., 1st Sess. 340–41 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6296–97. From the view of the creditor body, the automatic stay protects property of the estate "in a manner consistent with the bankruptcy

---

**69.** "Cause" under § 362(d)(1) and § 1104(a) ap- pears in *different* subchapters of the *same* act.

goal of equal treatment by ensuring that no creditor receives more than an equitable share of the bankrupt's estate." *Lincoln Sav. Bank v. Suffolk County Treasurer (In re Parr Meadows Racing Ass'n, Inc.),* 880 F.2d 1540, 1545 (2d Cir.1989), *cert. denied,* 493 U.S. 1058, 110 S.Ct. 869, 107 L.Ed.2d 953 (1990). *See also Borman v. Raymark Indus., Inc.,* 946 F.2d 1031, 1036 (3d Cir.1991) (purpose of automatic stay is "to prevent creditors from gaining a preference for their claims" and "to avoid interference with the orderly liquidation or rehabilitation of the debtor"); *Holtkamp v. Littlefield (Matter of Holtkamp),* 669 F.2d 505, 508 (7th Cir.1982) ("purpose of automatic stay is ... to provide a systematic equitable liquidation procedure for all creditors, secured as well as unsecured").

Relief from the automatic stay under § 362(d) serves a different purpose. Although the legislative history does not specifically address Congress' objective, this court strongly believes that one major intent of § 362(d)(1) is protection of a secured creditor's Fifth Amendment property rights. *See Wright v. Union Central Life Ins. Co.,* 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940); *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935). If the somewhat uncertain "cause" standard for relief from the stay is satisfied, § 362(d)(1) entitles a secured creditor to enforce its individual rights against property of the estate.

This court disagrees with Sumitomo's analysis and refuses to axiomatically extend § 1104(a)'s definition of "cause" to § 362(d)(1). The intent of § 1104(a) and § 362(d)(1) is not necessarily coterminous. The purpose of § 1104(a) is to protect and conserve property of the estate for the *entire creditor body.* When a debtor in possession breaches its fiduciary duties, this section provides a meaningful remedy to remove the debtor in possession and obtain an independent trustee fiduciary to administer the estate. When a secured creditor's property rights are jeopardized or adversely affected, the purpose of § 362(d) is to modify the stay to permit the creditor to undertake remedies to recover property for its *individual benefit* as contrasted to the *benefit of the creditor body as a whole.*

In a somewhat analogous case, Judge Cyr implicitly recognized the difference between the purpose of § 1104 and § 362(d). In *In re Sea Queen Kontaratos Lines, Ltd.,* 10 B.R. 609 (Bankr.D.Me.1981), a secured creditor requested the appointment of a trustee because of gross mismanagement by the debtor. The debtor's business involved chartering a commercial sea vessel for summer cruises along the Maine coast. The secured creditor held a first preferred ship mortgage on the vessel. As winter approached, instead of berthing the vessel, the debtor decided to dispatch it to Florida to continue business operations. *Id.* at 609–10.

Judge Cyr ruled the evidence established that continuing operations in Florida over the winter was the best course of action for the debtor and all creditors of the estate. The court noted that "[the secured creditor] confuses its own self interest with the interests of the estate and creditors generally...." *Id.* at 610. In a footnote, Judge Cyr acknowledged that the secured creditor's remedies for its own self interest were found in §§ 361–364 of the Code. *Id.* at 610 n. 2. "Self interest has narrowed the focus of [the secured creditor], obscuring the many advantages accruing to creditors generally and to the estate...." *Id.* at 610.

Similar to the analysis in *Sea Queen,* when a secured creditor requests relief from the stay, it often does so with nondisparagingly self-ish motives. Any benefit to the estate is rare a factor in determining whether modifica ion of the stay should be sought or grante. Conversely, when a creditor seeks an appointment of a trustee, the benefit to and needs of the entire estate, including all other creditors, is the raison d'être. Therefore, "cause" under § 362(d)(1) focuses on the interests of an individual creditor, where "cause" under § 1104(a) focuses on the interests of the entire body of creditors. Because the intent of the two sections is different, the definition of "cause" in § 1104(a) will not

be deemed coextensive to the definition of "cause" in § 362(d)(1).

c. *Does "Cause" Exist to Warrant Modification of the Automatic Stay Under the Facts in this Contested Matter?*

 "Cause" under § 362(d)(1) is an intentionally broad and flexible concept which must, of necessity, be determined on a case by case analysis. *Christensen v. Tucson Estates, Inc. (In re Tuscon Estates, Inc.),* 912 F.2d 1162, 1166 (9th Cir. 1990); *Pursifull v. Eakin,* 814 F.2d 1501, 1506 (10th Cir.1987); *Mac Donald v. Mac Donald (In re Mac Donald),* 755 F.2d 715, 717 (9th Cir.1985); *Kerns,* 111 B.R. at 781–82 n. 2; *In re Kelly,* 125 B.R. 301, 302 (Bankr.D.Kan.1991); *Murray Indus., Inc. v. Aristech Chem. Corp., (In re Murray Indus., Inc.),* 121 B.R. 635, 636 (Bankr. M.D.Fla.1990); *In re Sentry Park, Ltd.,* 87 B.R. 427, 430 (Bankr.W.D.Tex.1988).[70] This court briefly passed upon what might constitute "cause" under § 362(d)(1) in *Schewe v. Fairview Estates (Matter of Schewe),* 94 B.R. 938 (Bankr.W.D.Mich. 1989). Although the facts in *Schewe* are distinguishable from the matter now before this court, it was stated:

> In previous bench opinions, given certain facts, this court has determined cause may include lack of insurance, commission of waste, failure to pay post-petition taxes respecting the property in which the creditor has an interest, or the violation of government statutes or ordinances.

*Id.* at 949.

There are a multitude of reported decisions discussing relief from the stay for "cause". The decisions are fact intensive and, except for the balancing test enunciated in *Cardinal Indus.,* the opinions generally offer no precise standards to determine when "cause" exists to successfully obtain relief from stay. *See, e.g., Tucson Estates,* 912 F.2d at 1166 ("cause" exists to lift stay as to state court trial involving same issues

for which bankruptcy court may abstain); *White v. White (In re White),* 851 F.2d 170, 173–74 (6th Cir.1988) ("cause" exists to lift stay to allow spouse to continue divorce proceedings and determine property settlement); *Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (Matter of Little Creek Dev. Co.),* 779 F.2d 1068, 1071–73 (5th Cir.1986) (lack of good faith in filing for bankruptcy constitutes "cause" for relief from stay); *Mac Donald,* 755 F.2d at 717 ("cause" exists to lift stay to allow creditor to proceed in state court action for spousal support modification); *Farmers & Merchants Bank & Trust of Watertown v. Trail West, Inc.,* 28 B.R. 389, 394 (D.S.D. 1983) (debtor's failure to comply with restrictions placed on it by the Code constituted sufficient misconduct to lift the stay); *In re Future Growth Enters., Inc.,* 61 B.R. 469, 472 (Bankr.E.D.Pa.1986) ("cause" to lift stay exists when debtor is significantly in default under lease and has failed to successfully move for assumption); *Matter of McMartin Indus., Inc.,* 62 B.R. 718, 723 (Bankr.D.Neb.1986) ("cause" exists to grant relief from the automatic stay when debtor fails to pay postpetition taxes, fails to disclose a bank account on its bankruptcy schedules, and fails to notify creditor of the existence of the account); *Matter of Lipply,* 56 B.R. 524, 528 (Bankr.N.D.Ind. 1986) ("cause" is more than simple nonpayment but relief from stay is granted where malfeasance by debtor constitutes abuse of bankruptcy process); *Brand Assocs. v. CGR, Ltd. (In re CGR, Ltd.),* 56 B.R. 305, 307 (Bankr.S.D.Tex.1985) ("cause" to grant relief from stay exists when debtor fails to follow court order); *In re Dabney,* 45 B.R. 312, 313 (Bankr.E.D.Pa.1985) (debtor's failure to pay rent for three months did not constitute sufficient misconduct to lift the stay); *Schmidt Indus., Inc. v. Schreiber (In re Schreiber),* 14 B.R. 1013, 1014 (Bankr.S.D.Fla.1981) (failure to file plan

**70.** Some courts have developed a balancing test to determine whether "cause" exists. "In determining whether or not cause exists, the bankruptcy court must balance the inherent hardships on all parties and base its decision on the degree of hardship and the overall goals of the

Bankruptcy Code." *In re Cardinal Indus., Inc.,* 116 B.R. 964, 983 (Bankr.S.D.Ohio 1990) (quoting *In re Opelika Mfg. Corp.,* 66 B.R. 444, 449 (Bankr.N.D.Ill.1986)). Because the stay is an automatic injunction, some consideration of balancing of harms is appropriate.

and comply with requirements of the Code constitutes "cause" for relief from stay).

Under the particular facts of this contested matter, the court must decide whether the Debtors' alleged mismanagement of the Crowne Plaza, the Debtors' alleged fraud upon Sumitomo, and the Debtors' failure to provide for postpetition real property taxes constitute sufficient "cause" for relief from the stay.[71]

### i. May Mismanagement Constitute Sufficient "Cause" to Obtain Modification of the Stay?

Sumitomo asserts that certain acts of mismanagement by the Debtors constitute sufficient "cause" for relief from the automatic stay under § 362(d)(1). The specific alleged acts of mismanagement include: (1) a poorly operated and uncompleted conversion of the Marriott to a Crowne Plaza; (2) a substantial decrease in revenues and occupancy rates after Holly's began managing the hotel property; (3) failure to pay a variety of taxes including real estate and personal property taxes assessed against the hotel property for the years 1989, 1990, and 1991; (4) an inherent conflict of interest between the Debtors resulting in misappropriating and commingling of Partnership funds by Holly's; (5) disregarding material provisions of the Loan Documents and Management Agreement; and (6) substantially increasing current management's salaries on the eve of bankruptcy. (*See* Sumitomo's Amended Motion Against the Partnership at 4; Sumitomo's Brief in Support of Motions for Relief From the Automatic Stay at 12, 17.)

In response, the Partnership asserts that all the alleged wrongs have occurred prepetition and prompt measures, after Krok's death, have been taken to rectify the organizational defects which led to the admittedly serious problems. Specifically, the Partnership and Holly's now maintain separate bank accounts and separate accounting systems. Also, the cause of many of the alleged problems was Krok, who can no longer be a member of current management. Since the source of the alleged mismanagement is no longer involved in management and current management is operating responsibly, the Debtors assert "cause" does not exist to grant relief from the stay. (*See* Partnership's Memorandum of Law in Opposition to Motion for Relief From the Automatic Stay at 10; Partnership's Supplemental Memorandum of Law in Opposition to Motion for Relief From the Automatic Stay at 2–3.) Sumitomo responds that not all the blame for the Partnership and Holly's difficulties can be placed on Krok. Sumitomo argues that current management cannot sufficiently distance itself from actions taken during Krok's tenure. (*See* Sumitomo's Brief in Support of Motions for Relief From the Automatic Stay at 17.)

Although there is no staunch rule, four reported cases have specifically discussed whether mismanagement may constitute sufficient "cause" under § 362(d)(1) stay relief. *See In re New Era Co.*, 125 B.R. 725, 730 (S.D.N.Y.1991); *In re Forest Ridge, II, Ltd. Partnership*, 116 B.R. 937, 946 (Bankr.W.D.N.C.1990); *Homestead Sav. & Loan Ass'n v. Associated Investors Joint Venture (In re Associated Investors Joint Venture)*, 91 B.R. 555, 556–57 (Bankr.C.D.Cal.1988); *Powers Aero Marine Servs., Inc. v. Merrill Stevens Dry Dock Co. (In re Powers Aero Marine Servs., Inc.)*, 42 B.R. 540, 545–46 (Bankr.S.D.Tex.1984). Some opinions focus upon whether the debtor's alleged mismanagement has contributed to a diminution in the secured creditor's collateral. *See New Era Co.*, 125 B.R. at 730; *Forest Ridge II*, 116 B.R. at 946; *Associated Investors*, 91 B.R. at 557.

---

**71.** In Sumitomo's original brief, it asserted that "cause" existed for relief from the stay because the Partnership lacked good faith in filing its petition for bankruptcy. (*See* Sumitomo's Brief in Support of Motions for Relief From the Automatic Stay at 21–23.) In subsequent briefs and during trial, Sumitomo failed to argue bad faith filing. At final argument, the court inquired as to whether Sumitomo still asserted "cause" existed for lack of good faith filing by the Partnership. Sumitomo orally withdrew the bad faith filing assertion. Therefore, the court will not analyze whether "cause" exists for relief from the stay because the Partnership allegedly lacked good faith in filing its petition.

Given this court's view that "cause" to appoint a trustee under § 1104 and "cause" to modify the stay for the benefit of a secured creditor under § 362(d)(1) are not identical, an analytical framework is helpful. A concept based upon cause and effect is apparent and may be posed as a question: Does a postpetition act or omission by a debtor result in an adverse effect upon the secured creditor's collateral value? If so, such potential effect, unless cured or promptly curable, results in a diminution of, or substantial jeopardy to, value thereby constituting sufficient "cause" for relief from stay. Such remedies include, but are not limited to, repossessing collateral, instituting foreclosure, or appointment of a state court receiver, all for the creditor's individual benefit. The court believes that this analysis is constructive and practical in assessing the merits of asserted "cause" involving a secured creditor's interests under § 362(d)(1).

The facts in this matter are very unique and unusual. There are two distinct time periods involving the management of the Debtors. From 1986 to June 10, 1991, the Debtors were controlled by Krok and, similar to Krok, the Debtors were in disarray. From June 11, 1991 to the hearing dates, the Debtors seem to have transmuted to business structures with different institutional personalities and goals. This court believes current management has taken some positive steps in the right direction.

Because of the two distinct time periods, much of the argument regarding whether mismanagement constitutes sufficient "cause" for relief from the stay has centered on whether the court should examine only postpetition alleged mismanagement or also review Krok's prepetition mismanagement as well. Two courts have considered whether alleged postpetition mismanagement constitutes sufficient "cause" to modify the stay. Under the facts in those cases, sufficient "cause" was not demonstrated. *See Forest Ridge II*, 116 B.R. at 946 ("the property is not being presently mismanaged so as to constitute cause"); *Associated Investors*, 91 B.R. at 557 (creditor did not argue prepetition mismanagement—court based its ruling only on postpetition mismanagement). Another court has ruled that prepetition mismanagement was sufficient "cause" for relief from the stay. *See Powers Aero Marine Servs.*, 42 B.R. at 546. However, it should be noted that in *Powers Aero Marine Servs.* the same management was in place both prepetition and postpetition.

In this matter, the evidence demonstrates, without serious question, that prepetition mismanagement occurred. Examples of such mismanagement include: (1) failure to pay prepetition real and personal property taxes; (2) failure to pay withholding and payroll taxes; (3) failure to pay trade creditors and Holiday Inn franchise fees; (4) failure to establish a separate account for the Crowne Plaza as required by the Management Agreement; (5) commingling the funds of Holly's and the Partnership in one general account and then paying obligations of all Holly's operations from that account; and (6) general disregard for certain requirements in the Management Agreement and Loan Documents.

With respect to prepetition mismanagement, this court believes the responsibility for the Debtors' actions is important. The court finds that Krok was substantially the root of all prepetition mismanagement. Krok was unquestionably the "Czar" of Holly's and the Partnership. Four witnesses, including two called by Sumitomo, testified regarding Krok's dictatorial style of management and unstable personality.[72] All four witnesses testified that Krok considered Holly's "his company" and he operated it according to *his* beliefs. This court reiterates its finding that Krok made all major decisions for the Debtors prior to his

---

72. *See* Trial Transcripts November 25, 1991, at 167–69 (testimony of Azar); November 26, 1991, at 28–31 (testimony of Cooper); November 26, 1991, at 68–75 (testimony of Lion); November 27, 1991, at 73–74 (testimony of Ahrens).

death on June 10, 1991.[73]

Since Krok's death, current management has made on-going efforts towards correcting the past mismanagement of Krok. By way of illustration, the Debtors: (1) have established and are using a separate bank account for the Partnership; (2) are now improving their financial reporting systems; and (3) are implementing a kinder and gentler organizational structure to accomplish business goals more competently.

This court rules that *under these facts* prepetition mismanagement should not be considered for sufficient "cause" to grant modification of the stay to Sumitomo pursuant to § 362(d)(1). Because of the major institutional differences between the Krok Czar-like prepetition management and the current management team, the court will not consider the mismanagement from 1986 until Krok's death on June 10, 1991 as constituting sufficient "cause" to modify the automatic stay. Equally important, Sumitomo has not shown that Krok's prior mismanagement, within this court's analytical framework, has adversely affected its postpetition property interests in the hotel collateral. No cogent proofs exist to show that prepetition mismanagement is now causing any diminution of Sumitomo's Fifth Amendment property rights.

▇▇▇▇▇▇ Postpetition mismanagement, under certain circumstances, may constitute sufficient "cause" under § 362(d)(1). For reasons discussed above, this court will focus on whether postpetition mismanagement has caused a diminution in the collateral. *Cf. Forest Ridge II,* 116 B.R. at 946; *Associated Investors,* 91 B.R. at 557. The court finds there is no nonspeculative evidence that supports the conclusion that Sumitomo's hotel collateral has been adversely affected postpetition.

In addition to the above, Sumitomo advances three other related arguments as postpetition "cause" to modify the stay: (1) excessive salaries have been continued postpetition; (2) potential conflicts of interest exist by Holly's concurrently managing its hotel properties and the Partnership's hotel property; and (3) the Partnership has failed to pay or escrow funds for payment of postpetition real and personal property taxes.

▇▇▇▇▇▇ The most troubling evidence regarding current management is the relatively recent immense salary increases taken by Ahrens and Lion. This evidence alone might constitute sufficient postpetition mismanagement to constitute "cause" for appropriate relief. The expert testimony of Steven Jorns indicates that both Ahrens and Lion are enormously overpaid compared to similar executives in the industry.[74] (*See* Trial Transcript January 6, 1992, at 49–51.) The court believes that Ahrens' and Lion's salary increases are excessive and unjustified especially given the Debtors' financial circumstances. Although the continuation of the salary increases may constitute some indication of postpetition mismanagement, the court believes that this fact standing alone is insufficient to warrant relief from stay for Sumitomo's individual benefit. Further, the salary increases are being paid by *Holly's,* not the Partnership. From a legal standpoint, Sumitomo, which is principally a creditor of the *Partnership,* is in a weaker position to advance this argument. Rather than granting relief from stay for excessive salaries, the court believes this factor may more properly be considered as a possible cause to appoint a trustee. Further,

**73.** The parties disagree on Ahrens' role with Holly's and the Partnership from the time he moved to Grand Rapids in September, 1990 until Krok's death. The parties disagree on Ahrens subsequent input into the prepetition mismanagement. This court has previously found that Ahrens was not a limited partner of the Partnership. Additionally, because of Krok's domineering management style and personality, Ahrens had no substantial independent control over the Debtors' operations. Ahrens' role was merely as an advisor to Krok. Therefore, the court finds that Ahrens had no substantial input into prepetition mismanagement.

**74.** Both Holly's counsel and the creditors' committee counsel have made representations to the court that Ahrens and Lion have decreased their salaries. After the hearing, a letter was filed with the court which stated salaries had been reduced. However, there was no testimony regarding this fact at the hearing itself.

the court has the power to reduce salaries of a debtor's employees. *See Matter of All Seasons Indus., Inc.,* 121 B.R. 822, 825 (Bankr.N.D.Ind.1990); *In re New York City Shoes, Inc.,* 89 B.R. 479, 483 (Bankr. E.D.Pa.1988); *In re State Optical Co., Inc.,* 70 B.R. 82, 83–84 (Bankr.E.D.Pa. 1987); *In re Athos Steel & Aluminum, Inc.,* 69 B.R. 515, 520 (Bankr.E.D.Pa.1987); *In re Zerodec Mega Corp.,* 39 B.R. 932, 935 (Bankr.E.D.Pa.1984); *In re Lyon & Reboli, Inc.,* 24 B.R. 152, 154 (Bankr.E.D.N.Y. 1982).[75]

■ A second concern of Sumitomo is the possibility of conflicts of interest arising from Holly's management of the Crowne Plaza. The only substantive evidence before the court establishing the realization of Sumitomo's concern is Holly's failure to maintain a separate account for the Crowne Plaza, then subsequently using funds generated by the Partnership to pay obligations of Holly's other properties. Current management has addressed this particular problem by establishing a separate account for the Crowne Plaza, establishing separate accounting systems for the Debtors, and attempting to reconcile the intercompany claims between the Partnership and Holly's. Sumitomo is also receiving reports and financial information regarding the income and expenses relating to the Crowne Plaza.

There has also been much argument and evidence regarding whether Holly's "portfolio management approach" promotes conflicts of interest. Sumitomo's argument is that because Holly's manages the Crowne Plaza, it can influence potential customers to use other Holly's hotel properties rather than the Crowne Plaza. While the court acknowledges that this could conceivably occur, there has been no substantive evidence presented that corroborates Sumitomo's argument.[76]

Lastly, Sumitomo claims that the Partnership's failure to make provision to pay postpetition taxes constitutes postpetition mismanagement and warrants modification of the stay. This issue is discussed in detail below.

The only substantive evidence of postpetition mismanagement is the unjustified amount of salary increases to the extent they have not already been reduced. If the salary increases remain an issue, a motion may be filed for relief. A stipulation may be provided to the court documenting that Ahrens' and Lion's salaries have been decreased to a reasonable level. If a party requests that Ahrens' and Lion's salaries be reduced, this court, after notice an hearing, is extremely likely to grant such relief. The court holds no sufficient mismanagement exists to warrant modifying the stay for Sumitomo to realize upon its collateral under § 362(d)(1).

ii. May Fraud Constitute Sufficient "Cause" to Obtain Modification of the Stay?

Sumitomo asserts that certain acts of fraud by the Debtors constitute sufficient "cause" for relief from the automatic stay under § 362(d)(1). The specific alleged acts of fraud include misleading Sumitomo into believing that unpaid obligations were being satisfied by transmitting false financial information and failing to disclose that substantial arrearages were accruing on these

**75.** Although the courts agree that a bankruptcy court has the power to review and reduce the compensation a debtor pays its executives, the basis for such power is conflicting. Some courts base the reduction of salaries on the equitable powers of the bankruptcy court under § 105. *See, e.g., All Seasons Indus.,* 121 B.R. at 825; *Lyon & Reboli,* 24 B.R. at 154. Other courts base the reduction of salaries on §§ 327, 328 & 330. *See, e.g., New York City Shoes,* 89 B.R. at 482–84; *State Optical Co.,* 70 B.R. at 83–84; *Athos Steel & Aluminum,* 69 B.R. at 520; *Zerodec Mega Corp.,* 39 B.R. at 934–35.

**76.** Sumitomo's expert witness, Jorns, addressed this issue in his testimony. He testified that the "portfolio management approach", as a theory, could be beneficial to both Holly's and the Partnership. While he acknowledged, under these facts, a potential conflict of interest exists from the approach, he opined that there was no evidence that the conflict has been realized. Additionally, he testified that if his hotel management company was offered the opportunity to manage the Crowne Plaza and Holly's other Grand Rapids hotel properties simultaneously, it would accept as long as the lenders were notified. (Trial Transcript January 6, 1992, at 97–99.)

unpaid obligations. (*See* Sumitomo's Amended Motion Against the Partnership at 4; Sumitomo's Brief in Support of Motions for Relief From the Automatic Stay at 12, 17.)

■ Fraud may constitute sufficient "cause" for relief from the automatic stay pursuant to § 362(d)(1). *Wilmington Sav. Fund Soc'y v. 1025 Assocs., Inc. (Matter of 1025 Assocs., Inc.)*, 106 B.R. 805, 808 (Bankr.D.Del.1989). In *1025 Assocs.*, the debtor's president had allegedly committed fraud by diverting funds from the debtor for his personal use. Although the court acknowledged that fraud may constitute sufficient "cause" for relief from the stay pursuant to § 362(d)(1), no hard evidence existed to substantiate a fraud claim. *Id.*

Sumitomo asserts claims based upon both affirmative and silence fraud. Sumitomo's affirmative fraud claim is that the financial documents provided by the Debtors falsely indicated that taxes, franchise fees, and trade obligations were being met. The silence fraud claim is that the Debtors failed to disclose to Sumitomo, either verbally or through financial documents, that substantial arrearages were accruing for taxes, franchise fees, and trade obligations.

■ The elements of actual fraud are: (1) a material representation was made; (2) the representation was false; (3) the representation was made with knowledge of its falsity, or made recklessly; (4) the representation was made with the intention that it be acted upon; (5) the creditor reasonably relied upon the representations; and (6) the creditor thereby suffered injury.

*See Coman v. Phillips (In re Phillips)*, 804 F.2d 930, 932 (6th Cir.1986); *Eaton Corp. v. Easton Assocs., Inc.*, 728 F.2d 285, 292 (6th Cir.1984); *McHenry v. Ward (In re Ward)*, 115 B.R. 532, 537 (W.D.Mich.1990); *Hi-Way Motor Co. v. International Harvester Co.*, 398 Mich. 330, 336, 247 N.W.2d 813, 815–16 (1976).[77]

According to the Mortgage, Financing Statement and Security Agreement ("Mortgage Agreement") executed on July 27, 1989, the Partnership is required to deliver, within 120 days after its fiscal year, certified copies of annual operating statements and annual operating budgets prepared by an approved accounting firm in accordance with generally accepted accounting principles and a statement of projected income and expenses of the upcoming year for the Crowne Plaza. These financial documents are required to be "prepared by [the Partnership's] accountant and certified by a certified accounting firm of national standing as approved by [Sumitomo]." (*See* Sumitomo Exhibit 35–1, § 1.10(c).) Sumitomo also has the right to "examine, copy and audit from time to time [the Partnership's] records and books ...." (Sumitomo Exhibit 35–1, § 1.10(a).) Section 7(n) of the Loan Agreement requires the Partnership and Holly's to periodically deliver to Sumitomo certified financial statements regarding their "financial condition". Additionally, § 7(n) provides: "In addition to the forgoing, [the Partnership] shall each deliver to [Sumitomo] such other financial information as [Sumitomo] may reasonably require ... certified ... to be accurate by the

**77.** The cases cited for the elements of fraud interpret Michigan law. The Loan Documents conflict regarding whether Michigan law or California law applies. The Loan Documents granting an encumbrance upon the real property, i.e. the Mortgage, Financing Statement and Security Agreement, are to be construed pursuant to Michigan laws. (*See* Sumitomo Exhibit 35–1, at 63.) Other Loan Documents not directly related to the granting of encumbrances on the real property are to be construed under California laws. (*See* Sumitomo Exhibit 35–2, at 28 (Loan Agreement); Sumitomo Exhibit 35–3, at 12 (Secured Promissory Note); Sumitomo Exhibit 35–8, at 9 (Security and Pledge Agreement); Sumitomo Exhibit 35–9, at 6 (Invest-

ment Agreement); Sumitomo Exhibit 35–13, at 6 (Indemnity Agreement)).

In analyzing fraud, California law and Michigan law are the same. "The elements of fraud ... are: a representation ... which is false, knowledge of its falsity, intent to defraud, justifiable reliance upon the misrepresentation, and damage resulting from that justifiable reliance." *Stansfield v. Starkey*, 220 Cal.App.3d 59, 269 Cal.Rptr. 337, 345 (1990) (citing *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz*, 57 Cal.App.3d 104, 128 Cal.Rptr. 901, 905 (1976). Because the elements of fraud are the same whether applying Michigan or California law, it is not necessary for the court to make a choice of law decision and it will apply Michigan law.

principal financial officer of [the Partnership]." (Sumitomo Exhibit 35–2, § 7(n).)

Sumitomo never received certified annual operating statements, annual operating budgets, or statements of projected yearly income and expenses prepared in accordance with the Mortgage Agreement. Sumitomo received other financial documentation which, although did not comply with the Mortgage Agreement, satisfied its needs. These documents were certified by Krok but not certified by an approved accounting firm. (*See* Holly's Exhibit 5.) Benjamin testified that the required documentation was not necessary as long as the financial information received by Sumitomo was satisfactory and the Partnership was paying its monthly interest payment. (Trial Transcript December 23, 1991, at 90–91.)

Sumitomo exercised its right to receive other financial information from the Partnership. The Debtors provided Benjamin with monthly operating statements prepared on an accrual basis. The Partnership identified these statements as the so-called Summary 90 Statements ("Summary 90's"). (*See* Sumitomo Exhibit 49; Holly's Exhibit 4.) Benjamin testified that he requested the Summary 90's on the average once a month. The parties agree that because the Summary 90's are prepared on an accrual method, a person examining the financial information could not determine whether taxes or other expenses were actually being paid.[78] To determine the Partnership's cash flow from the Summary 90's, Benjamin would take the net operating income, add in depreciation, then subtract Sumitomo's interest expense.[79] (*See* Trial Transcript December 23, 1991, at 82, 174–75.)

■ The basis of Sumitomo's actual fraud claim are the Summary 90's. Applying the elements of actual fraud to the Summary 90's, it is clear that Sumitomo has not even met an initial showing of fraud to support "cause" for modifying the stay for two reasons.

First, although the Summary 90's are material representations, they are not false. Benjamin testified that he was unable to identify any instances where information provided in the Summary 90's was incorrect. (Trial Transcript January 7, 1992, at 115–16.) In essence, Benjamin admitted that the financial information provided to Sumitomo was *not false.* The Summary 90's did not indicate whether current expenses were being paid. But, because the statements are based on accrual method of accounting, it was never expected nor represented that the Summary 90's alone would indicate such matters.

■ Second, any reliance placed on the Summary 90's by Benjamin cannot be considered reasonable or justifiable. A person experienced in business is less justified in relying upon representations than one who is not experienced. *Shell Oil Co., Inc. v. Mammina,* 353 Mich. 9, 18, 90 N.W.2d 676, 677 (1958); *Feldpausch v. Hendershot,* 245 Mich. 694, 698, 224 N.W. 407, 408–09 (1929).

Benjamin is a chartered accountant with an apparently impressive background.[80]

---

**78.** If a balance sheet was analyzed along with the Summary 90's, it could be determined whether accrued expenses were actually being paid. (*See* Trial Transcript December 23, 1991, at 149–50 (testimony of Benjamin).) Benjamin testified that he requested a balance sheet but the Partnership was unable to produce one. He believed that if taxes were not paid by the Partnership, Sumitomo would be notified because a lien would be placed on the property by the taxing authority. According to Benjamin, most of Sumitomo's single asset borrowers did not have balance sheets, therefore he did not actively pursue the Partnership for one. (*See* Trial Transcript, December 23, 1991, at 150.)

**79.** There was much testimony regarding the accuracy of Benjamin's method of determining cash flow. Holly's cross examination of Benjamin attempted to indicate that under Benjamin's method of determining cash flow, he should have known that the Partnership was unable to pay Sumitomo's interest and meet expenses such as vendors, franchise fees, and taxes. (*See* Trial Transcript December 23, 1991, at 177–82.) Benjamin vein-poppingly argued while on the witness stand that Holly's cross examination exercise only considered the time period during the Persian Gulf War when revenues were down and did not consider past cash flow surpluses during the year.

**80.** Benjamin testified that he attended London University where he received professional certificates in accounting and insurance. The certifi-

He knows the difference between accrual and cash basis accounting principles. (*See* Trial Transcript December 20, 1991, at 78.) He knew that the Partnership had cash flow problems and difficulty paying vendors and franchise fees in the past. (*See* Holly's Exhibits 6–11.) As late as April, 1991, Benjamin acknowledged to his superiors that the 1990 debt service coverage ratio for the Partnership was as low as 1.18. (Holly's Exhibit 14.) Benjamin testified that a debt service coverage ratio below 1.2 is a sign of weakness. (Trial Transcript December 23, 1991, at 189–91.) Benjamin had knowledge that the Partnership made capital improvements to the Crowne Plaza in excess of $1,000,000 between 1989 and 1991. (Holly's Exhibit 14.) He also had knowledge that the Summary 90's did not account for these capital expenditures. Yet, he "assumed" the that the Debtors financed the capital improvements through a $1,000,000 equity infusion. (Trial Transcript December 23, 1991, at 187.) Under the Loan Documents, Benjamin had the right to examine and audit the Partnership's books and records but he never exercised that right. Therefore, this court finds that even assuming the financial information provided by the Debtors had been false, Sumitomo did not justifiably rely on it.

■ In *United States Fidelity & Guar. Co. v. Black*, the Michigan Supreme Court stated:

It is generally recognized that "[f]raud may be consummated by suppression of facts and of the truth, as well as by open false assertions", since "a suppression of the truth may amount to a suggestion of falsehood." In order for the suppression of information to constitute silent fraud there must be a legal or equitable duty of disclosure.

412 Mich. 99, 125, 313 N.W.2d 77, 88 (1981). Additionally, silence fraud requires a showing of reliance by the party alleging it was defrauded. *Lumber Village, Inc. v. Siegler*, 135 Mich.App. 685, 700, 355 N.W.2d 654, 660 (1984).

■ Sumitomo's silence fraud claim is based on the fact that Ahrens had knowledge of the arrearages for taxes, franchise fees, and trade obligations but failed to disclose the information to Sumitomo. There has been much testimony regarding Ahrens ignoring an alleged duty to disclose to Sumitomo because of fear of ramifications from Krok. Because of the uncertainty surrounding Ahrens' role with the Debtors from the time he moved to Grand Rapids in September, 1990 until Krok's death, even assuming that the Partnership or Holly's had a duty to disclose, the court is not convinced that *Ahrens* had a duty to disclose. Much more importantly, the court does not need to even decide whether a duty to disclose exists because Sumitomo has failed to demonstrate any reasonable reliance on the Debtors' silence. Although Sumitomo could have requested information, or obtained information from other sources, e.g., from the real and personal property taxing entity, it failed to make any inquiry. Sumitomo's loan officer, Benjamin, proverbially stuck his head in the sand and napped until he was rudely awakened. As long as Sumitomo's interest was paid he took no action.

Even assuming any of the asserted fraud was proven, there has been no showing that Sumitomo has been harmed to justify relief from stay. Again this court reiterates that fraud in and of itself may not be sufficient to create "cause" for stay relief purposes; the proper relief may often more appropriately be appointment of an independent trustee.

iii. May Failure to Pay or Escrow Postpetition Real Property Taxes Constitute Sufficient "Cause" to Obtain Modification of the Stay?

■ In Michigan, as is true in some other states, unpaid real property and per-

cate in accounting is equivalent to a CPA. He was employed for over six years with Coopers & Lybrand in London. Benjamin then came to America and received a Bachelor of Science in Business Administration and Economics from Westminster College. He later received a Masters Degree from the University of Utah. (*See* Trial Transcript December 20, 1991, at 36–38.)

Benjamin began employment with Sumitomo in January of 1986. The loan portfolio Benjamin is responsible for is in excess of $1,000,-000,000.

sonal property taxes automatically are given lien status on the property subject to the tax. MICH.COMP.LAWS ANN. § 211.40. Although the taxes are due and owing on the "tax date", the lien does not attach until a later "lien date." *Watervliet Paper Co. v. City of Watervliet (In re Shoreham Paper Co.)*, 117 B.R. 274, 277 (Bankr. W.D.Mich.1990). *See generally In re Sabec*, 137 B.R. 659 (Bankr.W.D.Mich.1992) (general summary of portions of Michigan General Property Tax Act). Under state law, *subsequent* property tax liens are accorded higher priority than a *prior* mortgage interest on the property. *See Chrysler Corp. v. Long & Long, Inc.*, 171 F.Supp. 541, 544 (E.D.Mich.1958); *Manistee County v. Reef Petroleum Corp. (In re Reef Petroleum Corp.)*, 92 B.R. 741, 745–46 (Bankr.W.D.Mich.1988); *Cambron Tool Co. v. Manufacturers Bank of Detroit (In re Cambron Tool Co.)*, 27 B.R. 723, 725 (Bankr.E.D.Mich.1983); *In re Rite-Way Tool & Mfg. Co.*, 333 Mich. 551, 556, 53 N.W.2d 373, 376 (1952); *In re Ever Krisp Food Prods. Co.*, 307 Mich. 182, 196, 11 N.W.2d 852, 856 (1943). Thus, the state tax liens will "prime" other existing liens, including mortgages.

As discussed below, Sumitomo and the Debtors agree that Sumitomo is an undersecured creditor, i.e., the value of the property subject to Sumitomo's security interests is not sufficient to fully satisfy Sumitomo's debt. In this circumstance outside of bankruptcy, Sumitomo's interest in the property would be adversely affected by the imposition of state tax liens. For every dollar of unpaid taxes which results in the statutory priming lien, Sumitomo's potential recovery from its interest in the property is correspondingly reduced by a dollar. Outside of bankruptcy an *undersecured* creditor's property interest is jeopardized by the accrual of property taxes and is measurably diminished on the date the

unpaid taxes become a lien on the property.[81]

After a bankruptcy case is commenced, the automatic stay prevents unpaid real and personal property taxes from achieving lien status. 11 U.S.C. § 362(a)(4); *In re Shoreham Paper Co.*, 117 B.R. at 277. Property taxes that become due postpetition in a chapter 11 case are entitled to administrative priority status. 11 U.S.C. § 503(b)(1)(B)(i); *Perpetual American Bank, FSB v. District of Columbia (In re Carlisle Court, Inc.)*, 36 B.R. 209, 218 (Bankr.D.C.1983); *cf. In re Shoreham Paper Co.*, 117 B.R. at 283 (although Judge Stevenson was not required to reach issue, conclusion that postpetition taxes are entitled to administrative expense priority is strongly implied).[82]

All chapter 11 administrative claims, unless the holder agrees to a different treatment, must be paid in cash on the effective date of the confirmation of the plan. 11 U.S.C. § 1129(a)(9)(A). In this case, if the Partnership obtains confirmation of a plan, provision must be made for full payment of all postpetition real and personal property taxes. This court is extremely likely to require a confirmation deposit to assure requisite payment to all creditors entitled to payment on the plan effective date. FED.R.BANKR.P. 3020(a). Therefore as a practical matter, the Partnership may decide it is in its and the estate's interests to escrow funds to provide for eventual payment of postpetition real and personal property taxes.

More importantly, and of far greater legal significance, is the possible adverse serious financial effect upon Sumitomo if postpetition taxes are not either paid or sufficient funds escrowed to assure payment. If a plan is not confirmed and postpetition property taxes are not paid, Sumitomo's

---

**81.** With regard to an *oversecured* creditor, this analysis may be different. If a sufficient equity cushion exists, the oversecured creditor's property interest may not be jeopardized or diminished as a result of the borrower's failure to pay taxes and the resultant imposition of higher priority tax liens.

**82.** The Debtors argue that property taxes that are billed prepetition and would have become a lien postpetition but for the automatic stay are not entitled to either secured status or administrative claim status. The Debtors argue that such types of claims are only entitled to priority tax status under § 507(a)(7).

collateral shall likely be abandoned either in connection with the chapter 11 case or, more probably, by a chapter 7 trustee after conversion. Alternatively, if no plan is confirmed, this court would very likely grant relief from stay under § 362(d)(2).[83] Under either scenario, the estate will not pay the postpetition (or for that matter, prepetition) property taxes.

When the abandonment of property is effectuated, or foreclosure of the real and personal property completed, the property will no longer be property of the estate. The value of such property to the estate will be zero. Under such circumstances, any tax claim assessed against the property will be totally disallowed. 11 U.S.C. § 502(b)(3). Also the property taxing entity would become entitled to enforce its statutory *in rem* rights against the property subject of unpaid taxes either because of automatic termination of the stay under § 362(c) or because relief from stay would be mandated by § 362(d)(2).[84]

Unless and until Sumitomo obtains relief from stay, it can do nothing to enforce its property rights against the real or personal property of the Partnership. It cannot recover so-called lost opportunity costs and must share the burden of delay, with all other creditors, while Partnership seeks to reorganize. *Timbers,* 484 U.S. at 370–80, 108 S.Ct. at 629–35. However, Sumitomo is entitled to be protected or compensated with regard to any diminution of its property interest occasioned by the automatic stay. 11 U.S.C. § 361; *Timbers,* 484 U.S. at 378–79, 108 S.Ct. at 634. Failure to protect Sumitomo, or compensate Sumitomo, for possible diminution of its property rights constitutes lack of adequate protection and expressly requires modification of the automatic stay. 11 U.S.C. §§ 361 & 362(d)(1).

A foreseeable contingent possibility of jeopardy to a secured creditor's property rights is sufficient cause to warrant relief from stay—current on-going diminution of collateral value is not an absolute prerequisite to obtaining relief. This rationale is supported by those cases stating that lack of property insurance may constitute cause to modify the stay. *See Matter of T & H Diner, Inc,* 108 B.R. 448, 455 (D.N.J.1989); *Society Bank v. Botteri (In re Botteri),* 108 B.R. 164, 165 n. 1 (Bankr.S.D.Ohio 1989); *Schewe,* 94 B.R. at 949. Unless there is an actual loss or damage to the secured creditor's collateral, no diminution occurs and the creditor is not harmed by the stay delay regardless of whether or not there exists fire and casualty coverage for the property. However, as adequate protection, courts require that the debtor maintain adequate insurance. Property insurance coverage is required because of the *foreseeable risk* to the secured creditor—the possible jeopardy to the collateral while it is under the control of a debtor.

The insurance analysis is similar to the postpetition property tax accrual issue. Whether a fire (absent a debtor's arson) or storm damage shall occur is a fortuitous happening beyond a secured creditor's control. Likewise, whether a debtor can successfully reorganize, obtain chapter 11 confirmation, and ultimately pay postpetition property taxes is problematic. In this postpetition property tax context, ersatz insurance is requiring the Partnership to escrow sufficient funds to pay those taxes. The funds must be specifically earmarked for the property tax obligations and used for payment of such taxes before or at confirmation. Alternatively, if the chapter 11 case is fruitless and the property is abandoned, surrendered, or recovered by the secured creditor, the funds must be released to the secured creditor and used to satisfy the taxing authorities' postpetition claims. Under either eventuality, a secured creditor's interest in the property shall not be eroded by the ultimate effect

---

**83.** See discussion *infra* VI(B)(2).

**84.** For a summary discussion of a taxing authority's collection and enforcement rights under

of a priming tax lien.[85]

■ In this case, the Partnership must pay into escrow, *each month*, an amount equal to one-twelfth of the yearly real and personal property taxes regarding the hotel collateral. The first escrow payment shall be retroactively made for the month of November, 1991, which is the first month after Sumitomo requested relief from stay. These escrowed funds may only be used to pay postpetition taxes after interim court order or on the effective date of a chapter 11 confirmed plan.

If no plan is confirmed, upon relief from stay, abandonment or surrender of the property, whichever first occurs, all remaining escrowed funds shall be released to Sumitomo to pay the property taxes which effectively compensates Sumitomo for any post-filing diminution of its undersecured claim which resulted from the continued imposition of the automatic stay.

2. Is the Bank Entitled to Relief From Stay Because the Partnership has No Equity in and the Property is Not Necessary for an Effective Reorganization?

■ Section 362(d)(2) provides that:

On request of a party in interest ... the court shall grant relief from the stay ...

....

(2) with respect to a stay of an act against property ..., if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

Because § 362(d)(2) is drafted in the conjunctive, both prongs must be satisfied to grant relief from the stay. *New Era Co.*, 125 B.R. at 728; 1 NORTON BANKR.L. & PRAC. § 20.27 (1991). The section is "intended to solve the problem of real property mortgage foreclosures of property where the bankruptcy petition is filed on the eve of foreclosure." 124 CONG.REC. H11,092–93 (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards). While the burden of proof regarding the issue of lack of equity in the property is on the moving party, the debtor has the burden to prove the property is necessary to an effective reorganization. 11 U.S.C. § 362(g).

a. *Does the Partnership Lack Equity in the Crowne Plaza?*

For purposes of this contested matter only, the parties have stipulated as to the value of the Crowne Plaza and the amount and validity of Sumitomo's secured claim. The going concern value of the Crowne Plaza is $13,500,000 and the liquidation value is $10,400,000. As of the date of the Partnership's filing for chapter 11, October 29, 1991, the amount of Sumitomo's secured claim is $17,038,846.66.[86] (Trial Transcript January 7, 1992, at 113–14.)

■ " 'Equity ... is the value, above all secured claims against the property, that can be realized from the sale of the property for the benefit of the unsecured creditors.' "[87] *Stephens Indus., Inc.*

---

the Michigan General Property Tax Act, see *In re Sabec*, 137 B.R. 659 (Bankr.W.D.Mich.1992).

**85.** For this reason, the court's standard Definitive Order, entered in all chapter 11 cases, requires a debtor in possession to maintain a tax escrow account and pay postpetition taxes, including real property taxes, as they become due. A Definitive Order was signed in the Partnership's case on October 30, 1991. No motion has yet been filed requesting a modification of that order—the order remains binding.

**86.** For purposes of this contested matter only, the parties stipulated to the components of Sumitomo's claim as follows:

(1) Unpaid Principal $ 14,800,000.00
(2) Unpaid Interest $ 353,680.49
(3) Unpaid Late Charges $ 445,105.85

(4) Prepayment Penalty $ 1,378,741.06
(5) Attorney Fees & Costs $ 61,319.26

**87.** "Equity" as used in § 362(d)(2)(A) is a different concept than "equity cushion" which is normally referred to with adequate protection. An equity cushion is defined as "the value in the property, above the amount owed to the [secured] creditor ..., that will shield that interest from loss due to any decrease in the value of the property during [the] time the automatic stay remains in effect." *Pistole v. Mellor (In re Mellor)*, 734 F.2d 1396, 1400 n. 2 (9th Cir.1984). Where "equity" requires a consideration of all claims against the debtor's property, "equity cushion" only requires a consideration of an individual creditor's interest and priority in the property.

*v. McClung,* 789 F.2d 386, 392 (6th Cir. 1986) (quoting *Pistole v. Mellor (In re Mellor),* 734 F.2d 1396, 1400 n. 2 (9th Cir. 1984)). The only lien claims against the hotel real and personal property are held by Sumitomo and the prepetition tax lienholders. Because the aggregate amount of Sumitomo's secured claim and the taxing creditors' lien is greater than either the going concern value or liquidation value of the Crowne Plaza, the Partnership lacks equity in the property under § 362(d)(1).

### b. Is the Crowne Plaza Necessary to an Effective Reorganization?

Any analysis of whether property is necessary to an effective reorganization under § 362(d)(2)(B) must begin with *United Sav. Ass'n of Texas v. Timber of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). The Supreme Court, construing the term "interest in property", held that undersecured creditors are not entitled to compensation under § 362(d)(1) for the reasonable delay in foreclosing on their collateral caused by the automatic stay. *Id.* at 382, 108 S.Ct. at 636. In supporting its holding, the Supreme Court concluded that the petitioner's interpretation of § 362(d)(1) would render § 362(d)(2) "a practical nullity and a theoretical absurdity". *Id.* at 375, 108 S.Ct. at

632. With regard to the second prong of § 362(d)(2), the Court stated:

> Once the movant under § 362(d)(2) establishes that he is an undersecured creditor, it is the burden of the *debtor* to establish that the collateral at issue is "necessary to an effective reorganization." What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect.* This means ... that there must be "a reasonable possibility of a successful reorganization within a reasonable time." The cases are numerous in which § 362(d)(2) relief has been provided within less than a year from the filing of the bankruptcy petition. And while the bankruptcy courts demand less detailed showings during the four months in which the debtor is given the exclusive right to put together a plan, even within that period lack of any realistic prospect of effective reorganization will require § 362(d)(2) relief.

*Id.* at 375–76, 108 S.Ct. at 632–33 (citations omitted) (emphasis in original).[88]

The reported decisions post-*Timbers* generally agree that the standard to be applied pursuant to § 362(d)(2)(B) is whether there is "a reasonable possibility of a successful reorganization within a reasonable time." [89] *See, e.g., Canal Place*

---

**88.** Prior to *Timbers,* two different tests had evolved to determine whether property was necessary for an effective reorganization under § 362(d)(2)(B). The minority of courts had adopted the "necessity test" which provides that § 362(d)(2)(B) is satisfied "whenever [property] is necessary, either in the operation of the business or in a plan, to further the interests of the estate...." *Empire Enters., Inc. v. Koopmans (In re Koopmans),* 22 B.R. 395, 407 (Bankr. D.Utah 1982). The test did not require a showing by the debtor that a reasonable likelihood of a successful reorganization exists. *Id.* at 405–06. Other decisions adopting the necessity test include *In re Rassier,* 85 B.R. 524 (Bankr. D.Minn.1988); *Hunter Sav. Ass'n v. Padgett (In re Padgett),* 74 B.R. 65 (Bankr.S.D.Ohio 1987); *In re Deeter,* 53 B.R. 623 (Bankr.N.D.Ind.1985); *In re Sunstone Ridge Assocs.,* 51 B.R. 560 (Bankr.D.Utah 1985); *In re W.S. Sheppley Co.,* 45 B.R. 473 (Bankr.N.D.Iowa 1984).

The majority of courts adopted a so-called "feasibility test" under which the debtor must show not only that the property is necessary to

a reorganization but also that a reorganization is reasonably likely to occur. *In re Planned Sys., Inc.,* 78 B.R. 852, 865 (Bankr.S.D.Ohio 1987). Other decisions adopting the feasibility test include *Grundy Nat'l Bank v. Tandem Mining Corp.,* 754 F.2d 1436 (4th Cir.1985); *Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.),* 749 F.2d 670 (11th Cir.1984); *In re Cablehouse, Ltd.,* 68 B.R. 309 (Bankr.S.D.Ohio 1986); *In re 6200 Ridge, Inc.,* 69 B.R. 837 (Bankr.E.D.Pa.1987); *In re Bellina's Restaurants II, Inc.,* 52 B.R. 509 (Bankr.S.D.Fla.1985); *Matter of Terra Mar Assocs.,* 3 B.R. 462 (Bankr. D.Conn.1980).

**89.** In construing this language, some reported decisions post-*Timbers* have continued to adopt the "feasibility test". *See, e.g., Carteret Sav. Bank v. Nastasi–White, Inc. (Matter of East–West Assocs.),* 106 B.R. 767, 774 (S.D.N.Y.1989); *Travelers Life & Annuity Co. v. Ritz–Carlton of D.C., Inc. (In re Ritz–Carlton of D.C., Inc.),* 98 B.R. 170, 172 (S.D.N.Y.1989); *In re Building 62 Ltd. Partnership,* 132 B.R. 219, 222 (Bankr.D.Mass.

*Ltd. Partnership v. Aetna Life Ins. Co. (Matter of Canal Place Ltd. Partnership)*, 921 F.2d 569, 577 (5th Cir.1991); *Anderson v. Farm Credit Bank of St. Paul (In re Anderson)*, 913 F.2d 530, 532 (8th Cir. 1990); *New Era Co.*, 125 B.R. at 729; *Northgate Terrace Apartments*, 126 B.R. at 523; *Matter of Whitemont Assocs. Ltd. Partnership*, 125 B.R. 354, 357 (Bankr. D.Conn.1991); *Ashgrove Apartments*, 121 B.R. at 756; *In re Lakeshore Apartments*

*of Ft. Oglethorpe, II, Ltd.*, 109 B.R. 278, 281 (Bankr.S.D.Ohio 1989); *Triton/Richmond Assocs.*, 103 B.R. at 767; *In re Chandler*, 98 B.R. 516, 517 (Bankr.D.Mont. 1988); *Grand Sports*, 86 B.R. at 974 The decisions also support the conclusion that the burden of proof upon the debtor under § 362(d)(2)(B) is a "sliding scale" which this court characterizes as a *"moving target".*[90] The burden enlarges as the bank-

1991); *In re Broad Assocs. Ltd. Partnership*, 110 B.R. 632, 636 (Bankr.D.Conn.1990); *Homestead Sav. & Loan Ass'n v. Associated Investors Joint Venture (In re Associated Investors Joint Venture)*, 91 B.R. 555, 558 (Bankr.C.D.Cal.1988); *In re National Real Estate Ltd. Partnership*, 87 B.R. 986, 990 (Bankr.E.D.Wis.1988). *But see In re Rassier*, 85 B.R. 524, 529–30 (Bankr.D.Minn. 1988) (post-*Timbers* decision adopting necessity test because language in *Timbers* regarding § 362(d)(2)(B) is dicta and not binding).

Although this court agrees that *Timbers'* principles are binding as quoted above, for semantic reasons, the court disagrees with the appellation given to these principles by other courts—the "feasibility test". What concerns the court regarding the use of this term is that a "feasibility test" is also, and more appropriately, applied in connection with plan confirmation pursuant to § 1129(a)(11). It is very important not to confuse the *Timbers* effective reorganization principles with chapter 11 plan confirmation standards.

Under § 1129(a)(11), in determining feasibility the court considers "the adequacy of the capital structure, the earning power of the business, economic conditions, the ability of management, the probability of a continuation of the same management, and any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan." 5 L. KING, COLLIER ON BANKRUPTCY ¶ 1129.02[11] (15th ed. 1992). The § 1129(a)(11) feasibility standards are appropriate to consider at plan confirmation. But, such consideration is not necessarily appropriate under § 362(d)(2)(B).

In this court's view, under the majority of factual situations, § 1129 plan confirmation issues should *not* be considered at a relief from stay hearing. *See East–West Assocs.*, 106 B.R. at 774; *In re Northgate Terrace Apartments, Ltd.*, 126 B.R. 520, 524–25 (Bankr.S.D.Ohio 1991); *In re Wasserman*, 122 B.R. 839, 844 (Bankr. D.Mass.1991); *In re Ashgrove Apartments of DeKalb County, Ltd.*, 121 B.R. 752, 756 (Bankr. S.D.Ohio 1990); *Crestar Bank v. Triton/Richmond Assocs. Ltd. Partnership (In re Triton/Richmond Assocs. Ltd. Partnership)*, 103 B.R. 764, 767 (Bankr.E.D.Va.1989); *General Motor Inns, Inc. v. L & M Properties, Inc. (In re L & M Properties, Inc.)*, 102 B.R. 481, 484 (Bankr. E.D.Va.1989); *American State Bank v. Grand*

*Sports, Inc. (In re Grand Sports, Inc.)*, 86 B.R. 971, 974 (Bankr.N.D.Ind.1988); *Planned Sys.*, 78 B.R. at 866. The main instance where § 1129(a)(11) factors should be analyzed under § 362(d)(2)(B) is when the plan confirmation and relief from stay hearings are concurrently held. *See, e.g., In re Gulph Woods Corp.*, 84 B.R. 961 (Bankr.E.D.Pa.1988). In such a situation, if plan confirmation is denied under § 1129, the second prong of § 362(d)(2) will not be satisfied because a successful reorganization is not in prospect.

**90.** The burden facing a debtor to adequately demonstrate that property is "necessary for effective reorganization that is in prospect" may be compared to a trap shooting event. In trap shooting, the participant stands at the "station" with his or her shot gun. When "target" is called, the clay pigeon, commonly called the "bird", is thrown by the trap machine out of a "house" away from the station. Immediately after the bird is thrown, it is far easier to hit the target—the accuracy required is less. As time passes, in milliseconds, the bird is farther away and the target is more difficult to hit. Thus, accuracy of aim becomes of much greater importance. At some point in time, the bird is effectively out of range and cannot be hit absent a fluke shot. Of course, in addition to the accuracy of the aim, the ability of the shooter to hit the clay pigeon also depends upon the equipment. If the shot gun is inoperative or the shell is defective, it is impossible to successfully hit the target regardless of passage of time or accuracy of aim.

Many courts recognize that a less detailed showing of effective reorganization is required during the early stages of a bankruptcy case. In effect, the targeted burden of proof is far easier to satisfy earlier in the case. However, as time passes, the burden becomes greater and it becomes more difficult to meet the targeted burden of proof. Finally, much later in the case, the burden of the debtor is tantamount to showing that a plan is feasible; absent a demonstration of feasibility, by preponderance of evidence, the targeted burden is missed.

As recognized by some reported decisions, it may be impossible for the debtor to ever hit the target. The debtor's intended reorganization may be illusory which is akin to the trap shoot-

ruptcy case progresses. *See Anderson,* 913 F.2d at 533; *Building 62,* 132 B.R. at 221; *Ashgrove Apartments,* 121 B.R. at 757; *In re Willowood East Apartments of Indianapolis II, Ltd.,* 113 B.R. 392, 398 (Bankr.S.D.Ohio 1990); *In re Eisentrager,* 102 B.R. 181, 182 (Bankr.W.D.Mo.1989); *Grand Sports,* 86 B.R. at 974. Therefore, if the relief from stay is requested at the early stages of the bankruptcy case, the burden upon the debtor is less stringent. But, if relief from the stay is requested later in the case, the debtor's showing is closely scrutinized. *See Timbers,* 484 U.S. at 376, 108 S.Ct. at 633.

■ Although post-*Timbers* reported decisions agree on the § 362(d)(2)(B) standard and that the burden of proof is a sliding scale or moving target, the application of the burden of proof to the standard appears inconstant. The apparent variation in opinions is because § 362(d)(2)(B), like § 362(d)(1), is fact intensive and should be determined on a case by case basis. *See Ashgrove Apartments,* 121 B.R. at 756; *National Real Estate,* 87 B.R. at 990.

■ In addition to providing guidance regarding § 362(d)(2)(B), *Timbers* holds that undersecured creditors must bear a reasonable delay imposed by the stay. 484 U.S. at 378–79, 108 S.Ct. at 634. Because one rationale for imposition of the stay is to give the debtor sufficient time to formulate a plan of reorganization, the *Timbers* holding has applicability to § 362(d)(2)(B). When considering the debtor's burden of proof target under § 362(d)(2)(B), one consideration is a secured creditor may be

expected to bear some reasonable delay while the debtor is moving meaningfully to propose a plan. Conversely, a secured creditor should not bear inordinate delay if the debtor is not progressing to plan confirmation.

Summarizing, (1) the standard of proof under § 362(d)(2)(B) is whether there is "a reasonable possibility of a successful reorganization within a reasonable time"; (2) the debtor's burden to prove the standard is a moving target which is more difficult to attain as the chapter 11 case progresses; (3) applying the burden of proof to the standard of proof is fact intensive and must necessarily be considered on a case by case basis; and (4) a factor to consider by the court is the reasonableness of delay imposed upon a creditor while the debtor is progressing toward plan confirmation.

■ The reported cases discussing § 362(d)(2)(B) have reached various results. The cases can be broadly categorized into four separate groups based upon how soon after the bankruptcy filing the creditor requests relief from stay and the evidentiary showing necessary, under the facts of each case, to satisfy the moving target burden of proof. The four broad categories can be stated as follows: (1) is it *plausible* that a successful reorganization will occur within a reasonable time?; (2) is it *probable* that a successful reorganization will occur within a reasonable time?; (3) is it *assured* that a successful reorganization will soon occur?; or (4) is it *impossible* that a successful reorganization will occur within a reasonable time? [91]

---

er "shooting blanks". In such instances, it is impossible for the debtor to meet its burden and demonstrate that an effective reorganization is in prospect. In a § 362(d)(2) relief from stay setting, the debtor's burden is similar to trap shooting; as time passes, the burden becomes more difficult to satisfy.

**91.** In conceptualizing these *rough categories,* the court has considered the burden of proof necessary to satisfy § 362(d)(2)(B) throughout a bankruptcy case. The court constructed a time line with the bankruptcy filing date as the starting point, the expiration of the exclusivity period as the intermediate point, and the plan confirmation date as the ending point. The court then considered when relief from stay was requested relative to the bankruptcy filing date.

The category names attempt to coincide with the quantum of evidence necessary to satisfy § 362(d)(2)(B). Because a court should not generally conduct a mini-confirmation hearing at relief from stay, to satisfy *Timbers,* the focus is, relative to the date of filing, whether the debtor is moving meaningfully to propose a plan which by preponderance may be confirmable. "Plausibility" is the easiest standard to meet and corresponds with relief from stays filed early in the bankruptcy case. "Assured" is the most stringent standard to meet and corresponds with relief from stays requested after expiration of the exclusivity period and at, or some time close to, the confirmation date. "Probability" is the middle category and corresponds with relief from stays requested some-

■ At the early stages of a bankruptcy case, the moving target requires a less strenuous showing of "a reasonable possibility of a successful reorganization within a reasonable time." *Timbers*, 484 U.S. at 376, 108 S.Ct. at 633. This is especially true when a creditor requests relief from the stay fast on the heels of the bankruptcy filing. At such an early stage in the bankruptcy, the burden of proof under § 362(d)(2)(B) is satisfied if the debtor offers sufficient evidence to indicate that a successful reorganization within a reasonable time is "plausible".[92] The debtor need only present sufficient evidence to demonstrate it is superficially worthy of belief that it is capable of producing a plan which by preponderance may be confirmable.[93] Although, if it is possible, the debtor may present a plan or evidence regarding plan confirmation standards, at this early stage it is only *required* to produce some substantive evidence that a successful reorganization is on the horizon.[94] The debtor's plan to reorganize does not have to be crystal clear. At this stage, the debtor's plan can be somewhat obscure or vague as long as it is plausible that a successful reorganization may occur. The court must balance the reasonableness of the delay borne by a secured creditor against the debtor's ability to formulate a plan. At this stage in the bankruptcy case, if the debtor presents any evidence that a confirmable plan is plausible, the balance favors the debtor, and the creditor must bear a reasonable delay while debtor attempts to formulate a plan.[95]

■ Without question, the most nebulous category of cases is when the motion

---

time shortly before the expiration of the exclusivity period to propose a plan until shortly after the expiration of the exclusivity period to solicit acceptances of plan confirmation. "Impossibility" refers to those factual situations where the evidence presented by the debtor indicates that there is no possible means for successful reorganization, i.e. the "pie-in-the-sky" cases. In such instances, it is unimportant when the relief from stay is filed.

The court acknowledges that these categories are broad and, under certain factual situations, it will be very difficult, perhaps impossible, to categorize a case. The court is utilizing the broad categories as methodology to analyze how different decisions have examined the application of the changing burden of proof to the § 362(d)(2)(B) standard articulated in *Timbers*.

92. "Plausible" is defined as "superficially fair, reasonable or valuable ... superficially worthy of belief." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1736 (1986).

93. *Cf. Wasserman*, 122 B.R. at 839–40, 844 (denying relief from stay where motion filed approximately one month after bankruptcy filing and debtors presented evidence that they were sophisticated business people, had attracted new business since filing, and were negotiating with creditors); *Willowood East Apartments*, 113 B.R. at 393–94, 398 (denying relief from stay where motion filed approximately one month after bankruptcy filing and, even though it could not currently service creditor's debt, the debtor presented superficial evidence that income could be increased and expenses decreased); *In re Marion Street Partnership*, 108 B.R. 218, 220–21, 225–26 (Bankr.D.Minn.1989) (denying relief from stay where hearing held within one month from bankruptcy filing and debtor presented evidence that it had taken posi-

tive steps to locate additional sources of capital); *Triton/Richmond Assocs.*, 103 B.R. at 766, 767–68 (denying relief from stay where motion filed the same day that bankruptcy was filed and debtor presented superficial evidence that it was obtaining additional financing and implementing a different business plan).

94. In some cases, a debtor files a plan before the relief from stay hearing or submits a model plan into evidence at a relief from stay hearing. The debtor then relies on the plan to satisfy § 362(d)(2)(B). In such cases, courts have analyzed the plan under plan confirmation standards. *See, e.g., In re Lumber Exch. Ltd. Partnership*, 125 B.R. 1000 (Bankr.D.Minn.), *aff'd*, 134 B.R. 354 (D.Minn.1991); *In re Chandler & Chandler Motor Inns, Inc.*, 93 B.R. 755 (Bankr. N.D.Fla.1988); *In re Nat'l Real Estate Ltd. Partnership*, 87 B.R. 986 (Bankr.E.D.Wis.1988).

95. In addition to satisfying the *Timbers* standards, this approach is very practical. For example, a creditor files a motion for relief from stay within a week after the bankruptcy filing. The preliminary hearing is scheduled 15 days later. The final hearing must be scheduled within 30 days of the preliminary hearing. Subsequently, the hearing on relief from stay is held approximately 50 days after the bankruptcy filing. At that early period in the bankruptcy case, although it is possible that a plan may be proposed, it is not intended that the debtor *must* propose a plan. Nor should the debtor be required to propose a plan or satisfy plan confirmation standards to defend a motion for relief from stay. During the infancy of a bankruptcy case, the debtor should be entitled to use the mechanisms provided by the Code to enhance its ability to reorganize.

for relief from the stay is requested near the expiration of the exclusivity period. At this point in the bankruptcy case, the moving target burden of proof requires a greater showing than "plausibility". At these intermediate points in a bankruptcy case, this court believes that to satisfy § 362(d)(2)(B), the debtor must demonstrate that a successful reorganization within a reasonable time is "probable".[96] Sufficient evidence must be presented to persuade the court it is more likely than not that the debtor is capable of producing a plan which by preponderance may be confirmable.[97] Although the debtor is still not *required* to produce a plan or satisfy plan confirmation standards, it must produce sufficient evidence that the tools necessary to formulate a plan are available. As the expiration of the exclusivity period to file a plan nears, and shortly after if a plan has been filed, the balance between the reasonableness of the delay borne by the creditor and the debtor's ability to formulate a plan is approximately equal. If the court concludes that it is improbable that the debtor can formulate a plan, the creditor should not have to bear any additional delay and the stay should be lifted.

■ A moving target burden of proof requires that the debtor must provide the most stringent and convincing showing under § 362(d)(2)(B) after the expiration of the exclusivity periods to file a plan and obtain acceptance thereof. *Timbers*, 484 U.S. at 376, 108 S.Ct. at 633. The evidence presented by the debtor must be greater than "plausible" or "probable". After the expiration of the exclusivity period or periods, to satisfy § 362(d)(2)(B), the debtor must offer sufficient evidence to indicate that a successful reorganization within a reasonable time is "assured".[98] The debtor must present sufficient evidence to demonstrate it is certain or unquestionable that *a plan* to be considered at confirmation *will soon be produced.*[99] Even at this point in the bankruptcy, the debtor is *not required* to produce a plan to defend a motion for relief from stay. But the debtor must produce concrete evidence that a plan is forthcoming. After the expiration of the exclusivity period, the balance between the reasonableness of the delay borne by a secured creditor and the debtor's ability to formulate a plan favors the creditor. If the debtor cannot show it is certain a plan will soon be filed, the creditor should not have to bear any additional delay and the stay should be modified.

■ Regardless of the amount of time a case has been pending before relief from stay is requested, a court is required to grant relief under § 362(d)(2)(B) if there is "lack of any realistic prospect of effective reorganization". *Timbers*, 484 U.S. at 376, 108 S.Ct. at 633. During *any* stage of a bankruptcy case, if relief from the stay is

**96.** "Probable" is defined as "having more evidence for than against; supported by evidence which inclines the mind to believe, but leaves some room for doubt; likely." BLACK'S LAW DICTIONARY 1201 (6th ed. 1990).

**97.** *Cf. In re Forest Ridge, II, Limited Partnership,* 116 B.R. 937, 938, 943–44, 946 (Bankr.W.D.N.C. 1990) (denying relief from stay where hearing was held near the expiration of exclusivity period and debtor presented testimonial evidence of a proposed plan that demonstrates an intent to repay and no intent to abuse the bankruptcy process); *Lakeshore Apartments,* 109 B.R. at 279, 281–82 (granting relief from stay where hearing was held near the expiration of exclusivity period and evidence indicated that debtor could not produce sufficient income to service mortgage debt).

**98.** "Assured" is defined as "characterized by certainty or security ... beyond doubt or question:

unquestionable, certain." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 133 (1986).

**99.** *Cf. Northgate Terrace Apartments,* 126 B.R. at 522–23, 525 (denying relief from stay where hearing was held nearly a year after bankruptcy filing but debtor had filed a plan and the hearing on the adequacy of the disclosure statement was to be held within a short time); *In re Kurth Ranch,* 97 B.R. 33, 34, 36 (Bankr.D.Mont.1989) (acknowledging that debtor must make a "pronounced" effort to satisfy § 362(d)(2)(B) after expiration of exclusivity period and granting relief from stay because debtor did not propose a plan or testify as to the contents of any possible plan); *In re Asheville Bldg. Assocs.,* 93 B.R. 913, 914, 916 (Bankr.W.D.N.C.1988) (granting relief from stay where hearing was held after the expiration of the exclusivity period and the debtor presented no credible evidence that a plan would be forthcoming).

requested pursuant to § 362(d)(2)(B) and the evidence indicates that a successful reorganization within a reasonable time is "impossible", the court must grant relief from the stay. Generally, it is impossible to satisfy § 362(d)(2)(B) if: (1) the only evidence offered is debtor's chimerical opinion that it can successfully reorganize [100]; or (2) the evidence offered indicates the debtor is unable to propose a meaningful plan.[101] In such instances, any additional delay imposed upon the creditor is unreasonable. Therefore, relief from stay should be granted.

Sumitomo asserts the Crowne Plaza is not necessary for an effective reorganization that is in prospect because: (1) the Partnership's projections do not provide for sufficient net operating income to service the debt; (2) the Partnership has not produced evidence that an injection of new capital is being contemplated; (3) the Partnership has not produced evidence that a sale of the property is being contemplated; (4) since the filing of the Debtors' petitions, the Crowne Plaza has experienced a de-crease in revenue and occupancy levels; and (5) since filing of the Debtors' petitions, the Partnership has instituted personnel, maintenance, and servicing cuts that have adversely affected the Crowne Plaza's status as a "First Class Hotel".[102] (Sumitomo's Fourth Supplemental Brief at 7, 10–11.)

 Sumitomo filed its Motion for Relief from the Automatic Stay *one week* after the Partnership filed for bankruptcy. The actual hearings for relief from the stay began less than a month from the Partnership's filing date. In such a case, a moving target burden of proof requires a less stringent showing of a "reasonable possibility of a successful reorganization within a reasonable time". *Timbers*, 484 U.S. at 376, 108 S.Ct. at 633. Because the Crowne Plaza is the single asset of the Partnership, it clearly is necessary for any reorganization plans. But this conclusion standing alone is not enough to warrant denying relief from the stay. The Partnership must also present sufficient evidence to demonstrate that a successful reorganization within a

**100.** *See, e.g., New Era Co.,* 125 B.R. at 730 (*Timbers* standard not satisfied when debtor did not present any documentary to support its "unrealistic hypotheticals"); *Triton/Richmond Assocs.,* 103 B.R. at 767 (debtor's contemplated proposals were more than "mere financial pipe dreams" therefore relief from stay not warranted); *L & M Properties,* 102 B.R. at 484 (*Timbers* standard not satisfied where debtor presented no evidence of any attempts to find a buyer for the business or obtain new capital and no credible financial forecasts were presented); *Grand Sports,* 86 B.R. at 975 ("[D]ebtor must do more than evince high hopes.... [S]incerity, honesty, willingness, and visionary promises will not support a conclusion that there is a reasonable possibility of a successful reorganization.").

**101.** *See, e.g., Canal Place,* 921 F.2d at 571, 577 (granting relief from stay within exclusivity period where evidence indicated that debtor's implicit objective was to delay foreclosure until the office and retail market improved and any possible plan would only benefit insiders); *Sutton v. Bank One, Texas (Matter of Sutton),* 904 F.2d 327, 330–31 (5th Cir.1990) (granting relief from stay where debtor had no net income, there is an arrearage on tax payments, and a property to be sold had been on market for three years); *In re Lumber Exch. Ltd. Partnership,* 125 B.R. 1000, 1001, 1009 (Bankr.D.Minn. 1991) (granting relief from stay where hearing held one month after bankruptcy filing because debtor did not present evidence that it was will-ing or able to propose a meaningful plan); *In re PMS Assocs. No. 2,* 104 B.R. 86, 87–89 (Bankr. S.D.Ind.1989) (granting relief from stay where exclusivity period had expired and debtor's cash flow projections and proposed additional financing did not support reorganization); *In re Diplomat Elecs. Corp.,* 82 B.R. 688, 692–93 (Bankr.S.D.N.Y.1988) (granting relief from stay within exclusivity period where debtor failed to present evidence that net operating losses could be preserved, no potential investors existed, and the debtor was not operating and had no income stream).

**102.** Both parties rely to some extent on factors used by Judge Sellers to determine if there is a reasonable possibility of a successful reorganization within a reasonable time under § 362(d)(2)(B). *See Ashgrove Apartments,* 121 B.R. at 756–57. In *Ashgrove Apartments,* Judge Sellers also acknowledged that each case under § 362(d)(2)(B) is different and must be viewed on its own facts. *Id.* While this court agrees with Judge Sellers' decision and many of the factors in *Ashgrove Apartments,* these factors should not be interpreted as rigid rules to be considered in every relief from stay hearing. Therefore, the court has considered the factors but will not necessarily rely on *Ashgrove Apartments* to decide the issues presented under § 362(d)(2)(B).

reasonable time is "plausible". Specifically, the evidence must demonstrate it is superficially worthy of belief that the Partnership can formulate a plan which by preponderance may be confirmable.[103]

Two principal types of evidence were presented at the hearing regarding whether an effective reorganization is in prospect. First, both Sumitomo and the Debtors presented evidence regarding the financial projections for the Crowne Plaza. Second, the Debtors presented extensive evidence regarding the improvement in their management since the death of Krok.

The financial projections presented at trial include the Crowne Plaza Projected Operating Results for the Twelve Periods Ended July 2, 1992 prepared by Elliston ("Elliston Projections") (Crowne Plaza Exhibit 1), the Oetzel, Hanton & Williams, Inc. Appraisal of the Crowne Plaza dated September 20, 1991 ("Oetzel Appraisal") (Sumitomo Exhibit 8), and the Gloodt Associates, Inc. Valuation of the Crowne Plaza date August 1, 1991 ("Gloodt Valuation") (Crowne Plaza Exhibit 4).

The Elliston Projections were prepared by the Debtors in July 1991 at the request of creditors and cover the period from July 19, 1991 until July 2, 1992. The projections address anticipated revenues and expenses for the Partnership operating both as a chapter 11 debtor and outside a bankruptcy case. These projections indicate that the Partnership would have $564,317 available for debt service at the conclusion of the period ending July 2, 1992. There were several financial documents admitted indicating that the Partnership's previous financial projections were not met. (See Sumitomo Exhibits 1–7.)

The Oetzel Appraisal and the Gloodt Valuation provide, among other items, long term financial projections for the Crowne Plaza. The Oetzel Appraisal was prepared for Sumitomo. In establishing the going concern value of the Crowne Plaza, the Oetzel Appraisal performed a six year cash flow analysis of the property. According to this analysis, the Crowne Plaza's projected net operating income should range from $1,372,240 in the first year to $1,906,140 in the sixth year. (See Sumitomo Exhibit 8, at 82.) The Gloodt Valuation, in establishing the going concern value of the Crowne Plaza, performed an eleven year cash flow analysis of the Crowne Plaza. Over the same six years covered by the Oetzel Appraisal, according to the Gloodt Valuation, the Crowne Plaza's projected net operating income should range from $1,378,000 in the first year to $1,976,000 in the sixth year. (See Crowne Plaza Exhibit 4, at 8.)

Because of the short term nature and the circumstances surrounding the production of the Elliston Projections, that evidence is given very little weight. The most credible and compelling evidence regarding financial projections are the Oetzel Appraisal and Gloodt Valuation—both were prepared by apparently unbiased third parties who are experts in their fields. Each indicates that the Crowne Plaza is capable of producing substantial cashflows during the next six years. This evidence, coupled with the various improvements made by the Debtors' current management team, demonstrates that a successful reorganization within a reasonable time is plausible.[104] At

---

**103.** Because the relief from stay hearing was not completed until February 12, 1992, Sumitomo argues that in reality the Partnership had sufficient time to consider its reorganization plan. Therefore, the Partnership should present concrete evidence regarding any contemplated plan. In essence, Sumitomo argues that the moving burden of proof requires a more stringent showing by the Partnership regardless of the fact that the request for relief was filed one week after the bankruptcy filing. This is based on the length of time necessary to complete the relief from stay hearing. The court disagrees with this contention because the Partnership was utilizing most, if not all, of its resources to defend the relief from stay hearing. This court will not require the Partnership to satisfy a more stringent burden of proof than is mandated by the facts.

**104.** The court takes judicial notice that the Partnership filed a plan of reorganization with the court on February 26, 1992. FED.R.EVID. 201. Sumitomo's arguments regarding sale of the property and possible equity injection are more appropriately considered at the confirmation hearing for the Partnership's proposed plan. Under the facts of this case, the court will not consider such issues at relief from stay.

the current stage in this bankruptcy proceeding, the Partnership has met its burden of proof under § 362(d)(2)(B). Therefore, even though there is no equity in the Crowne Plaza, the court denies Sumitomo's motion for relief from stay. The property is *now* necessary for an effective reorganization.

### C. *Adequate Protection of Sumitomo's Property Interest.*

Sumitomo is entitled to adequate protection of its property interest in the Partnership's tangible hotel property.[105] 11 U.S.C. §§ 363(e) & 361. The court grants adequate protection to Sumitomo as follows:

1. The Partnership shall pay Sumitomo monthly payments in the amount of $20,-000. These payments shall commence effective retroactively for the month of January, 1992. The payment for each month shall be paid on or before the 15th day of the following month. The retroactive payments for the months of January–April, 1992, shall be paid on or before May 15, 1992. After applying such payments to compensate Sumitomo for diminution of the property value, if any, these payments shall be credited to the principal balance of Sumitomo's allowed secured claim in the Partnership's chapter 11 case.[106] 11 U.S.C. § 506(a); *Timbers*, 484 U.S. at 372–73, 108 S.Ct. at 630–31; *John Fabick Tractor Co. v. Maun (In re Maun)*, 95 B.R. 94, 96 (Bankr.S.D.Ill.1989); *Matter of Kain*, 86 B.R. 506, 515 (Bankr.W.D.Mich.1988).

2. The Partnership shall establish a separate account with the funds deposited therein to be exclusively utilized to refurbish the hotel property's operating assets as may be necessitated by wear and tear and depreciation (the "Refurbishment Account").[107] The Partnership shall deposit three percent (3%) of gross monthly revenues generated from the operations of the hotel facility into the Refurbishment Account effective retroactively as of January 1, 1992. The payment for each month shall be paid on or before the 15th day of the following month. The retroactive payments for the months of January–April, 1992, shall be paid on or before May 15, 1992. If the Partnership intends to withdraw funds from the Refurbishment Account, it must disclose the purposes for such withdrawal to Sumitomo, in writing, at least ten (10) days prior to the time of withdrawal. Sumitomo may object to any intended withdrawal by filing a written objection with this court and serving a copy of the objection upon the Partnership and its attorney of record. To the extent possible and as may be required, the court may schedule a hearing on any objection with reduced notice to Sumitomo and other parties in interest. 11 U.S.C. § 363(c)(3). Absent a timely objection by Sumitomo, the Partnership shall be entitled to withdraw funds and use them for the stated purpose.

3. The Partnership shall procure and maintain adequate fire and casualty insurance on its real and personal property tangible assets. On the policy of insurance, or an endorsement thereof, Sumitomo, as mortgagee/secured party, shall be designated as a loss payee and additional insured. Unless subsequently modified by a court order, or stipulated to the contrary by the Partnership and Sumitomo, the policy coverage limits shall not be less than $10,400,000, i.e., the liquidation value per the Oetzel Appraisal. Sumitomo shall be provided with evidence of insurance not later than ten (10) days from the date of this opinion.

---

**105.** Many of these adequate protection provisions have been structured and imposed pursuant to the Debtors' written Joint Offer of Adequate Protection and Sumitomo's written Response to Joint Adequate Protection Offer. This opinion does not address issues regarding use of cash collateral which are subject of a stipulated court order that has been periodically extended by the court after notice and opportunity to be heard.

**106.** Given the other adequate protection provisions, including the Refurbishment Account, the court believes it to be unlikely that there will be a postpetition diminution of Sumitomo's prepetition collateral.

**107.** In the Management Agreement, this account is called the "Capital Improvements and Furniture, Fixtures and Equipment Reserve Fund". (*See* Sumitomo Exhibit 40, art. VIII.)

4. The Partnership shall establish another separate account with the funds to be deposited therein to be utilized to pay postpetition real and personal property taxes (the "Property Tax Account"). On a monthly basis, the Partnership shall pay into the Property Tax Account an amount equal to one-twelfth of the yearly assessment for the real and personal property taxes to be assessed against the hotel facility. The first payment shall be retroactively deposited for the month of November, 1991. The retroactive deposits for the months of November, 1991, to April, 1992, shall be deposited on or before June 1, 1992. For the months of May, 1992, and thereafter, the deposits shall be made on or before the 15th day of the following month. The funds in the Property Tax Account may only be used to pay postpetition property taxes pursuant to court order or pursuant to confirmation of the Partnership's chapter 11 plan. Even assuming conversion of the Partnership's case to a chapter 7 case, these funds will remain "earmarked" for payment of taxes or for possible release to Sumitomo if and when the property may be abandoned. This provision is intended to protect Sumitomo against a possible priming of its lien position as discussed in § VI(B)(1)(c)(iii) herein.

5. The Partnership shall grant Sumitomo a replacement lien on its postpetition property which is coextensive with Sumitomo's prepetition mortgage and security interest in the hotel property. This replacement lien is granted to protect Sumitomo from any possible diminution in value of its property lien interest for the period commencing on the Partnership's bankruptcy filing date.

6. The Partnership, or Holly's, as the case may be, shall provide periodic written financial information to Sumitomo as follows:

(a) copies of income deposit slips on a daily basis;

(b) copies of the hotel property's socalled "green sheet" and so-called "blue sheet" on a weekly basis;

(c) copies of all reports required to be filed with the United States Trustee in the Partnership's chapter 11 case;

(d) copies of all reports required to be filed with the United States Trustee in Holly's chapter 11 case; and

(e) copies of the so-called Summary 90 profit and loss statements respecting the Partnership for each accounting period.

7. Sumitomo may, at its own expense, employ an observer or auditor (the "Monitor") who shall be given reasonable access to the books, records and financial information of the Partnership, whether such records are in the possession of the Partnership or Holly's. The Monitor may visit and examine the hotel property upon reasonable notice to the Partnership.

## VII. CONCLUSION

The Management Agreement is an executory contract containing, *inter alia,* two promises intended to subordinate the management fee earned by Holly's to Sumitomo if the Partnership defaults on the Loan Documents. The Partnership's negative promise is *not* a subordination and is *not now enforceable* in its bankruptcy case. Holly's affirmative promise is a subordination which is *unenforceable* in bankruptcy against Holly's *postpetition* earnings. However, Holly's affirmative promise is generally *enforceable* against Holly's *prepetition* earnings unless it is determined in a subsequent adversary proceeding that a federal purpose requires a different result.

Both the Partnership's negative promise and Holly's affirmative promise are legally separate and severable provisions from the rest of the Management Agreement. Both promises are nonexecutory and are not assumable or rejectable by the Debtors. This court will not, at this time, require the Debtors to seek to assume or reject the Management Agreement at a date certain prior to plan confirmation.

Because of this court's analysis of the Management Agreement issues, Sumitomo's requested injunctive relief prohibiting and enjoining the Partnership from paying,

and Holly's from accepting, a management fee is denied without prejudice. However, because the Management Agreement has not been assumed and no determination has yet been made regarding Holly's possible chapter 11 administrative expense claim or whether Holly's is entitled to a quasi-contract or quantum meruit recovery, the Partnership's obligation to Holly's, if any, will accrue and Holly's entitlement to payment, if any, will be delayed.

"Cause" does not exist pursuant to § 362(d)(1) to warrant modification of the automatic stay with respect to the Crowne Plaza for mismanagement or fraud. Failure to provide for postpetition real and personal property taxes may constitute "cause" to warrant modification of the stay under § 362(d)(1). Therefore, the Partnership must pay into an escrow account funds sufficient to account for postpetition real and personal property taxes in accordance with this opinion. Additionally, even though there is no equity in the Partnership's hotel property, relief from stay is denied under § 362(d)(2) because the property is now necessary for an effective reorganization. Because relief from the stay is denied, Sumitomo is entitled to adequate protection of its interest in the real and tangible personal property of the hotel facility in accordance with this opinion.

An order shall be entered accordingly.